## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

_____ x
                                                :

DALIAN HUALING WOOD CO., LTD.,        :

                            Plaintiff,       :

                                               :

      v.                                      :

                                             :

UNITED STATES,                        :        Court No. 22-00334

                                             :

                            Defendant,     :

                                             :

      and                                       :

                                             :

AMERICAN KITCHEN CABINET ALLIANCE,  :

                                             :

                       Defendant-Intervenor.:

                                             :

_____ x

## PLAINTIFF'S MOTION FOR JUDGMENT
## ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Pursuant to Rule 56.2 of the Rules of this Court, by Plaintiff Dalian Hualing Wood Co., Ltd. respectfully moves for judgment on the agency record. Plaintiff challenges certain aspects of the U.S. Department of Commerce's ("Commerce") final results in the antidumping duty administrative review published as published as *Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China: Final Results and Partial Rescission of the Antidumping Duty Administrative Review; 2019-2021*, 87 Fed. Reg. 67,674 (Nov. 9, 2022) ("*Final Results*").

Plaintiffs request that the Court remand this matter to Commerce with instructions to

assign the separate antidumping rate. The legal arguments in support of this motion are detailed in the attached Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Agency Record.

Respectfully submitted,

 _/s/ Michael S. Holton_____
Michael S. Holton
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiff*
*Dalian Hualing Wood Co., Ltd.*

Dated: June 22, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |  |
|---|---|---|
| ———————————————————x | : | |
| DALIAN HUALING WOOD CO., LTD., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | Court No. 22-00334 |
| | : | |
| Defendant, | : | **PUBLIC VERSION** |
| | : | |
| and | : | |
| | : | |
| AMERICAN KITCHEN CABINET ALLIANCE, | : | |
| | : | |
| Defendant-Intervenor. | : | |
| | : | |
| ———————————————————x | | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO USCIT RULE 56.2

Michael S. Holton
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Plaintiff*
*Dalian Hualing Wood Co., Ltd.*

Dated: June 22, 2023

## <u>TABLE OF CONTENTS</u>

**STATEMENT PURSUANT TO USCIT RULE 56.2**..................................................... 1

    A.   Administrative Determination Subject to Appeal............................................. 1

    B.   Issues of Law Presented and Summary of the Argument ................................. 1

    C.   Reasons for Contesting the Administrative Determination ............................. 2

**STANDARD OF REVIEW** ........................................................................................... 2

**STATEMENT OF FACTS** ............................................................................................ 3

    A.   CVD AR1................................................................................................... 4

    B.   NSR........................................................................................................... 5

    C.   ADD AR1 .................................................................................................. 8

**ARGUMENT** ................................................................................................................ 12

    I.   COMMERCE UNLAWFULLY MADE A NON-BONA FIDE DETERMINATION COVERING THE SAME SALE THAT IT REVIEWED AND CALCULATED A CVD RATE IN THE PARALLEL CVD AR1 ........................................................................................... 12

    II.   COMMERCE'S "WELL-ESTABLISHED PRACTICE" DOES NOT CONDUCT A BONA FIDE SALES ANALYSIS FOR SEPARATE RATE APPLICANTS WHEN IT LIMITS EXAMINATION ........................ 13

        A.   The Statute Limits the Bona Fide Analysis to Sales Used In the Weighted-Average Calculation ................................................................................................. 16

        B.   Commerce Limited Examination Due to Resource Constraints ................................... 18

        C.   No Precedent Exists to Single Out a Single Separate Rate Applicant.......................... 22

        D.   Commerce's Intent to Examine Hualing's Sale Does Not Justify Departing from Its Practice................................................................................................. 23

    III.   COMMERCE'S BONA FIDE ANALYSIS IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE....... 24

        A.   Hualing's Sale Prices ................................................................................. 26

            1.   CBP Data AUV versus Ranged CBP Data ............................................. 29

            2.   Separate Rate Applicant and Mandatory Respondent Comparisons ....................... 32

            3.   Hualing Domestic Sales .................................................................... 34

            4.   Other Objective Record Information ...................................................... 34

B.   Whether Hualing's Sale Was Made In Commercial Quantities ................................... 36

C.   Timing of the Sale ........................................................................................................ 39

D.   Expenses Arising from the Transaction ....................................................................... 40

E.   Whether the Goods Were Resold at a Profit ................................................................ 42

F.   Whether the Transaction was Made on an Arm's-Length Basis .................................. 44

G.   Other Relevant Factors ................................................................................................ 45

**CONCLUSION** ............................................................................................................................ **46**

## TABLE OF AUTHORITIES

**Cases**

*AK Steel Corp. v. United States*, 21 CIT 1265 (1997) ................................................... 41

*Calgon Carbon Corp. v. United States*, 145 F.Supp.3d 1312 (CIT 2016)................................... 14

*Consolidated Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)............................... 24

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ............................................. 2-3

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)............................................. 3

*Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F.Supp.3d 1364 (CIT 2017) ......... 17

*Federal–Mogul Corp v. United States*, 17 CIT 88 (1993)............................................................. 41

*Hebei New Donghua Amino Acid Co. v. United States*, 209 CIT 603 (2005) .............................. 31

*Hoogovens Staal BV v. United States*, 4 F.Supp.2d 1213 (CIT 1998)......................................... 41

*Home Meridian Int'l, Inc. v. United States*, 36 CIT 1279 (2012)................................................. 37

*Huzhou Muyun Wood Co. v. United States*, 324 F.Supp.3d 1364 (CIT 2018) ............................ 37

*Hyundai Elecs. Indus. Co. v. United States*, 899 F.2d 1204 (Fed. Cir. 1990) ................................ 3

*Inner Mongolia Jianlong Biochem. Co. v. United States*, 337 F.Supp.3d 1329 (CIT 2018).. 18, 40

*Jinxiang Chengda Imp. & Exp. Co. v. United States*, 317 CIT 418 (CIT 2013) .............. 30, 31, 32

*Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .................... 3

*Novolipetsk Steel Pub. Joint Stock Co. v. United States*, 483 F.Supp.3d 1281 (CIT 2020) ... 17, 18

*PQ Corp v. United States*, 11 CIT 53 (1987)............................................................................... 41

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) ................. 3, 16, 22, 24

*Shanghai Sunbeauty Trading Co. v. United States*, Slip Op. 18-111 (CIT Sept. 6, 2018)
............................................................................................................................. 30, 31, 32

*Tiancheng Pharm. Co v. United States*, 29 CIT 256 (2005) ........................................................ 40

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................... 3

*WelCom Prods., Inc. v. NLRB*, 865 F.Supp.2d 1340 (CIT 2012) .................................................... 3

**Statutes**

5 U.S.C. § 706 .......................................................................................................................3

19 U.S.C. § 1516a .................................................................................................................2

19 U.S.C. § 1675 ......................................................................................................... passim

19 U.S.C. § 1677a ...............................................................................................................41

19 U.S.C. § 1677f-1 ..............................................................................................................8

19 U.S.C. § 1677m................................................................................................................9

**Regulations**

19 C.F.R. § 351.204 ..................................................................................................... 8, 9, 14

**Administrative Decisions & Publications**

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 86 Fed. Reg. 17,137 (Apr. 1, 2021) .................................... 4

*Initiation of ADD/CVD Administrative Reviews*, 86 Fed. Reg. 31,282 (June 11, 2021) ............... 4

*Carbon and Alloy Steel Cut-To-Length Plate from the People's Republic of China*,
    86 Fed. Reg. 6865 (Jan. 25, 2021) (final rescission) ................................................. 14, 40, 41

*Carbon and Alloy Steel Cut-To-Length Plate from the People's Republic of China*,
    85 Fed. Reg. 18,915 (Apr. 3, 2020) (preliminary rescission) .................................................. 14

*Cut-To-Length Plate from Romania*, 63 Fed. Reg. 47,232 (Sept. 4, 1998) (rescission).............. 40

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 81 Fed. Reg. 39,905 (June 20, 2016) (final results) .................. 15

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 80 Fed. Reg. 80,746 (Dec. 28, 2015) (preliminary results)
    .......................................................................................................................... 15, 21, 24

*Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Russia*, 84 Fed. Reg. 39,948
    (Aug. 8, 2019) (final results) ........................................................................................ 17

*New Pneumatic Off-the-Road Tires from the People's Republic of China*, 80 Fed. Reg. 20,197
    (Apr. 15, 2015) (final results) ................................................................................ 15, 21, 24

*Passenger Vehicle and Light Truck Tires from the People's Republic of China*,
86 Fed. Reg. 13,966 (Mar. 11, 2022) (final results) ................................................ 14

*Passenger Vehicle and Light Truck Tires from the People's Republic of China*,
86 Fed. Reg. 50,029 (Sept. 7, 2021) (preliminary results) ....................................... 14

*Polyethylene Terephthalate Film, Sheet, and Strip from India*, 76 Fed. Reg. 30,908
(May 27, 2011) (final results) ................................................................................. 41

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
87 Fed. Reg. 67,674 (Nov. 9, 2022) (final ADD results) .................................. passim

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
87 Fed. Reg. 51,967 (Aug. 24, 2022) (final CVD results) ....................................... 5

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
87 Fed. Reg. 27,099 (May 6, 2022) (preliminary CVD results) ........................... 4, 5

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
87 Fed. Reg. 27,090 (May 6, 2022) (preliminary ADD results) ...................... passim

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
86 Fed. Reg. 62,788 (Nov. 12, 2021) (final new shipper review rescission) ...................... 4, 8

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
86 Fed. Reg. 46,178 (Aug. 18, 2021) (preliminary new shipper review rescission) ............. 4, 8

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
85 Fed. Reg. 77,102 (Dec. 1, 2020) (new shipper review initiation) ......................... 4

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
85 Fed. Reg. 22,126 (Apr. 21, 2020) (ADD order) ......................................... 41, 42

## Micellaneous Authorities

Merriam-Webster .............................................................................................. 23

This Memorandum is filed by Plaintiff Dalian Hualing Wood Co., Ltd.("Hualing").

## STATEMENT PURSUANT TO USCIT RULE 56.2

### A.    Administrative Determination Subject to Appeal

Hualing seeks judicial review of the U.S. Department of Commerce's ("Commerce" or the "Department") final results in the first administrative review ("AR1") of the antidumping duty ("ADD") order on Wooden Cabinet and Vanities and Components thereof ("WCV") from the People's Republic of China ("China"), covering the period of review ("POR") October 9, 2019, to March 31, 2021 published as *WCV from China*, 87 Fed. Reg. 67,674 (Nov. 9, 2022), PR307 ("*Final Results*"), Issues and Decision Memorandum, PR305 ("IDM").

### B.    Issues of Law Presented and Summary of the Argument

Commerce unlawfully made a non-*bona fide* determination when Commerce treated the same sale as *bona fide* by calculating a countervailing duty ("CVD") rate in the parallel CVD AR1. When conducting a *bona fides* analysis, Commerce relies on the statute covering the *Antidumping* or *Countervailing* Duties for New Exporters and Producers. Per statute, when calculating a "dumping margin *or* individual {CVD} rate," Commerce will conduct a *bona fides* analysis. Statutorily, the same sale cannot be *bona fide* in one proceeding and not the other-- statutory criteria apply to both ADD and CVD proceedings.

Commerce's *bona fide* sale analysis was unlawful. As a "*separate rate applicant*" in AR1 it's the Department's "well-established practice" when limiting its examination of respondents to <u>not</u> require a *bona fide sale;* rather the applicant is only required to establish that there was a suspended entry during the POR. Commerce's basis for not conducting a *bona fide* analysis of separate rate applicants are (1) the sale at issue is not the basis for any "weighted-average dumping margin," and (2) Department practice does not perform a resource-intensive and

1

complex *bona fides* analysis on sales made by separate rate applicants, when, due to resource constraints, it limits individual examination. In AR1, both factors applied and Commerce failed to provide a reasoned basis for departing from its "well-established practice" to conduct—and single-out Hualing as the only separate applicant for—a *bona fide* analysis.

Commerce's *bona fide* analysis was unsupported by substantial evidence. Commerce considers the totality-of-the-circumstances when determining whether "a sale is 'unrepresentative or extremely distortive' and, therefore, not reviewable due to its non-*bona fide* status." In relying on this totality, Commerce considers price, commercial quantity, timing, expenses, profit, and arm's-length nature, and other factors. As to price, the record shows wide ranging prices depending on material and type of merchandise produced. Moreover, direct evidence shows that Hualing's ADA prices were lower than other ADA prices on the record and that the prices were consistent with the importer's business practices. As to the other factors Commerce conceded that the record did not show the commercial quantity, timing, expenses, profit, and arm's-length nature supported a non-*bona fide* finding. With Commerce finding Hualing's sale was not "commercially unreasonable," the determination of non-*bona fide* is unsupported by substantial evidence.

### C.     Reasons for Contesting the Administrative Determination

Hualing's reasons for contesting AR1 are set out below.

### STANDARD OF REVIEW

This Court must hold unlawful any aspect of Commerce's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v.*

*NLRB*, 305 U.S. 197, 217 (1938). The substantial evidence standard requires more than mere

assertion of "evidence which in and of itself justified {the determination}, without taking into

account contradictory evidence or evidence from which conflicting inferences could be drawn."

*Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997). Rather "the

substantiality of evidence must take into account whatever in the record fairly detracts from its

weight." *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

Reviewing courts must "hold unlawful and set aside agency action, findings, and

conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). The "touchstone" of this standard is "rationality";

agency actions are unlawful if there has been "a clear error in judgment." *Hyundai Elecs. Indus.

Co. v. United States*, 899 F.2d 1204, 1209 (Fed. Cir. 1990). "An abuse of discretion occurs where

the decision is based on an erroneous interpretation of the law, on factual findings that are not

supported by substantial evidence, or represent an unreasonable judgment in weighing relevant

factors." *WelCom Prods., Inc. v. United States*, 865 F.Supp.2d 1340, 1344 (CIT 2012).

Commerce must "cogently explain why it has exercised its discretion in a given manner."

*Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). "Despite

Commerce's statutory discretion, . . . if Commerce had a routine practice for addressing like

situations, it must either apply that practice or provide a reasonable explanation as to why it

departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir.

2004).

## STATEMENT OF FACTS

Hualing challenges Commerce's determinations that culminated in the *Final Results*. In

April 2021, Commerce provided interested parties with the opportunity to request administrative

reviews of the ADD and CVD orders on WCV from China, covering the PORs of October 1,

2019, through March 31, 2021, and August 12, 2019, through December 31, 2020, respectively.

*ADD/CVD Order, Finding, or Suspended Investigation*, 86 Fed. Reg. 17,137, 17,138 (Apr. 1,

2021), PR1.

In April 2021, Hualing requested a review for both the ADD and CVD orders on WCV

from China. Letter from GDLSK to Commerce (Apr. 30, 2021), PR18 ("Review Request");

*WCV from China*, 87 Fed. Reg. 27,099 (May 6, 2022) ("*CVD Preliminary Results*"), Preliminary

Decision Memorandum ("CVD PDM") at 2. In June 2021, Commerce initiated AR1 of the

ADD/CVD orders on WCV from China for exporters including Hualing. *Initiation of ADD/CVD

Administrative Reviews*, 86 Fed. Reg. 31,282, 31,292, 31,296 (June 11, 2021) ("*AR1 Initiation*").

In addition to requesting ADD/CVD administrate reviews, Hualing in October 2020

requested a New Shipper Review ("NSR"), which Commerce initiated in December 2020. *WCV

from China*, 85 Fed. Reg. 77,102 (Dec. 1, 2020). In August 2021, Commerce published its

preliminary intent to rescind the NSR, which was ultimately rescinded in November 2021. *WCV

from China*, 86 Fed. Reg. 46,178 (Aug. 18, 2021) ("*NSR Preliminary Rescission*"), PDM ("NSR

PDM"); *WCV from China*, 86 Fed. Reg. 62,788 (Nov. 12, 2021) "(*NSR Final Rescission*"), IDM

("NSR IDM"). This NSR, as well as CVD AR1, are applicable to Hualing's challenge that

cumulated in the *Final Results*, are detailed below before ADD AR1.

### A.    CVD AR1

Hualing was, in September 2021, selected as a mandatory respondent in the parallel AR1

CVD order with the POR spanning August 12, 2019 to December 31, 2020. CVD PDM at 2.

Hualing and its importer fully participated and timely filed all responses to Commerce's

questionnaires. *Id.* at 3. In May 2022, Commerce published the preliminary results—

preliminarily calculating CVD rates for Hualing of 22.29% for 2019 and 16.91% for 2020. *CVD Preliminary Results*, 87 Fed. Reg. at 27,100; *see* Hualing Administrative Case Brief, (July 1, 2022), CR138, PR281 ("Case Brief") at 32 n.92. In June 2022, Hualing submitted its CVD case and rebuttal briefs. *WCV from China*, 87 Fed. Reg. 51,967, (Aug. 24, 2022) ("*CVD Final Results*"), IDM ("CVD IDM"), at 2.

In August 2022, Commerce concluded CVD AR1, assigning Hualing individual rates of 8.44% for 2019 and 2.78% for 2020, *CVD Final Results*, 87 Fed. Reg. at 51,967. The 2020 AR1 CVD rate of 2.78% calculated for Hualing covered the same single sale that Commerce determined was not *bona fide* in AR1 that is being challenged. *See* Case Brief at 32 n.92 (Commerce reviewing Hualing's single sale); CVD IDM at 15 ("Hualing reported that it sold to one customer . . . '{d}uring the 2020 POR").

### B.   NSR

Hualing throughout the NSR provided complete and timely responses to Commerce's questionnaires. NSR IDM at 1-2. In response to Commerce's NSR questionnaire that was placed on the AR1 record, Hualing provided certain facts and background relevant to the challenged AR1 determination. During the NSR, Hualing explained that one of its owners went to the United States on several occasions to seek business opportunities in the U.S. market. Hualing Voluntary Response (Sept. 1, 2021), CR67-71, PR 147 ("Vol. Resp."): Attachment I: Hualing Section A Questionnaire Response (Jan. 4, 2021) ("AQR"), at 15-16. In June 2019, Hualing's owner went to the United States again where he met up with the importer who he had met previously in 2016 at Surfaces Exhibition in Las Vegas. *Id*. at 15. Hualing and the importer discussed whether there was a market to import specialty kitchen cabinets into the United States. *Id*. As a consequence of this meeting, Hualing invited the importer to visit its China factory. *Id*.

In August 2019, the importer had planned a trip to South Korea, and at the invitation of Hualing, the importer also visited Hualing's factory–where they discussed a potential business relationship for custom-made cabinets. *Id*.

Around the beginning of June 2020—in the midst of COVID—the importer received a purchase inquiry from a customer inquiring about the availability of custom cabinets, namely Americans with Disabilities Act ("ADA") compliant cabinets. *Id*. at 15-16. As a result of its customer's inquiry, the importer contacted three domestic cabinet suppliers, and later contacted Hualing, asking whether it could produce ADA compliant kitchen cabinets. *Id*. at 16, 23-24. Two of the three domestic suppliers indicated that they were unable to supply the requested cabinets in the time necessary due to the pandemic. Hualing Voluntary Supplemental Response (Dec. 30, 2021), CR118-22, PR211 ("Vol. Supp. Resp."): Attachment II: Hualing's Supplemental Sections A, C, and D Questionnaire Response (Feb. 24, 2021), at 3. The importer did receive one quote from one domestic supplier in June 2020; however, due to the high prices, the importer reached out to Hualing. *Id*. at 3, Exhibit S-3. Through email between Hualing and the importer, both companies agreed to the details about the requirements of the specific products, prices, and payment terms for the initial sale. AQR at 7, 16, 24, Exhibit IMP-1.

The importer further reported that Hualing's sale price was somewhat higher than prices the importer had paid for standard cabinets, *i.e.*, non-compliant ADA. AQR at 25. This reporting responded to Commerce's request that the importer explain whether there were any price differences between the purchases of the subject merchandise and other purchases of similar WCV. *Id*. The importer reported that the prices were reasonable based on the unique issue

PUBLIC VERSION

associated with COVID,[1] with many U.S. factories either not open or not at full capacity at the time, along with the ADA requirement, and compared with other domestic prices. *Id*. at 25-26.

Despite Hualing's full cooperation, Commerce, in August 2021—on account of other record information—preliminarily rescinded Hualing's NSR, finding that certain wooden "drawer" boards shipped by Hualing during the period of investigation ("POI"), were classified as "'*drawer* components (which typically include *sides*, backs, bottoms, and faces)." NSR IDM Comment 1. As discussed in Hualing's responses and the NSR IDM, Hualing protested that the "drawer boards" were not subject merchandise based on the fact the boards were [

                                            ]—*i.e.*, not drawer sides—and the declaration from its customer that the boards were not used to produce subject cabinets. Vol. Supp. Resp. Attachment I: Hualing's Supplemental Questionnaire Response (Feb. 3, 2021) ("SQR"); NSR IDM Comment 1.

Nonetheless, Commerce preliminarily found that Hualing did "not meet the minimum requirements under 19 CFR 351.214(b)(2)(i) for a NSR." NSR PDM at 4. Consequently, Commerce stated that that it did:

> . . . not conduct{} a detailed *bona fide* analysis for these preliminary results because we preliminarily determine that Hualing is not eligible for an {sic} NSR given its exports of subject merchandise to the United States during the POI. Instead, we intend to examine the bona fide nature of Hualing's sale in the context of the administrative review.

NSR IDM at 4-5.

Commerce preliminarily declined to conduct a *bona fide* analysis because Hualing's shipments during the POI of wooden boards constituted WCV, and, therefore, Hualing did not

---

[1]      China shutdown in the early days of COVID in 2020, but reopened when the United States subsequently started shutting down. Later in 2020 and 2021, these roles again reversed.

PUBLIC VERSION

qualify for the NSR. *NSR Preliminary Rescission*, 86 Fed. Reg. at 46,178 n.5. In other words,

Commerce fully acknowledged that because Hualing did not meet the minimum eligible

requirements for a NSR, it would be improper to conduct a *bona fide* analysis. Commerce in

November 2021 finalized the NSR rescission on this basis. *NSR Final Rescission*, 86 Fed. Reg.

62,788; NSR IDM at 8.

      **C.    ADD AR1**

Hualing in April 2021 timely filed a request for AR1 of the ADD order on WCV from

China. Review Request. Hualing requested based on various supplemental questionnaires issued

by Commerce in the NSR indicating its potential ineligibility as a new shipper, which ultimately

resulted in the rescission of the NSR. *See* NSR PDM at 1-2, 4-5. Commerce in June 2021 placed

data from U.S. Customs and Border Protection ("CBP") on the record for purposes of respondent

selection. Commerce Memorandum to File (June 24, 2021), CR2, PR36. Hualing in July 2021

timely filed its Separate Rate Application (July 16, 2021), CR50-53, PR105 ("SRA").

In August 2021, Commerce selected two mandatory respondents in AR1: Ancientree

Cabinet ("Ancientree"); and Linyi Kaipu Furniture ("Kaipu"). Commerce Respondent Selection

Memorandum (Aug. 6, 2021), CR66, PR130 ("1RSM"). Commerce limited its "examination of

respondents in this review to a reasonable number of exporters or producers" pursuant to 19

U.S.C. § 1677f-1(c)(2) and 19 C.F.R. § 351.204(c)(2). *Id*. at 2-4. Commerce then issued the

questionnaire to Ancientree and memorialized its intent to rescind with respect to Kaipu, which

had withdrawn its review request. Letter from Commerce to Ancientree (Aug. 11, 2021), PR133;

Commerce Memorandum (Aug. 27, 2021), PR132. After Ancientree and Defendant-Intervenor

American Kitchen Cabinet Alliance ("Petitioner") subsequently withdrew their review requests

for Ancientree, Commerce, later in August 2021, likewise memorialized its intent to rescind with

respect to Ancientree. Commerce Memorandum (Aug. 27, 2021), PR143. At that stage in AR1,

there were no mandatory respondents under review and no deadlines for responses.

On September 1, 2021, following Commerce's *Preliminary NSR Rescission* indicating

that Hualing was ineligible as a new shipper, Hualing requested that it be treated as a voluntary

respondent in AR1 and submitted its NSR AQR. Vol. Resp. Attachment I. This request asked

that Commerce calculate an individual ADD margin for Hualing pursuant to 19 U.S.C.

§ 1677m(a) and 19 C.F.R. § 351.204(d). *Id.* at 1.

Per the deadlines for the original questionnaire sent to Ancientree, Hualing, in

September 2021, timely filed its voluntary response to Sections C and D of Commerce's ADD

Questionnaire. Hualing Voluntary Sections C and D Response, (Sept. 17, 2021), CR74-76,

PR157-58 ("CDQR"). Again, Hualing requested to be a voluntary respondent in the review. *Id.*

at 1. With AR1 rescinded for both original mandatory respondents, Commerce on September 17,

2021–weeks after Hualing's initial voluntary respondent request–selected respondents again.

Second Respondent Selection Memorandum (Sept. 17, 2021), CR73, PR156 ("2RSM").

Commerce again limited its examination of respondents to a reasonable number of exporters or

producers pursuant to 19 U.S.C. § 1677f-1(c)(2) and 19 C.F.R. § 351.204(c)(2), *id.* at 3-4, and

selected two additional mandatory respondents: Shanghai Beautystar Cabinetry ("Beautystar");

and Qufu Xinyu Furniture ("Qufu Xinyu"). *Id.* at 1, 5. Commerce made no mention of Hualing's

voluntary respondent selection request. *See id.* at 1-6.

In October 2021, after Beautystar withdrew from participation in the AR1, Commerce

replaced Beautystar by selecting Jiang Su Rongxin Cabinets Ltd. ("Rongxin"). Third Respondent

Selection Memorandum, (Oct. 20, 2021), CR88, PR177 ("3RSM"). Again, Commerce made no

mention of Hualing's voluntary respondent request in the selection memo. *See id.* at 1-4. Later in

October 2021, Rongxin provided Commerce with information establishing that it was not subject to AR1. *WCV from China*, 87 Fed. Reg. 27,090 (May 6, 2022), PR231 ("*Preliminary Results*"), PDM, PR229, at 6-8. Accordingly, Qufu Xinyu remained the only valid mandatory respondent selected by Commerce in AR1. *Id*. at 13.

Hualing, in December 2020, timely submitted the supplemental responses that it had filed in the NSR in response to Commerce's supplemental questionnaires. Vol. Supp. Resp. In this submission, Hualing again requested to be treated as a voluntary respondent in AR1 and have an individually calculated ADD margin. *Id*. at 2. In April 2022, Hualing filed comments once again requesting that Commerce select Hualing as a voluntary respondent. Hualing Pre-Preliminary Comments (Apr. 14, 2022) PR215, at 2. Yet despite Hualing's requests and timely voluntary responses, Commerce at no point prior to the *Preliminary Results* indicated whether it would consider Hualing as voluntary respondent. Moreover, Commerce never issued Hualing any questionnaires or requests for any additional information. Again, Commerce, before its *Preliminary Results*, declined to address any of the Hualing information on the record or even mention Hualing's voluntary respondent request.

The *Preliminary Results* were the first time that Commerce mentioned Hualing and its sale in AR1. Specifically, "Commerce preliminarily determine{d} that . . . {Hualing}, a separate rate applicant, did not make any *bona-fide* sales during the POR and is being preliminarily rescinded from the review." PDM at 1. Commerce further stated that "{o}n November 12, 2021, Commerce determined that Hualing did not qualify as a new shipper and rescinded the {NSR} with respect to Hualing." *Id.* at 8. Commerce preliminarily found that Hualing's sale was not *bona fide*. Commerce Memorandum: Preliminary *Bona Fides* Sale Analysis (May 2, 2022), CR127, PR257 ("PBFM"), at 1.

Hualing in July 2022 timely filed its administrative case, arguing that:

1. it is Commerce's "well-established practice" to not conduct a *bona fide* sales analysis for separate rate applicants when Commence limits examination of respondents;

2. there is no precedent supporting Commerce's decision to conduct a *bona fide* analysis for a single separate applicant;

3. Commerce's single *bona fide* analysis for a separate rate applicant was unlawful; and

4. Commerce's preliminary *bona fide* analysis is not supported by substantial evidence because: Hualing's sale values and quantities were consistent with CBP data, other separate rate respondents, the importer's other sales and purchases, and were lower priced than the domestic company; the timing of the sale was not unusual; the inclusion of ADD/CVD in expenses and profit was contrary to Department practice – especially when Hualing was the only CVD mandatory respondent based on the same exact sale in the CVD review, the sale was at arms-length, and the importer's "specialty" cabinet purchases were consistent with its other purchases.

Case Brief at 1-37.

In its *Final Results*, Commerce calculated zero ADD for the only remaining mandatory respondent Qufu Xinyu. *Final Results*, 87 Fed. Reg. at 67,675. Consequently, Commerce assigned zero ADD to separate rate respondents. *Id*. Rather than treat Hualing as separate rate respondent, Commerce finalized its preliminary finding that it properly conducted a *bona fide* analysis of Hualing and continued to find that its sale was not *bona fide.* IDM at 5-23; Commerce Memorandum: Final *Bona Fides* Sale Analysis (Nov. 2, 2022) CR142, PR306 ("FBFM"). Subsequently in 2002, Hualing appealed the *Final Results* to this Court.

## ARGUMENT

I.   **COMMERCE UNLAWFULLY MADE A NON-BONA FIDE DETERMINATION COVERING THE SAME SALE THAT IT REVIEWED AND CALCULATED A CVD RATE IN THE PARALLEL CVD AR1**

To defend its conduct of a *bona fides* analysis in AR1, Commerce explained that:

> {it} has a well-established practice of conducting *bona fides* analysis in administrative reviews and also looks to . . . {19 U.S.C. § 1675(a)(2)(B)(iv)}, which governs NSRs, for guidance in conducting this analysis in administrative reviews. In determining whether a respondent's sales are *bona fide*, we examine a number of factors, all of which speak to the commercial realities surrounding the sales of subject merchandise.

PDM at 9; PBFM at 2; *see* IDM at 10. Thus, when conducting a *bona fides* analysis in

administrative reviews, Commerce relied on the statute covering the NSRs of the "*Antidumping*

or *Countervailing* Duties for New Exporters and Producers." 19 U.S.C. § 1675(a)(2)(B)

(emphasis added).

More specifically, Commerce relied on the statutory subsection governing NSRs in

conducting its *bona fide* analysis:

> **Determinations Based on bona fide sales**
>
> Any weighted average *dumping margin* or *individual {CVD} rate* determined for an exporter or producer in a review . . . shall be based solely on the bona fide United States sales of an exporter or producer . . . .

*Id*. § 1675(a)(2)(B)(iv) (emphasis added).

Per statute, when calculating a "dumping margin *or* individual {CVD} rate," Commerce

will conduct a *bona fides* analysis. *Id*. (emphasis added) Here, Commerce never selected Hualing

as a mandatory or voluntary respondent to calculate an ADD margin; rather Hualing was a

"separate rate applicant." By contrast, Commerce selected Hualing as a mandatory respondent in

the parallel CVD AR1, in which Commerce calculated an *individual CVD rate* in 2020 based on

the same single sale that Commerce determined to be non-*bona fide* in this challenged ADD

12

AR1. *See* Case Brief at 32 n.92 (Commerce reviewing Hualing's single sale in the parallel CVD AR1); CVD IDM at 15 ("Hualing reported that it sold to one customer . . . '{d}uring the 2020 POR . . . '").

Commerce, in the parallel CVD AR1, calculated an *individual CVD rate* based on the same sale to the same customer that Commerce found non-*bona-fide*. Statutorily, the same sale cannot be *bona-fide* in one proceeding and not the other because the same statutory *bona fide* criteria apply to both ADD and CVD proceedings. 19 U.S.C. § 1675(a)(2)(B)(iv). Consequently, Commerce violated its statutory mandate by arbitrarily conducting its *bona fide* analysis.

## II.   COMMERCE'S "WELL-ESTABLISHED PRACTICE" DOES NOT CONDUCT A BONA FIDE SALES ANALYSIS FOR SEPARATE RATE APPLICANTS WHEN IT LIMITS EXAMINATION

Again, Commerce justified its determination to conduct a *bona fide* analysis in AR1 pursuant 19 U.S.C. §1675(a)(2)(B)(iv) by stating that, "{w}hen calculating export price, . . . Commerce excludes sales that are not *bona fide.* By statute, Commerce examines seven factors to determine whether a sale is *bona fide.*" IDM at 10. In the *Preliminary Results*, Commerce conducted a *bona fide* sale analysis of Hualing's single sale during the POR:

> Commerce reached {its non-*bona* fide} conclusion based on the totality of the record information surrounding Hualing's reported sale, including, but not limited to, the price and quantity of the sale, the timing of the sale, the resale price and profit, and other relevant factors such as the single sale made during the POR, the "specialty" nature of the product, and the likelihood of future sales..

87 Fed. Reg. at 27,092 (citing PDM at 6-11; PBFM).

In challenging the *Preliminary Results*, Hualing emphasized that Commerce made *three* factual determinations critical to whether the *bona fide* analysis in AR1 was lawful. Hualing Case Brief at 4. These factual determinations were:

1. Hualing was merely a *separate rate applicant*;

13

2. Pursuant to 19 U.S.C. § 1677f-1(c)(2) and 19 C.F.R. § 351.204(c)(2), Commerce *limited* its "examination of respondents in this review to a reasonable number of exporters or producers"; and

3. Commerce determined that Hualing *did not qualify as a new shipper* and rescinded the {NSR} with respect to Hualing.

*Id.* (emphasis in original).

Hualing, as a "*separate rate applicant*" in AR1, demonstrated Commerce's "well-established practice" in administrative reviews, where it limits examination of respondents, to not require a *bona fide sale;* rather the applicant is only required to establish that there was a suspended entry during the POR. *Id* at 5 (citing *Passenger Vehicle and Light Truck Tires from China*, 86 Fed. Reg. 50,029 (Sept. 7, 2021) (preliminary results), PDM n.67, *unchanged*, 87 Fed. Reg. 13,966 (Mar. 11, 2022) ("*PVLT 19/20 Final Results*"), IDM Comment 6. Commerce's rationale for not conducting a *bona fide* analysis of separate rate applicants that are not mandatory respondents are twofold, addressed in turn below.

First: As a separate rate applicant, and not a mandatory respondent, the sale at issue is not the basis for any "weighted-average dumping margin determined in an administrative review," Case Brief at 7 (citing *Carbon and Alloy Steel Cut-To-Length Plate from China*, 85 Fed. Reg 18,915 (Apr. 3, 2020) (preliminary rescission), PBFM (Mar. 27, 2020), ACCESS Barcode 3962117 ("CTLP PBFM"),[2] at 3 (citing 19 U.S.C. § 1675(a)(2)(B)(iv)), *unchanged*, 86 Fed. Reg. 6865, 6866 (Jan. 25, 2021) (final rescission) ("*CTLP from China*"). In fact, the statute only allows for a *bona fide* analysis when calculating a "weighted average dumping margin or individual {CVD} rate." 19 U.S.C. § 1675(a)(2)(B)(iv).

---

[2] This Court can and should take judicial notice of documents posted on Commerce's ACCESS website. *See, e.g.*, *Calgon Carbon Corp. v. United States*, 145 F.Supp.3d 1312, 1327 (CIT 2016).

Second: Commerce's practice is not to perform a resource-intensive and complex *bona fides* analysis on sales made by separate rate applicants, when, due to resource constraints, it limits the individual examination of exporters under review. Case Brief at 6-7 (citing *New Pneumatic Off-the-Road Tires from China*, 80 Fed. Reg. 20,197 (Apr. 15, 2015) ("*OTR 12/13 Final Results*"), IDM Comment 3). Hualing also addressed the numerous cases that Commerce preliminarily relied upon, emphasizing that not a single one supported the conduct of a *bona fide* analysis for a separate rate applicant that was not a mandatory respondent. Case Brief at 12-16.

In response to Hualing, the Department agreed "that it is not Commerce's normal practice to conduct *bona fides* analysis for separate rate applicants." IDM at 7 (citing *PVLT 19/20 Final Results*, 87 Fed. Reg. 13,966; *OTR 12/13 Final Results*, 80 Fed. Reg. 20,197; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*, 80 Fed. Reg. 80,746 (Dec. 28, 2015) ("*Solar 13/14 Preliminary Results*"), PDM at 12 n.42 ("the Department's practice is not to perform a bona fides analysis on sales made by separate rate applicants that are not mandatory respondents."), *unchanged*, 81 Fed. Reg. 39,905 (June 20, 2016) (final results)). Nonetheless, Commerce claimed unique circumstances for departing from this established practice. IDM Comment 1. None of these reasons discussed by Commerce, however, address or provide a reasoned basis for Commerce to depart from its well-established practice.

The Department and Petitioner concede that "it is not Commerce's normal practice to conduct *bona fides* analysis for separate rate applicants." *Id.* at 7. Yet Commerce proffered several reasons for conducting the *bona fide* analysis:

1. Hualing requested a NSR during a concurrent period (April 1, 2020, through September 30, 2020);

2. Hualing was aware that Commerce would examine the *bona fides* nature of the sale in analyzing Hualing's eligibility for a separate rate;

15

3. Hualing sought treatment as voluntary respondent and filed responses;

4. Commerce's actions reflect its determination that it had the resources to conduct a *bona fides* analysis of Hualing's sale, and Commerce is the best arbiter of its available resources; and

5. there does not need to be a concurrent NSR in order to conduct a *bona fides* analysis in an administrative review.

IDM at 7-8. None constitute a reasoned basis for Commerce to depart from its well-established practice.

First, these reasons fail to address Hualing's demonstration that Commerce does not conduct a *bona fide* analysis of separate rate applicants because, unlike mandatory respondents, the sale at issue is not the basis for any "weighted-average dumping margin determined in an administrative review." Case Brief at 7. Commerce also did not provide the requisite "reasonable explanation" for departing from its practice not to perform a resource-intensive and complex *bona fides* analysis on sales made by separate rate applicants, when, due to resource constraints, it limits individual examination. *Save Domestic Oil*, 357 F.3d at 1283.

## A. The Statute Limits the Bona Fide Analysis to Sales Used In the Weighted-Average Calculation

In the *Final Results*, Commerce never addressed Hualing's argument that the statute and practice is to limit the *bona fide* analysis to only sales that serve as the basis of any "weighted-average dumping margin determined in an administrative review." Case Brief at 7; *see* IDM Comment 1; CTL PBFM at 3 (citing 19 U.S.C. §1675(a)(2)(B)(iv)). Moreover, Commerce's own statements in AR1 support this fact. In AR1, Commerce never selected Hualing as a mandatory—or even a voluntary—respondent, but rather stated that it was a mere "separate rate applicant." PDM at 1. Rather than dispute these facts, Commerce characterized Hualing as not a

typical "separate rate applicant" because it submitted responses as a voluntary respondent from the rescinded NSR. IDM at 9.

Whether Hualing was not a typical "separate rate applicant" as described by Commerce, it indisputably was "separate rate applicant." PDM at1. As such, Hualing's sale was not under consideration and would not be included in "any weighted average dumping margin" as required for a *bona fide* determination pursuant to 19 U.S.C. § 1675(a)(2)(B)(iv). *See* PDM at 17 ("{W}e have preliminarily determined that a reasonable method for assigning a dumping margin to the non-individually examined separate-rate companies, . . . is to assign the zero percent dumping margin calculated for the sole participating mandatory respondent.").

In fact, Commerce explained that, "{w}hen calculating export price, . . . Commerce excludes sales that are not *bona fide.*" IDM at 10 (citing *Novolipetsk Steel Pub. Joint Stock Co. v. United States*, 483 F.Supp.3d 1281 (CIT 2020)). Commerce subsequently likewise explained that a concurrent NSR was unnecessary because in administrative reviews the:

> U.S. sale must be a *bona fide* commercial transaction to be a basis for a dumping margin, and, therefore, we apply the same test in administrative reviews and new shipper reviews. Regarding single sale reviews, it is also well-established that Commerce heavily scrutinizes single sales, because there is only one transaction with which to calculate a margin and establish a cash deposit rate.

IDM at 8-9 (citing *Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Russia*, 84 Fed. Reg. 38,948 (Aug. 8, 2019) (final results), IDM at 8; *Novolipetsk*, 483 F.Supp.3d at 1288-93); *see Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F.Supp.3d 1364, 1370 (CIT 2017) ("Commerce may exclude sales that would otherwise be included in the calculation of the export price if Commerce determines that the sales are not *bona fide.*").

Commerce continued by explaining that it "may examine the *bona fides* nature of single transactions in an administrative review to ensure the dumping margin 'accurately approximates

the exporter or producer's selling practices.'" IDM at 9 (citing *Novolipetsk*, 483 F.Supp.3d at

1289); *see Inner Mongolia Jianlong Biochem. Co. v. United States*, 337 F.Supp.3d 1329, 1338

(CIT 2018) ("{B}ecause the ultimate goal of the {NSR} is to ensure that the U.S. price side of

the antidumping calculation is based on a realistic figure.") (quoting *Tiancheng Pharm. Co. v.*

*United States*, 29 CIT 256, 260 (2005)).

The problem with these Commerce statements is that it does not calculate "export price"

for "separate rate applicants." PDM at 17. Rather, these statements serve as the basis for

Hualing's challenge before this Court; because the ADD rate assigned to a "separate rate

applicant" is based on "an amount equal to the weighted average of the estimated weighted

average dumping margins established for exporters and producers individually investigated"

(*i.e.*, mandatory respondents), the price at which the "separate rate applicant" sells merchandise

to the United States during the POR lacks relevance to the assigned weighted-average dumping

margin. PDM at 16. Moreover, it is unnecessary to conduct a *bona fide* analysis on the sale

because the "separate rate applicant's" rate is based on the *bona fide* sales of the mandatory

respondent—which prevents a "separate rate applicant" from obtaining a so-called "unrealistic"

rate. *See id* at 8-10. Regardless of the nature of the sale, the applicant does not unfairly benefit

from the sale to obtain a lower ADD margin—because that sale is not used to in the margin

calculation and the separate rate applicants are assigned a typical rate based on typical sales.

**B.     Commerce Limited Examination Due to Resource Constraints**

In AR1, rather than determine an "individual weighted-average dumping margin for each

known exporter or producer of the subject merchandise" through 19 U.S.C. § 1677f-1(c)(1),

Commerce on three occasions limited "its examination to a reasonable number of exporters or

producers under {19 U.S.C. § 1677f-1(c)(2)} and 19 CFR 351.204(c)(2)." 1RSM at 2-3; 2RSM

at 2; 3RSM at 2. As Commerce stated:

> Examining all known exporters and producers would require significant resources because it would require Commerce to analyze each company's corporate structure, accounting and selling practices, and production information.
>
> In addition to this administrative review, . . . Office I . . . is conducting numerous concurrent AD and CVD proceedings with overlapping statutory deadlines. The complexity of the above factors, combined with overlapping statutory deadlines of other AD and CVD proceedings, as well as Office I's additional workload, place a significant constraint on the number of analysts that can be assigned to this review and, thus, limit the number of respondents Commerce can reasonably examine. Further, because of the significant workload throughout Enforcement and Compliance, Office I does not anticipate receiving any additional resources to devote to this administrative review.

1RSM at 3; *see* 2RSM at 4 ("We continue to find, due to our resource constraints, that it would

not be practicable to individually examine the remaining exporters and producers of subject

merchandise for which there is a review request."); 3RSM at 2 ("Nothing has changed with

respect to Commerce's resources to cause us to revisit that determination.").

> Commerce also initially explained:
>
> If any voluntary responses are submitted . . . , we recommend evaluating the circumstances during the course of this review to determine whether the individual examination of such companies would be unduly burdensome and inhibit the timely completion of the review.

1RSM at 8. Again, Commerce recognizes that it will:

> . . . not examine separate rate applicants' single sales *bona fides* nature because of resource constraints. . . . This is because a *bona fides* analysis requires the collection and evaluation of extensive information, and adding this to the separate rate eligibility analysis that Commerce must already conduct for every separate applicant would strain Commerce's resources, given the number of concurrent non-market economy . . . administrative reviews and number of separate rate applicants.

IDM at 8.

Here, Commerce thrice found that it did not have the resources to conduct the complex analysis of reviewing all respondents in this proceeding, and, therefore, limited its examination. 1RSM at 3; 2RSM at 4; 3RSM at 2. Commerce also never evaluated whether to treat Hualing as a voluntary respondent, instead treating it as a "separate rate applicant." PDM at 1. Similarly, Commerce never indicated in any of its respondent selections that its resources were constrained because it planned to conduct a *bona fides* analysis. *See* 1RSM; 2RSM; 3RSM. The AR1 record was for a full year devoid of discussion that Commerce intended to conduct a *bona fide* analysis. *See* PDM at 1.

Thus, based on its own claim of resource constraints and its limiting respondents, Commerce's statement that its "actions reflect its determination that it had the resources to conduct a *bona fides* analysis of Hualing's sale" is contradicted by the record and unsupported by substantial evidence. IDM at 8. Hualing also never claimed to be "the best arbiter of {Commerce's} available resources." *Id*. Rather, Hualing merely emphasized Commerce's own statements that it lacked the sufficient resources to conduct complex analyses on multiple companies, and, therefore, limited its examination of respondents. 1RSM at 3; *see* IDM at 11.

Commerce also complained that it "already dedicated resources to determine whether Hualing was eligible for a {NSR}." IDM at 8. Other than this statement implying that Commerce in AR1 retaliated against Hualing for requesting the NSR, the fact that Commerce expended resources in the context of the NSR does not provide a reasoned basis from departing from its practice to not conduct a *bona fides* analysis.

Commerce's rationale not for requiring a *bona fide* sale in the "context" of an administrative review for separate rate applicants is unambiguous:

> . . . it is established practice that *Commerce does not perform a bona fide analysis on sales made by separate rate applicants that are not mandatory respondents.*

20

> Instead, Commerce relies on CBP data and/or CBP entry documentation to
> determine if a separate rate applicant had suspended entries during the POR . . . .

*PVLT 19/20 Final Results*, 87 Fed. Reg. 13,966, IDM Comment 6 (emphasis added) (footnotes

omitted); *see OTR 12/13 Final Results*, 80 Fed. Reg. 20,197, IDM Comment 3; *Solar 13/14*

*Preliminary Results*, 80 Fed. Reg. 80,746, PDM at 12 n.42.

Commerce's *PVLT 19/20 Final Results* is notable given that the determination published

on March 11, 2022—less than two months before its AR1 *Preliminary Results*. 87 Fed. Reg.

13,966. In its *OTR 12/13 Final Results*, Commerce articulated why it does not perform a *bona*

*fide* analysis for separate rate applicants:

> In this case, Zhongce is participating as a separate rate applicant. In light of the
> Department's resource constraints and decision to limit individual examination of
> exporters under review, *the Department's practice is not to perform a resource-*
> *intensive and complex bona fides analysis on sales made by separate rate*
> *applicants that are not mandatory respondents.*

80 Fed. Reg. 20,197, IDM at 23 (emphasis added). This reasoning is fully consistent with

Hualing's statutory demonstration that a *bona fides* analysis only applies when the sale is subject

to individual examination. Section II.A.1, *supra*.

Commerce throughout AR1 belabored that its resources were constrained from reviewing

all respondents. 1RSM at 3; 2RSM at 4; 3RSM at 2. Commerce made only conclusory claims to

have dedicated resources in the NSR, that it would "examine" the *bona fide* nature in the context

of AR1, and it ultimately dedicated its limited resources in AR1 to conduct an extensive *bona*

*fide* analysis contrary to practice. IDM at 11. Yet Commerce failed to provide a reasoned basis to

depart from its practice when it limits its examination of producers and exporters pursuant to 19

U.S.C. § 1677f-1(c)(1). *See id.* at 11-14.

### C.    No Precedent Exists to Single Out a Single Separate Rate Applicant

Hualing before Commerce addressed all the cases preliminarily relied upon to support its *bona fide* analysis in AR1. Case Brief at 12-16. In the *Final Results*, Commerce agreed with Hualing that none of these cases applied to the facts of this case or justified departing from its practice of not conducting a *bona fide* analysis on a single separate rate respondent. IDM at 11. This agreement in the *Final Results* is a clear reversal from Commerce's *Preliminary Results*. *See* PDM at 8-10; PBFM at 2-4. Yet Commerce neglected to provide the requisite "reasonable explanation as to why it depart{ed}" from its "routine practice for addressing like situations." *Save Domestic Oil*, 357 F.3d at 1283.

Commerce's *Final Results* imply that it was justified to single out Hualing because there is no precedent for conducting the *bona fides* analysis based on the precise facts in AR1—*i.e.*, where "single sale served as the basis for its {NSR} and SRA in the administrative review," which "involve{s} a prior-rescinded new shipper, whose single POR sale was already alleged to be non-*bona fide*."[3] IDM at 9. However, the only relevant fact is that Hualing was a "separate rate applicant" in this review. PDM at 1. Commerce's implication that facts are somehow different in AR1 does not provide a reasoned basis for departing from its established practice of not conducting a *bona fides* analysis on sales made by "separate rate applicants" that are not mandatory respondents. No precedent exists with similar facts to this case, because it is Commerce's practice not to conduct a *bona fides* analysis on sales made by "separate rate applicants" that are not mandatory respondents. In other words, no precedent exists because it would contradict Commerce's well-established practice.

---

[3]    Not only did this single sale serve as the basis for its NSR and SRA in AR1, but this same sale served as the basis of calculating a rate in the parallel CVD AR1. Section I, *supra*.

### D.   Commerce's Intent to Examine Hualing's Sale Does Not Justify Departing from Its Practice

Hualing knew that Commerce stated its intent "to examine the *bona fides* nature of Hualing's sale in the context of the administrative review." NSR PDM at 5. However, Hualing could not have expected that Commerce would: decline to state the same intention in AR1; decline to ask or issue any questionnaires concerning the sales *bona fide* nature; or, moreover, contradict its practice of conducting a *bona fides* analysis on only a single separate rate respondent. In other words, Hualing could not have considered that Commerce would decline to "examine" —*i.e.* "to inspect closely," "to test the condition of," or "to inquire into carefully," MERRIAM-WEBSTER ("examine")[4]—the sale in the "context" of AR1.

Here, Commerce did not "examine" the sale in the context of AR1, but rather Commerce made conclusory determination without examination for the first time in the *Preliminary Results*. This is notable, given that Commerce on three occasions either had the opportunity to state that it had the resources to conduct a *bona fide* analysis of separate rate applicants or select Hualing as voluntary respondent—but declined to take either course of action. Here, if "examine" means "conduct" a *bona fides* analysis, then it should have stated it prior to issuing the *Preliminary Results* in AR1.

Commerce's clear practice, in the review "context," is not to perform a *bona fide* analysis on sales made by separate rate applicants that are not mandatory respondents (*i.e.*, where the sale will not be used in the margin calculation) when it limits individual examination of exporters in light of resource constraints. *See PVLT 19/20 Final Results*, 87 Fed. Reg. 13,966, IDM Comment

---

[4]        https://www.merriam-webster.com/dictionary/examine.

6 (citing *OTR 12/13 Final Results*, 80 Fed. Reg. 20,197, IDM Comment 3; *Solar 13/14 Preliminary Results*, 80 Fed. Reg. 80,746, PDM at 12 n.42).

Not only did Commerce in AR1 depart from this practice without a reasoned explanation, but it did so for a single separate rate applicant. The Federal Circuit recognizes that—as Commerce did in its AR1 *bona fides* analysis—agency action is arbitrary and capricious when it "consistently followed a contrary practice in similar circumstances and provide{s} no reasonable explanation for the change in practice" *Consolidated Bearings Co. v. United States,* 348 F.3d 997, 1007 (Fed. Cir. 2003). In sum, based on its "well-established practice," Commerce in AR1 should have:

- evaluated only whether Hualing had a suspended entry during the POR, which it did;

- proceeded to conduct its *de jure/de facto* **separate rate applicant** analysis, which confirmed that Hualing was independent from government control; and

- accordingly, assigned Hualing the ADD rate assigned to other separate rate respondents.

Because Commerce failed to take these actions with respect to Hualing, this Court should find that Commerce's *Final Results* was not based on the requisite "substantial evidence," 19 U.S.C. § 1516a(b)(1)(B)(i), and constitutes an arbitrarily unexplained reversal of practice. *Save Domestic Oil*, 357 F.3d at 1283. Not only did Commerce depart from its practice without a reasoned basis, but Commerce further failed to provide a reasoned basis for treating Hualing different than other separate rate applicants.

### III.   COMMERCE'S BONA FIDE ANALYSIS IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

When conducting a *bona fide* analysis, Commerce considers whether "a sale is 'unrepresentative or extremely distortive' and, therefore, not reviewable due to its non-*bona fide* status, Commerce employs a totality-of-the-circumstances test." PBFM at 3. In so doing, Commerce examines whether the transaction is "commercially reasonable" or "atypical." *Id.*

24

Moreover, this Court instructs that Commerce "examine objective" and "verifiable factors" to ensure that a sale is not being made to circumvent ADD/CVD. *Id*.

Concerning price, commercial quantities, and timing, and other factors, it appears that Commerce's primary concern with Hualing's sale is that it was "specialty," "custom," or "unique" because the sale included cabinets that were to be used by persons with disabilities. Prelim. *Bona Fide* Memo at 9-11; IDM at 15-16, 19-23. And, that "Hualing who has limited production in cabinets and never produced the 'specialty' cabinets . . . raises concerns as to whether the transaction is representative of future commercial practices." Prelim. *Bona Fide* Memo at 9; IDM at 15, 21.

Regardless of the ADA designation, the lack of prior production of ADA cabinets and the importer's statement that ADA cabinets are more expensive constitute objective evidence demonstrating that the sale was commercially reasonable. In other words, if the current sale of Hualing's "specialty," "custom," or "unique" cabinets is commercially reasonable, then there is no reason that its future transactions or sale of cabinets, or even cabinet components, would not also be commercially representative. In AR1, record evidence detailed below confirms that the cabinets produced and sold by Hualing were sold through a commercially reasonable transaction—regardless of the cabinet's "specialty," "unique," or "custom" nature.

First, Commerce found the same sale to be *bona fide* when calculating Hualing's CVD rate for 2020. Section I, *supra*. Any totality-of-the-circumstances analysis Commerce must include this fact, and the remaining circumstances show that Hualing's sale was *bona fide* based on objective record data.

### A.    Hualing's Sale Prices

Commerce acknowledged that broad-based CBP average unit value ("AUV") price was "not necessarily the same as actual sale prices, that the price of kitchen cabinets made of different materials (*i.e.*, maple, birch, or cherry woods, or plywood cabinet faces and components) may vary, and that the CBP data only provides information on {Harmonized Tariff Schedule ("HTS")} number and number of pieces, not type of material." PBFM at 5. Commerce also acknowledged that CBP "AUV prices do not account for differences in the sale prices for different types of kitchen cabinets." *Id*. at 4-5. Moreover, not only do the different types of WCV and different materials used to produce WCV affect price, but so too does the amount of solid or face wood used to produce the different styles and types of WCV, such as ADA cabinets. *See id*. at 5 ("AUV prices do not account for differences in the sale prices for different types of kitchen cabinets, such as the different prices for [                    ] wood kitchen cabinets.").

Critically, the scope language is broad, including different types and size cabinets (*i.e.*, corner cabinets, sink cabinets, wall cabinets, drawer cabinets, all forms of vanity cabinets, etc,) whether assembled or unassembled, single wood components parts of cabinets such as cabinet sides, drawer sides/backs/front boards, toe kicks (*i.e.*, all wooden cabinet component parts). IDM at 2-3. It is therefore unsurprising that the CBP data for this product range in prices per piece from [        ] to [      ]—from more than [                    ] to less than [        ]. Case Brief Exhibit 1.

Commerce acknowledged the wide diversity of WCV and that broad-based single CBP "{**average** unit value} of all imports of the same HTS number from China during the POR" was not necessarily indicative of a non-*bona fide* sale. PBFM at 4-5. Given this acknowledgement, Commerce self-selected other certain separate rate applicants' sales and found that Hualing's

sales were [          ], but again, recognizing that even these self-selected comparisons failed to

fully account for the wide diversity of WCV. *Id.* at 5.

Further acknowledging such WCV pricing problems, Commerce attempted to compare

"the mandatory respondent's [                              ] wood cabinets to Hauling's [

       ] cabinets." *Id.* Commerce concluded that "the mandatory respondent's [          ]

cabinets average gross unit price is $[     ] and the average gross unit price for Hauling's

[          ] cabinets is $[        ] or [      ]% more than the mandatory respondent's average

gross unit price for RTA cabinets." *Id.* at 5-6. To bolster its analysis, Commerce compared the

face [         ] wood component costs by comparing the differences between surrogate values

("SV") for [                    ]:

> The difference between [                   ] woods are [
>                    ], respectively, with a [   ] percent price difference. Although these
> [    ] cabinets use different types of face wood, we find that the price difference
> between [                      ] does not account for the vast difference (*i.e.*, [     ]
> percent) . . . .

*Id.* at 6.

Commerce further recognized that the higher price when compared with its self-selected

separate rate applicants and the difference in SVs for [                    ] did not explain the

[    ]% price difference: "Although . . . reasonable for [        ] cabinets to be priced higher than

other types of wooden cabinets, given the wood prices placed on the record of this review (i.e.,

[        ] being higher than [        ])," Commerce concluded that "Hualing made a single sale of

[       ] kitchen cabinets at an atypical price." *Id.*

Given the broad differences in the types of subject merchandise and inherit problem with

the AUVs acknowledged by Commerce, Hualing first argued that Commerce should consider

whether Hualing's sale fell in the range of prices of CBP data that are deemed commercially

reasonable. *See* Case Brief at 19. Hualing also explained that [      ] other separate rate applicants,

[                                                    ], assigned a separate rate in AR1 had

entries during the POR that were [        ] than Hualing. *Id.*

To rebut Commerce's analysis of certain self-selected separate rate applicants, Hualing

provided its own. Hualing demonstrated that, using Commerce's same analysis, the mandatory

and selected separate rate applicants' sales also would be deemed atypical—underscoring that

WCV includes wide-ranging product variations resulting in wide-ranging prices that are

commercially reasonable.

To rebut Commerce's cost analysis of the face [        ] wood for [                    ],

Hualing pointed out two flaws in Commerce's analysis: (1) Commerce used the wrong HTS and

price for [        ]; and (2) the cost comparison failed to account for how much [        ] wood was

used to produce the cabinets. *Id.* at 21. With the SVs corrected, the price difference between

[                    ] almost [        ]. *Id.* at 22. And with, the amounts of [                    ] used

by Hualing and the mandatory respondent, the [        ] cost difference was [    ]%—*i.e.*, [    ]

times, more than the mandatory respondent's [        ], comprising a reasonable basis for the

[    ]% price difference between the mandatory respondent and Hualing. *Id.* at 23. Hualing

similarly demonstrated that [    ] of the mandatory respondent's [    ] cabinets were [

], while Hualing's [    ] cabinets were [

], again proving that it was not reasonable to compare the two products. *Id.*

Finally, Hualing emphasized other documentation that its prices were commercially

reasonable and representative based on the importer's business practices. *Id.* at 23-24. Hualing

submitted a price quote for ADA cabinets provided by its importer from a domestic producer,

showing domestic prices nearly double. *Id.* The importer submitted additional documentation

consisting of sales information for almost three years—between [

]—attesting that the only cabinets it sold were "custom" or "specialty" type cabinets, with

AUV prices ranging between [      ] and [      ]—again proving that the sale represented the

importer's business practice. *Id.* at 24 (citing Vol. Supp. Resp. Attachment IV Exhibits S-1

(importers' customers shown as [                    ] requiring custom or specialty made

cabinets), S-2).

## 1. CBP Data AUV versus Ranged CBP Data

Commerce reversed its preliminary position that the broad-based CBP AUV "price of

kitchen cabinets made of different materials (*i.e.*, maple, birch, or cherry woods, or plywood

cabinet faces and components) may vary, and that the CBP data only provides information on

HTS number and number of pieces, not type of material." IDM at 43. Commerce concluded that:

> We agree with the petitioner that it is Commerce's practice to use broad-based
> averages for the entire POR . . . . While Commerce acknowledged in the
> *Preliminary Results* that the AUV derived from the CBP data did not account for
> wide-ranging variations in raw material types, or different types of subject
> merchandise, . . . the AUV includes all types of subject merchandise . . . .

*Id.* at 11-12.

This reversal further contrasts with Commerce's other finding in *Final Results* where

Petitioner argued that the "AUVs from the CBP data demonstrates the separate rate respondents'

dumping practices might differ from Qufu Xinyu." IDM at 43. Here, Commerce disagreed with

Petitioners' use of the broad based AUVs, finding that "entry values are not necessarily the same

as U.S. net sale prices, . . . the price of subject merchandise made of different materials (*i.e.*,

maple, birch, or cherry woods, or plywood cabinet faces and components) may vary, and the

CBP data only provides information on HTS subheading and number of pieces, not type of

material." *Id.* at 43; *see* PBFM at 5.

Commerce thereby, when convenient, continued to find that the broad-based AUVs from CBP data vary—as in its preliminary analysis. PBFM at 5-6 (CBP data do not represent sale values and vary due to different materials or WCV type). Yet when these facts became inconvenient, Commerce overturned its preliminary position to conclude that the CBP AUVs includes all types of WCV, and using CBP "AUVs, rather than a range of prices contained in the CBP data, establishes a fair market price for all U.S. imports and a baseline for comparison." IDM at 11 (citing *Jinxiang Chengda Imp. & Exp. Co. v. United States*, 317 CIT 418, 424-25 (CIT 2013).

First, as Commerce repeatedly found, CBP data cannot establish "a fair market price" if the entry prices "are not necessarily the same as U.S. net sale prices" or vary due to merchandise type. IDM at 11-12; PBFM at 5. In other words, a broad-based CBP AUV of non-represented U.S. prices that vary from [      ]/piece to [        ]/piece cannot be a "useful tool for comparison because it provides a fair representation of prices set by the market." IDM at 10-11 (citing *Jinxiang Chengda*, 317 CIT at 423-25).

Commerce's misplaced reliance on this Court's precedent for its claimed "practice to use broad-based averages for the entire POR, rather than ranged individual sales prices for comparison," is significantly overstated. IDM at 11 (citing *Jinxiang Chengda*, 317 CIT at 423; *Shanghai Sunbeauty Trading Co. v. United States*, Slip Op. 18-111 (CIT Sept. 6, 2018), at 15-22). Unlike AR1, both *Jinxiang Chengda* and *Shanghai Sunbeauty* involved simple commodity products—*i.e.*, peeled or unpeeled garlic, and honey, respectively. These products are in no way similar to the endless variations covered by the WCV scope, having wide variations in prices from [     ] to [       ] in AR1.

This Court in both cases further recognized that Commerce is not limited to only comparing prices to a single AUV, but also compares prices to ranges when warranted. In *Shanghai Sunbeauty*, this Court noted: "Neither party disputes that the decision to compare price and quantity data by means of the average method or the range method depends on the specific facts of each case." Slip Op. 18-111 at 7 (citing *Hebei New Donghua Amino Acid Co. v. United States*, 209 CIT 603, 611 n.5 (2005) ("{W}hile some *bona fides* issues may share commonalities across various Department cases, each one is company-specific and may vary with the facts surrounding each sale."). In *Jinxiang Chengda*, this Court—while stating that "in some cases an examination of a range of prices may also be useful"—nevertheless determined:

> Chengda's transfer price . . . was not only high when compared to the Customs AUV, but was also an outlier when compared to the range of values in the Customs data. . . . Thus, the court finds that{,} even had Commerce used the "range of values" analysis plaintiff urges, the company's sales prices would have been found to be outside the norm.

317 CIT at 425. Accordingly, unlike AR1, this Court found that both the AUV and range comparisons failed.

*Shanghai Sunbeauty*, reached a similar conclusion where the price and quantity of sales fell within the range of other POR entries, but this was due to the presence of two aberrant entries made by other sellers during the POR. *Shanghai Sunbeauty*, Slip Op. 18-111 at 6, 8. In contrast, in this case, there is no indication by any of the parties that any of the CBP data are necessarily aberrant to be atypical. Moreover, unlike *Jinxiang Chengda*, Commerce in AR1 determined that cabinet pricing varies based on the raw materials and types of products with the record evidencing significant pricing variation between the various WCV and components. IDM at 43; *see* PBFM at 5-6. Therefore, as discussed in *Jinxiang Chengda*, Commerce's practice does not use broad-based averages when the subject merchandise is unique or has unique pricing

variations for HTS basket subheadings. 317 CIT at 422. In AR1, Commerce acknowledged the uniqueness of the various cabinet products, so much so that it attempted to calculate the costs of the material inputs in its pricing comparisons.

*Jinxiang Chengda* and *Shanghai Sunbeauty* confirm that Commerce overstated its claimed practice to use broad-based averages for the entire POR, rather than ranged individual sales prices for comparison practice. Rather, a ranged analysis is a "useful tool" showing that Hualing's sale was neither atypical nor commercially unreasonable given the numerous differences in material options and product variations that could affect price. *Jinxiang Chengda*, 317 CIT at 425. Although Hualing's entry was [   ] out of [     ] for per-piece entries that entered under HTS [          ] when Commerce ranged the CBP data by [          ] AUV, it is unlike other cases where pricing was clearly outside the range. Moreover, Hualing's price being in the top [              ] does not make the price commercially unreasonable; Hualing's AUV was nonetheless between other WCV that Commerce considered typical or commercially reasonable. Furthermore, there being other separate rate applicants with [

         ] Hualing's confirms that Hualing's pricing was not out of line with what is commercially reasonable in the CBP data.

### 2.    Separate Rate Applicant and Mandatory Respondent Comparisons

Again, Commerce unreasonably conducted a self-selected price comparison analysis with certain separate rate applicants and the mandatory respondent prices. As Commerce admits and the record evidences, the wide-ranging variations of WCV raw material, types, including ADA, and styles make it impossible—without adjustment—to fairly compare prices with other separate rate applicants or the mandatory respondent.

Commerce in its *Final Results* appears to have dropped its comparison to the self-selected separate rate applicants. IDM at 11-14. In so doing, Commerce sidestepped Hualing's demonstration that using a different separate rate applicant, the prices of those applicants—and the mandatory respondent—would all have been atypical. Case Brief at 20. For example, the CBP data for [                                    ] show that its AUV for the POR was $[    ]. *Id.* Using [          ]'s AUV, the other separate rate applicants' and mandatory respondent's AUVs would also be atypical—being [    ] to [    ]% [          ] than [            ] commercially reasonable AUV price. *Id* at 20-21. It is critical that any direct comparisons include similar products. As an AR1, the other separate rate applicants and mandatory respondent exclusively sold [        ] products, whereas Hualing sold a [        ] product.

Hualing similarly emphasized that Commerce: used the wrong HTS and price for [      ]; and conducted a cost comparison that failed to account for how much [      ] wood was used to produce the cabinets. Case Brief at 21. With the SVs and the respective material amounts corrected, the record evidences a reasonable basis for the percent price difference between the mandatory respondent and Hualing. *Id.* at 23; Section III.A. In response, Commerce's *Final Results* changed its tone: "Hualing failed to properly account for all wood inputs consumed by the mandatory respondent and Hualing when it compared the cost of production data." FBFM at 4. It is unclear how Hualing's analysis failed since it was in direct response to Commerce's analysis that did not consider all wood inputs in its preliminary *bona fides* analysis. Commerce's new analysis is a moving target that further proves wide variations in WCV.

Commerce erred in its original comparison, and Hualing showed that this analysis was flawed because attempting to price [        ] versus [        ] cabinets is not practicable given the unique nature of the different materials. Case Brief at 22-23. Similarly, Commerce misconstrued

Hualing's argument with respect to [        ] and the difference between cabinets that are [

        ] with cabinets whose prime visual feature is for the [                ]. Accordingly,

the "costs" of certain raw materials does not change the intrinsic element that cabinets made

from [                            ] cannot be compared with [        ] cabinets

[            ] is a primary feature—regardless of the differences in material costs. The two

cabinets will have different prices, and the record provides no basis to find that Hualing's prices

were commercially unreasonable based on cabinet type. *See id*. at 23.

### 3.    Hualing Domestic Sales

Commerce's *Final Results* attempted to compare Hualing's U.S. prices with domestic

prices: "Hualing's U.S. sale price is atypical when compared to its sales domestic sales of

[                            ]. FBFM at 3. First, it is unclear how

Commerce determined that Hualing's domestic cabinets were "identical" given that Commerce

declined to "examine" Hualing's responses in AR1. If Commerce believed that the domestic

cabinets were an issue, Commerce could have requested that Hualing explain any differences

between these products. Otherwise, this information at most confirms the wide variation in WCV

pricing, such that comparing non-similar products is problematic.

### 4.    Other Objective Record Information

Again, Hualing and its importer provided objective documentation that its importer sold

custom cabinets at average prices between [        ] and [        ] between [                ].

Section III.A, *supra*; PBFM Attachment 3. Commerce did not address this evidence in the *Final

Results*. More than the other Commerce comparisons, this extremely probative evidence proves

that the importer engages in the business, purchase, and sale of "custom," "unique," or

"specialty" cabinets. This evidence directly supports the prices that the importer paid and at

which it sold the cabinets being in the ordinary course of its business. Simply, the [          ]

AUV and the [       ] resell AUV are commercially reasonable values in comparison to the

importer's business practices. Moreover, the importer's custom cabinet pricing is in direct

contradiction to Commerce's CBP AUV pricing. This record evidence thereby shows that

Hualing's pricing was not atypical and would be consistent with future selling practices.

Commerce inaccurately complained that Hualing failed to show that the ADA cabinets

"command a higher price of 'two to three times' the price of other cabinets." IDM at 13. Hualing

submitted a price quote provided by its importer from a domestic producer showing that it would

cost nearly double for each piece of the same item. Case Brief at 24. The U.S. importer provided

a one-to-one comparison of the items from the domestic producer with Hualing. *See* Vol. Supp.

Resp. Attachment IV, Exhibit S-4. Commerce dismissed this price quote:

> We disagree with Hualing that the price quote from the U.S. producer
> substantiates the high price of Hualing's cabinets. For our *bona fides* analysis
> regarding Hualing's price, we are only concerned with the typical price of
> cabinets produced in China and sold on the U.S. market. There is no rationale for
> Commerce to compare a price quote from a U.S. producer to a Chinese producer.
> This information only demonstrates the pricing difference between U.S.-produced
> cabinets and Chinese-produced cabinets.

IDM at 13. This agency response is flawed in a number of respects.

First, Commerce cites to no precedent in support of any of these statements. Second,

besides its conclusory disagreement that the price quote from the U.S. producer does not

substantiate the high price of Hualing's cabinets, Commerce provides no reasoned basis for this

conclusion. Third, Commerce's statement that "we are only concerned with the typical price of

cabinets produced in China and sold on the U.S. market" is contradicted by its totality-of-the-

circumstances analysis. IDM at 13. Fourth, Hualing agrees that "{t}his information only

demonstrates the pricing difference between U.S.-produced cabinets and Chinese-produced

cabinets." IDM at 13. This information demonstrates that Hualing's Chinese-produced ADA cabinet prices were half that of the U.S.-produced ADA cabinets—establishing that (1) ADA cabinets "command a higher price of 'two to three times' the price of other cabinets," *id*.; and (2) that Hualing's price was a commercially reasonable price for ADA cabinets in the United States.

Finally, Commerce specifically "requested Hauling and the U.S. importer . . . demonstrate how the price of [    ] cabinets differed from standard cabinets using sales documentation  . . .  and cost of production information." PBFM at 10. Despite this request, the information was rejected for not fitting Commerce's narrative or conclusion. With the record evidencing WCV sold in wide-ranging prices based on factors including type and material inputs, the objective price ranges included in the CBP data, domestic price quote, and importer's selling prices and practices confirm that that Hualing's prices were commercially reasonable.

### B.      Whether Hualing's Sale Was Made In Commercial Quantities

Commerce's determination with respect to whether Hualing's sale was made in commercial quantities is unsupported by substantial evidence. Commerce stated: "Hualing's single sale of [    ] sets of kitchen cabinets is not atypical when compared to other sale quantities on the record of this review." PBFM at 6 (citing AQR Exhibit IMP-1). Yet Commerce concluded that, "because Hualing made only one atypical sale of 'specialty' cabinets to the U.S. market, we are unable to determine what Hualing's future commercial business practices would be." IDM at 15.

Critically, Commerce did not discuss whether Hualing's sale was sold in commercial quantities and made no determination regarding whether Hualing's quantity was commercial. Rather, Commerce concluded that Hualing's sale was not in commercial quantities and not *bona fide* because:

36

1. Hualing had only a single sale;

2. "Hualing's sales of similar merchandise to its domestic and third country markets indicates that its single 'specialty' cabinets sale to the United States is atypical of its business practice;"

3. the U.S. importer stated that it had never imported the "specialty" cabinets either from China or another country, or ever sourced them from a U.S. producer.

IDM at 14-15. None of these reasons address whether Hualing's single sale consisted of commercial quantities.

First, citing there being only a single sale is not a statutory factor for determining whether a sale is *bona fide*, 19 U.S.C. § 1675(a)(2)(B)(iv)(I-VI). *See Huzhou Muyun Wood Co. v. United States*, 324 F.Supp.3d 1364, 1375 (CIT 2018). The reason why Commerce conducts a *bona fide* analysis for new shippers and mandatory respondents is because it is a "single sale," and this is why the Department reviews whether that "single sale" was made in commercial quantities. Commerce's reasoning that a single sale triggers a *bona fide* analysis and at the same time is itself evidence the sale is not *bona fide* "creates a familiar geometric object." *Home Meridian Int'l, Inc. v. United States*, 36 CIT 1279, 1298-99 (2012). Consequently, the singularity of the sale does not evidence whether it was made in commercial quantities—especially here where Commerce determined that Hualing's sale was made in commercial quantities and was not atypical. PBFM at 6.

Second, beyond its conclusory statement, Commerce fails to explain how "Hualing's sales of similar merchandise to its domestic and third country markets indicates that its single 'specialty' cabinets sale to the United States" shows the sale not in commercial quantities. Commerce appears to be less concerned about whether the sale was in commercial quantities, and more about the sale covering ADA cabinets. Furthermore, Hualing sold similar quantities of cabinets in the domestic market. *See* FBFM at 3.

37

Third, Commerce finding that the U.S. importer "had never imported the 'specialty' cabinets either from China or another country, or ever sourced them from a U.S. producer" also ignores commercial quantities. The record shows that Hualing's importer sold unique custom specialty products for years, and nothing rebuts this information or casts doubt on the purchase being representative of future commercial practices. Case Brief at 24 (citing Vol. Supp. Resp. Attachment IV Exhibits S-1 (importer's customers are [                    ] requiring custom or specialty made cabinets), S-2). That this sale being for ADA cabinets does not change the importer being engaged in custom cabinets and won't continue to do so in the future.

Here, the record "shows that the respondents subject to this review exported sets of completed cabinets, RTA cabinets, individual cabinets or vanities, or component pieces" [          ] to Hualing. PBFM at 6 (citing CBP data; KM Cabinetry SRA, CR27-28, PR71; Dalian Meisen SRA, CR 35-37, PR92; Shenzhen Pengchengzhirong ("PCZR") SRA, CR29-30, PR72; Suzhou Siemo SRA, CR38, PR93; Qufu Xinyu CDQR, CR89, PR205). Indeed, the record evidences [                                             ] had one sale during AR1:

- [              ] shows that it had a single sale of [   ] pieces;

- [             ] shows that it only had a single sale of [  ] sets; and

- CBP data shows that [                                   ] had a single sale of [          ] at [        ].

Case Brief at 25-26, Exhibit 1. Commerce singling out Hualing for the *bona fides* analysis is arbitrary and not supported by substantial evidence. Finally, Commerce determining that "Hualing's single sale of [        ] sets of kitchen cabinets *is not atypical*" should have ended the analysis. None of the reasons provided by Commerce rebut this conclusion.

### C.      Timing of the Sale

Commerce's determination that the timing of Hualing's sale indicates that it was not *bona fide* is not supported by substantial evidence. As Commerce did with commercial quantities, Commerce "agree{d} that the timing of the sale by itself does not indicate that a sale is not *bona fide*." IDM at 16. This should have been the beginning and the end of the analysis for this factor. Yet Commerce nevertheless found that the sale was *non-bona fide* because: "{t}he fact that there was only one sale during the POR, it was atypical of Hualing's and the U.S. importer's business practices, and made at an atypical price, indicates that the sale was intended for the purposes of obtaining an artificially low dumping margin and, therefore, not *bona fide.*" *Id*. Again, there being only a single sale is not a statutory factor, 19 U.S.C. § 1675(a)(2)(B)(iv)(I-VI), let alone a basis to find whether Hualing's timing of the sale was aberrant.

Second, Commerce fails to reasonably explain how this sale was atypical of the importer's practices. AR1 evidences that the importer purchased and sold custom cabinets; the record gives full context for the 2020 sale, that the importer's long-time customer inquired if the importer could obtain ADA cabinets for a project it was offered. *See* Vol. Supp. Resp. Attachment IV at 3, Exhibit S-1. The importer contacted three domestic suppliers, two responded that they were not able to supply custom-made cabinets in a short period of time due to COVID. *Id.* at 3. One domestic supplier provided a price quote. *Id.* at 3, Exhibit S-3. The importer thought the price quoted was too high, and reached out to Hualing. *Id*.

In contrast, the record shows [                                    ] had, by Commerce's definition, "atypical" timing in this administrative review—yet the Department did not analyze whether any of these sales were *bona fide*. For example, [              ] and [        ] shows that their sales [                                    ] the POR. *See*

39

*Inner Mongolia Jianlong Biochem.*, 337 F.Supp.3d at 1342 (reasonable to conclude that a single sale at the end of the POR was atypical.). Yet these [                                    ] and Commerce [                                    ] to assess whether their sales were atypical. Moreover, no evidence supports Commerce's conclusory statement "that the sale was intended for the purposes of obtaining an artificially low dumping margin and, therefore, not *bona fide*."

Simply, Commerce failed to objectively analyze the timing of Hualing's shipment in finding it atypical and commercially unreasonable. The record shows that Commerce's single *bona fide* analysis was arbitrary and unsupported by substantial evidence.

### D.     Expenses Arising from the Transaction

Commerce's determination with respect to expenses associated with Hualing's sale is not supported by substantial evidence. Here, the only "significant costs" that the Department found in this case were the "AD and CVD cash deposits paid." PBFM at 7-8; *see* IDM at 17-18.

First, Hualing's counsel is unaware of a single case where Commerce considered "AD and CVD cash deposits" in its expense analysis. Case Brief at 29. Commerce's *Final Results* cited a single case as support. IDM at 18 n.88 (citing *CTLP from China*, 86 Fed. Reg. 6865, IDM at 18). Yet nowhere in that, or any other, case has Commerce considered "AD and CVD cash deposits" in its expense analysis. Indeed, Commerce long ago detailed the expenses it considers: "The cost of the air freight, customs fees, brokerage expenses, warehousing, and miscellaneous expenses." *Cut-to-Length Carbon Steel Plate from Romania*, 63 Fed. Reg. 47,232, 47,234 (Sept. 4, 1998) (rescission).

In fact, Commerce's long-standing practice does **not** include "AD and CVD cash deposits" as expenses or elsewhere in the analysis because these are contingent liabilities. The reason for not deducting AD/CVD was articulated by this Court decades ago:

PUBLIC VERSION

Commerce's long-standing policy and practice is not to treat estimated or final {ADD/CVD} as import duties or costs under 19 U.S.C. § 1677a(d). The Court has held that Commerce is "correct not to deduct {from U.S. price} cash deposits of estimated {ADD}, which may not bear any relationship to the actual {ADD} owed" under § 1677a(d). *Federal–Mogul Corp. v. United States,* 17 CIT 88, 108, . . . (1993) ("estimated deposits of {ADDs} are not analogous to estimated deposits of "normal import duties"). "If deposits of estimated {ADDs} entered into the calculation of present dumping margins, then those deposits would work to open up a margin where none otherwise exists." *PQ Corp. v. United States,* 11 CIT 53, 67, . . . (1987). . . . {T}he Court sustained Commerce's decision not to deduct final assessed {ADD/CVD} as normal import duties from U.S. price in its margin calculation. *AK Steel Corp. v. United States,* 21 CIT 1265, {1279-81} (1997) (Commerce's explanation that deducting {ADD} as import duties from U.S. price would result in double-counting is rational).

*Hoogovens Staal BV v. United States*, 4 F.Supp.2d 1213, 1220 (CIT 1998).

The rationale for not including "AD and CVD cash deposits" as standard "custom duties" or expenses is the same in the *bona fide* analysis as in ADD calculations. As creating a margin where one does not exist, including 251.64% ADD would cause a sale to be non-*bona fide* when it was otherwise *bona fide*. *WCV from China*, 85 Fed. Reg. 22,126 (Apr. 21, 2020) ("*ADD Order*").

Moreover, in *CTLP from China*, Commerce explained:

{A}s part of our {*bona fide*} analysis, we determined that the {ADD/CVD} the importer included in its profit calculation are 'contingent liabilities,' because they may later be refunded and, therefore, should not be considered in the commercial price of the sale for purposes of comparing the commercial transaction with other sales or, in this case, ascertaining whether the sale on its own merits is commercially reasonable.

86 Fed. Reg. 6865, IDM Comment 2.c; *see also Polyethylene Terephthalate Film, Sheet, and Strip from India*, 76 Fed. Reg. 30,908 (May 27, 2011) (final results), IDM Comment 4 ("{b}ecause it was a deposit and {ADD/CVD} may be refunded, we generally do not include such duties as a cost for consideration in our profit analysis because they are an estimated liability and not an actual expense incurred.").

41

Commerce finding that the "AD and CVD cash deposits" paid by Hualing or any other party are excessive or significant indicates that the "AD and CVD rates" provides all the more reason for the Department to grant Hualing a separate rate. Hualing and its importer reasonably believed that the assessment rate for shipments entered during the AR1 POR—and cash deposits for shipments entered after AR1 concluded—would be lower than the 251.64% PRC-wide rate and closer to the 37.96% separate rate assigned in the investigation, *ADD Order*, 85 Fed. Reg. 22,126, provided Hualing cooperated, which it did. Here, Commerce's arbitrary inclusion of ADD/CVD cash deposits further demonstrated by the parallel CVD AR1 where the CVD rate for this same sale was lower than the cash deposit paid.

In AR1, Commerce has not reasonably explained why it is appropriate to reverse its long-standing categorization of "AD and CVD cash deposits" as not "custom duties" or other expenses—and, consequently, excluding them in its *bona fide* analysis. Commerce unreasonably fixated on Hualing having never produced similar "custom" cabinets and its importer having never purchased similar "custom" cabinets. IDM at 18 and 21. Moreover, the arbitrary and punitive analysis is underscored by Commerce's expectation that it was more reasonable for the importer to pay double for domestic ADA cabinets than incur ADD/CVD cash deposits, despite being contingent liabilities.

### E.  Whether the Goods Were Resold at a Profit

Commerce agreed that once ADD/CVD cash deposits were excluded, its calculation showed that the importer made profit. IDM at 18-19. Here again, similar to its commercial quantities and timing analysis, this should have ended the analysis of this factor. Yet Commerce raises its generic conclusory arguments that the price was atypical, claiming the sale was not typical of the importer's business practices. Commerce explained:

> {W}hether the subject merchandise under review was resold in the United States
> at a profit as part of determining whether the sale under review is *bona fide* . . .
> {and} that reselling profitability is indicative of whether the sale under review is
> similar to other U.S. sales for the subject merchandise, as well as whether the
> respondent may be able to sell subject merchandise in the future at similar pricing
> levels.

IDM at 19 (citing PBFM).

Yet Commerce, in AR1, disagreed that the importer's profitability showed any these elements, instead concluding that it was atypical of the importer's activities because the price for these cabinets was the fourth highest resale AUV sales price compared with the importers other sales of cabinets. Again, Commerce fails to explain how the sale being priced lower than others, albeit on the higher end, is not indicative of the importer's business practice. Moreover, besides this conclusory statement, Commerce failed to explain how the profit earned from the resale indicates that the profit would not be similar to its future U.S. sales. The importer stated that its mark-up was [   ]%, and nothing indicates this mark-up was aberrant or otherwise not indicative of future mark-ups. Vol. Supp. Resp. Attachment IV at 2.

As with other factors, Commerce repeats that "Hualing and the U.S. importer stated on numerous occasions to Commerce that the purported 'specialty' cabinets were more expensive than 'standard' cabinets, but provided no substantiating cost or pricing data to support the typical price of ADA cabinets." IDM at 20. Oddly, however, Commerce immediately thereafter acknowledges that the importer provided a U.S. producer's price quote double that the sale. *See id.* Commerce then falsely claims that neither Hualing nor importer explained why prices are different for ADA cabinets. Commerce ignored the importer's statement that custom ADA cabinets are more expensive because a manufacturer generally produces standard sizes, and custom by nature means that the producer must adjust its machines to account for the different sizes—driving cabinets costs higher. *See* Vol. Supp. Resp. Attachment IV at 1. Moreover, the

record includes two domestic companies stating that they could not produce the cabinets in a timely manner, and another's price was more than double Hualing's price. *Id*. Attachment II at 3. Finally, that the importer sold the merchandise it purchased from Hualing at a profit, IDM at 18-19 (citing Vol. Supp. Resp. Attachment IV at 4), should end that analysis.

### F.      Whether the Transaction was Made on an Arm's-Length Basis

Commerce's arm's length analysis is conflicted. It preliminarily concluded that:

> {S}ale negotiations and sale terms between Hualing and the U.S. importer and the U.S. importer and U.S. customer are not unusual and do not indicate the sale was not an arms-length transaction . . . . The concurrent sales negotiations between all three parties, . . . does not weigh against finding the sale not an arm's length transaction or non-*bona fide*.

PBFM at 8-9. Yet Commerce's *Final Results* "continue{d} to find that the concurrent sales negotiations between all three parties are not indicative of future commercial selling practices." IDM at 21.

Commerce again only offers conclusory statements or repeated arguments to support this new contradictory conclusion. For example, to support finding negotiations between all three parties not indicating future commercial selling practices, Commerce espoused:

> First, Hualing has never produced cabinets or "specialty" cabinets for the U.S. market and the U.S. importer has never purchased the purported "specialty" cabinets. Second, the artificially high price paid by the U.S. importer indicates that the nature of this sale was not reflective of normal business considerations. Third, Hualing and the U.S. importer planned in advance of the sale to ship "specialty" cabinets that purportedly cost "two or three" times the price of other cabinets to the United States.

*Id.*

While Hualing did not previously produce ADA cabinets, it nonetheless produced WCV, having the machines and equipment necessary to produce ADA cabinets. Indeed, Commerce acknowledges there are not necessarily significant differences in production of custom ADA-compliant versus standard cabinets beyond requiring adjusted machinery. Again, Hualing's price

44

was not artificially high—but well within the range of pricing information on the record and less than half that of a domestic producer. Vol. Supp. Resp. Attachment IV at 3, Exhibits S-3–4.

Finally, Commerce ignored context to conclude that "Hualing and the U.S. importer planned in advance of the sale to ship 'specialty' cabinets that purportedly cost 'two or three' times the price of other cabinets." The record shows that the importer purchased custom cabinets. *Id,* Exhibit S-1, Moreover, there is no evidence of either: a "plan" between Hualing and its importer to ship cabinets at two- or three-times more than others; or that the parties involved made WCV only to establish an artificial ADD rate, without regard for commercial reasonableness. "It is well established that speculation does not constitute substantial evidence." *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1327 (Fed. Cir. 2009).

### G.    Other Relevant Factors

Commerce's primary basis for finding Hualing's sale non-bona fide was because the ADA designation and purported higher purchase and sale prices rendered it "not representative of Hualing's future selling practices." IDM at 23. Commerce concedes that no one factor, such as price, commercial quantity, timing, profit, and arm's-length nature, make Hualing's sale "commercially unreasonable"—nonetheless finding it not indicative of future selling practices. Id. Yet Commerce fails to explain how a sale can be found to not be "commercially unreasonable" while at the same time exhibiting atypical prices, future selling practices, or form an inappropriate basis for a dumping margin. If the sale is not commercially unreasonable as Commerce found, then there is no reasonable basis to conclude that the sale is not future selling practices, regardless of whether for ADA cabinets or component parts.

There is no evidence that Hualing's sale was "unrepresentative or extremely distortive"; it was "commercially reasonable." PBFM at 3. Consequently, substantial evidence does not

support Commerce's determination. Whether Hualing or its importer "*has ever produced or sourced* [     ] cabinets" is irrelevant to Commerce's analysis. *Id*. at 11 (emphasis in original). Hualing produced WCV; it does not matter whether its WCV is described as normal, special, unique, custom, boring, ugly, small, or large. Hualing and its importer fully cooperated and provided evidence that the sale was commercially reasonable. Based on objective evidence, Hualing's sale was unquestionably *bona fide*.

## <u>CONCLUSION</u>

For the foregoing reasons, Hualing respectfully requests that this Court remand for Commerce to reconsider its *Final Results* and assign the separate ADD rate for Hualing.

Respectfully submitted,

 */s/ Michael S. Holton*
Michael S. Holton
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiff*
*Dalian Hualing Wood Co., Ltd.*

Dated: June 22, 2023

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiffs' Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 13,907 words, less than the 14,000 word limit.


 _/s/ Michael S. Holton_____
*Counsel for Plaintiff*
*Dalian Hualing Wood Co., Ltd.*


Dated: June 22, 2023

44964_1