_____
　　　　　　　　　　　　　　　　　　　　　 )
DALIAN HUALING WOOD CO., LTD.,　　 )
　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　*Plaintiff,*　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　*v.*　　　　　　　　　　　　 )　　Court No. 22-00334
　　　　　　　　　　　　　　　　　　　　　 )
UNITED STATES,　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　*Defendant,*　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　　and　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　 )
AMERICAN KITCHEN CABINET　　　　　 )
ALLIANCE,　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　*Defendant-Intervenor.*　　　 )
_____)

## ORDER

Upon consideration of the motion for judgment on the administrative record filed by the plaintiff, the responses thereto filed by the defendant and the defendant-intervenor, the plaintiff's reply, the administrative record, and all other papers and proceedings herein, it is hereby:

**ORDERED** that the motion is **DENIED**; and it is further

**ORDERED** that the U.S. Department of Commerce's determination is sustained; and it is further

**ORDERED** that judgment is entered in favor of the defendant.

It is **SO ORDERED**.

_____
Honorable Jane A. Restani, Judge
U.S. Court of International Trade

Dated: _____, 2023
　　　　New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE
### Before the Honorable Jane A. Restani, Judge

| | | |
|---|---|---|
| _____ | ) | |
| DALIAN HUALING WOOD CO., LTD., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | Court No. 22-00334 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | PUBLIC VERSION |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN KITCHEN CABINET | ) | |
| ALLIANCE, | ) | |
| | ) | |
| *Defendant-Intervenor.* | ) | |
| _____ | ) | |

## DEFENDANT-INTERVENOR'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
Luke A. Meisner
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for American Kitchen Cabinet Alliance*

Date: August 24, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iii

STATEMENT PURSUANT TO RULE 56.2(c)(1)...................................................... 1

   I.  Administrative Determination Under Review ...................................................... 1

   II. Issues Presented for Review .............................................................................. 2

SUMMARY OF ARGUMENT .................................................................................... 2

STANDARD OF REVIEW .......................................................................................... 3

STATEMENT OF FACTS ............................................................................................ 6

      A.    New Shipper Review ................................................................................. 6

      B.    Administrative Review .............................................................................. 8

ARGUMENT .............................................................................................................. 10

   I.  Commerce Lawfully Determined that Hualing's Single Sale of Merchandise During the POR Was Not a Bona Fide Sale .......................................................... 10

      A.    Commerce Has the Statutory Authority to Analyze the *Bona Fides* of a Separate Rate Applicant's U.S. Sale in an Administrative Review ........................................... 11

      B.    Hualing Was Not Singled out By Commerce .............................................. 16

      C.    Commerce Properly Departed from Its Established Practice of Not Reviewing Separate Rate Respondent's Sales Based on Resource Constraints ....................... 18

      D.    Commerce's Determination in the First CVD Review Does Not Detract from Its Determination in the Underlying AD Review ........................................ 20

      E.    Conclusion ................................................................................................. 21

   II. Commerce's *Bona Fide* Sales Determination Is Supported by Substantial Evidence.......... 22

      A.    Commerce's *Bona Fide* Sales Determination............................................. 22

      B.    Hualing Impermissibly Asks This Court to Reweigh the Evidence to Reach a Different Conclusion than Commerce Regarding the *Bona Fides* of its Single Sale . 25

   III.    Conclusion ................................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Allegheny Ludlum Corp. v. United States*, 24 CIT 452, 459, 112 F.Supp.2d 1141, 1148 (Ct. Int'l Trade 2000) ................................................................................................................ 18

*Am. Silicon Techs. V. United States*, 110 F. Supp. 2d 992, 995 (CIT 2000) ...................... 36

*Bebitz Flanges Works Priv. Ltd. v. United States,* 433 F. Supp. 3d 1297, 1306 (Ct. Int'l Trade 2020) ................................................................................................................. 30

*Bethlehem Steel Corp. v. United States*, 25 C.I.T. 895 (Ct. Int'l Trade 2001) ........................... 18

*Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ................. 5

*Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1391 (Ct. Int'l Trade 2021) ......... 25

*Catfish Farmers of Am. v. United States*, 33 Ct. Int'l Trade 1258, 1269-70, 641 F. Supp. 2d 1362, 1375 (2009) ....................................................................................................... 25

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ..................... 5

*Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) ................................................ 5

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) ..................................................... 4

*Desert Glory, Ltd. v. United States*, 29 C.I.T. 462 (2005) ........................................................ 16

*Dorbest Ltd. v. United States*, 35 C.I.T. 995, 999–1000 (Ct. Int'l Trade 2011) .......................... 18

*FAG U.K. Ltd. v. United States*, 20 CIT 1277, 945 F.Supp. 260 (1996) ............................... 11, 14

*Floral Trade Council of Davis v. United States*, 13 C.I.T. 242, 242, 709 F.Supp. 229, 230 (1989) .................................................................................................................... 17

*Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d, 1313 (CIT 2015) ............. 13, 17

*Fusong Jinlong Wooden Grp. Co. v. United States*, 617 F. Supp. 3d 1221, 1241 (Ct. Int'l Trade 2022) ................................................................................................................. 30

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ............. 5

*Hebei New Donghua Amino Acid Co., Ltd.* v. *United States,* 374 F. Supp. 2d 1333 (Ct. Int'l Trade 2005) ................................................................................................................. 10

*Hyundai Steel Co. v. United States,* 279 F. Supp. 3d 1349, 1372 (Ct. Int'l Trade 2017) .............. 21

*Ipsco, Inc. v. United States*, 714 F.Supp. 1211, 13 CIT 402 (1989) ............................................ 11

*Jiaxing Brother Fastener Co. v. United States*, 380 F.Supp.3d 1343, 1365 (Ct. Int'l Trade 2019) ....................................................................................................................... 18

*Jinxiang Chengda Import & Export Co., Ltd. v. United States*, Slip Op. 13-40 (CIT March 25, 2013) ................................................................................................................... 26, 37

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) ................. 4, 25

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001) ................. 4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983) .................................... 4, 5

*Nippon Steel Corp. v. United States*, 27 C.I.T. 1856, 1859, 301 F. Supp. 2d 1355, 1360 (2003) 25

*North Star Steel Ohio, a Div. of N. Star Steel Co. v. United States*, 824 F. Supp. 1074, 1077 (CIT 1993) ....................................................................................................................... 6

*Novolipetsk Steel Pub. Joint Stock Co. v. United States*, 483 F. Supp. 3d 1281, 1283 (Ct. Int'l Trade 2020) ......................................................................................................... 11, 12, 15

*Pakfood Co. V. United States*, 724 F.Supp.2d 1327, 1345 (Ct. Int'l Trade 2010) ........................ 21

*Pakfood Pub. Co. Ltd. v. United States*, 753 F.Supp.2d 1334, 1341–42 (C.I.T. 2011) ............... 18

*Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1379-80 (Fed. Cir. 2001)* ....... 5

*Rust v. Sullivan*, 500 U.S. 173, 187 (1991) ................................................................. 18

*See Am. Silicon Techs. v. United States*, 110 F. Supp. 2d 992, 995 (CIT 2000) (*Silicon Techs*). 36

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994)  4

*Tianjin Tiancheng Pharm. Co. v. United States*, 29 CIT 256, 366 F.Supp.2d 1246 (2005).. passim

*Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) ................................. 5

*United States Steel Group v. United States*, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) ................... 4

*Venus Wire Indus. Pvt. Ltd. v. United States,* 471 F. Supp. 3d 1289, 1306 (Ct. Int'l Trade 2020)
................................................................................................................................. 30

*Weishan Hongda Aquatic Food Co. v. United States,* 273 F. Supp. 3d 1279, 1289 (Ct. Int'l Trade
2017) ...................................................................................................................... 21

*Windmill Int'l PTE., Ltd. v. United States*, 26 C.I.T. 221 (2002) ......................................... 11, 14

*Yama Ribbons and Bows Co. v. United States*, 36 C.I.T. 1250, 1254, 865 F.Supp.2d 1294, 1299
(2012) ...................................................................................................................... 30

**Statutes**

19 C.F.R. § 351.213(d)(1) ......................................................................................... 9

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................................... 3

19 U.S.C. § 1673d(b)(5) ........................................................................................... 15

**Administrative Determinations**

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 31,282
(Dep't Commerce June 11, 2021) ............................................................................... 9

*Certain Cut-to-Length Carbon Steel Plate From Romania: Notice of Rescission of Antidumping
Duty Administrative Review*, 63 Fed. Reg. 47,232, 47,234 (Dep't Commerce Sept. 4, 1998). 34

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results and Partial
Rescission of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 17,435
(Dep't Commerce Mar. 29, 2016) .......................................................................... 13, 16, 19

*Certain Frozen Fish Fillets from Vietnam*, 81 Fed. Reg. 17,435 (Dep't Commerce Mar. 29,
2016) ................................................................................................................. 13, 16

*Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results
of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,197 (Dep't
Commerce Apr. 15, 2015) ...................................................................................... 18

*Chlorinated Isocyanurates From Spain:* 78 Fed. Reg. 72,633 (Dep't Commerce Dec. 3, 2013) 10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review
and Preliminary Determination of No Shipments; 2013-2014*, 80 Fed. Reg. 80,746 (Dep't
Commerce Dec. 28, 2015) ...................................................................................... 19

*Fresh Garlic from the People's Republic of China: Final Results and Partial Rescission of the
18th Antidumping Duty Administrative Review; 2011-2012*, 79 FR 36,721 (Dep't Commerce
June 30, 2014) .................................................................................................... 13, 16, 19

*Freshwater Crawfish Tail Meat from China*, 68 Fed. Reg. 1,439 (Jan. 10, 2003) ...................... 37

*Freshwater Crawfish Tail Meat From China*, 73 Fed. Reg. 20,249 (Apr. 15, 2008) .................. 37

*Mattresses from the People's Republic of China: Rescission of 2020 Antidumping Duty New Shipper* Review, 86 Fed. Reg. 31,275 (Dep't Commerce June 11, 2021).......................... 27, 37

*Silicomanganese from India*, 80 Fed. Reg. 75,660 (Dep't Commerce Dec. 3, 2015 ................... 23

*Wooden Cabinets and Vanities and Components Thereof from China: Preliminary Rescission of Antidumping Duty New Shipper Review; 2020*, 86 Fed. Reg. 46,178 (Dep't Commerce Aug. 18, 2021) ................................................................................................................................ 8

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China; Final Results and Partial Rescission of the Antidumping Duty Administrative Review; 2019-2021*, 87 Fed. Reg. 67,674 (Nov. 9, 2022)............................................................................... 1

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China*, Antidumping Duty Order, 85 Fed. Reg. 22,126 (Dep't Commerce Apr. 21, 2020) ............... 6

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Initiation of Antidumping Duty New Shipper Review*, 85 Fed. Reg. 77,162 (Dep't Commerce Dec. 1, 2020)........................................................................................................................... 6

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Rescission of Antidumping Duty New Shipper Review; 2020*, 86 Fed. Reg. 62,788 (Dep't Commerce Nov. 12, 2021)........................................................................................................ 9

*Xanthan Gum From the People's Republic of China: Issues and Decision Memorandum For the Final Results of the Second Antidumping Duty Administrative Review*, 82 Fed. Reg. 11428-01 (Dep't Commerce Feb. 23, 2017) ................................................................................... passim

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Jane A. Restani, Judge**

| | |
|---|---|
| _____ ) | |
| DALIAN HUALING WOOD CO., LTD., ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| *v.* ) | Court No. 22-00334 |
| ) | |
| UNITED STATES, ) | |
| ) | PUBLIC VERSION |
| *Defendant,* ) | |
| and ) | |
| ) | |
| AMERICAN KITCHEN CABINET ) | |
| ALLIANCE, ) | |
| ) | |
| *Defendant-Intervenor.* ) | |
| _____ ) | |

## DEFENDANT-INTERVENOR'S RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to USCIT Rule 56.2 and the Court's May 16, 2023 scheduling order, Defendant-Intervenor American Kitchen Cabinet Alliance ("AKCA" or "Petitioner") submits the following response in opposition to the motion for judgment on the agency record filed by Plaintiff Dalian Hualing Wood Co., Ltd. ("Hualing" or "Plaintiff") in the above-captioned action.

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I. Administrative Determination Under Review

The administrative determination under review is the final results of the Department of Commerce ("Commerce") in the antidumping ("AD") duty review of *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Results and Partial Rescission of the Antidumping Duty Administrative Review; 2019-2021*, 87 Fed. Reg. 67,674 (Dep't Commerce Nov. 9, 2022) ("Final Results") (P.R. 307), including the accompanying Issues and Decision Memorandum ("Final IDM") (P.R. 305).

**II.     Issues Presented for Review**

    1.  Whether Commerce's determination that Hualing's single sale of merchandise during the period of review ("POR") was not a *bona fide* sale is consistent with the agency's statutory authority and practice and is otherwise in accordance with law.

    2.  Whether Commerce's *bona fide* sales determination is supported by substantial evidence.

<u>**SUMMARY OF ARGUMENT**</u>

The Court should uphold Commerce's determination that Hualing's single sale is not a *bona fide* sale. As this Court has previously recognized, Commerce has the statutory authority to analyze whether sales are *bona fide* to ensure that respondents do not unfairly benefit from an atypical sale to obtain a lower dumping margin. This authority extends to separate rate applicants in administrative reviews. Indeed, Commerce has conducted such an analysis in numerous prior reviews, and the Court has upheld Commerce's authority to conduct the analysis. Hualing's fixation on the phrase "weighted average" in one provision of the statute to argue that Commerce lacks the authority to conduct a *bona fide* sale analysis of separate rate respondents focuses on a provision that applies only to new shipper reviews ("NSRs") and not administrative reviews, ignores other language in the statute, and is at odds with a long line of court cases recognizing Commerce's authority to scrutinize the *bona fides* of separate rate respondents' U.S. sales. In addition, Hualing's contorted interpretation of the statute would lead to the absurd outcome that Commerce could never conduct a *bona fide* sale analysis when a respondent has a single sale – because no "weighted average" dumping margin is calculated for a single sale.

Commerce properly departed from its usual practice of not reviewing the *bona fides* of a separate rate respondent's sales in the underlying administrative review. As Commerce explained, it typically does not conduct a *bona fide* sales analysis of separate rate respondents

due to resource constraints on the agency. However, this review presented a unique fact pattern where Commerce had already expended substantial resources to examine Hualing's single U.S. sale during the POR in the concurrent NSR. Moreover, contrary to Hualing's claims, it was not unfairly "singled out" for different treatment during the review. It was Hualing itself that requested a NSR of its single sale of merchandise, and Hualing knew that this request would lead to Commerce scrutinizing its single sale to determine whether it was a *bona fide* sale.

Finally, Commerce properly decided that its actions in the concurrent countervailing duty ("CVD") review did not detract from its *bona fide* sales determination in the antidumping duty review. The CVD review and the underlying antidumping duty review each has its own administrative record as well as separate procedural postures that warrant different outcomes in each proceeding. For all these reasons, Commerce's Final Results were in accordance with law.

In addition, Commerce's *bona fide* sales analysis is supported by substantial evidence. Contrary to Hualing's claims, all seven factors that Commerce analyzes as part of its established practice fully support Commerce's determination that Hualing's sale was not a *bona fide* sale. At the end of the day, Hualing's challenge to Commerce's determination impermissibly asks this Court to reweigh the record evidence and reach a different conclusion than Commerce based on that same evidence. That is not the role of the Court. Accordingly, this Court should uphold Commerce's final determination.

## STANDARD OF REVIEW

The standard of review requires that the Court uphold an agency determination as lawful unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law" 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In evaluating Commerce's determination, the Court must decide whether "the administrative record contain{s} substantial evidence to support" Commerce's decision and whether that decision was "rational." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

A plaintiff must do more than simply point to contradictory evidence in the record to overturn the agency's decision. "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (citations omitted). To the extent, therefore, that a plaintiff claims the evidence before Commerce "could be open to multiple interpretations, its argument does not require, or even allow, reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001) (citing *Matsushita*, 750 F.2d at 933). In addition, a plaintiff may not ask the Court to re-weigh the evidence and decide the case for Commerce. *See Matsushita*, 750 F.2d at 933. The role of the Court is not to second guess the agency's decisions about the weight or quality of the evidence. *See United States Steel Group v. United States*, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) (it is the agency's task to evaluate and assign weight to the evidence); *see also Matsushita*, 750 F.2d at 933 (it is not the weight of the evidence, but whether it reasonably supports a rational decision, that is evaluated by a reviewing court). The Court may not substitute its judgment or its interpretation of the evidence for that of the agency. *See Matsushita*, 750 F.2d at 936.

The standard also requires Commerce to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983) (internal quotations omitted).

4

While Commerce must explain the basis for its decisions, the court "will . . . 'uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

In reviewing Commerce's interpretation of a statutory provision, this Court is guided by the principles set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Under *Chevron*, a court reviewing an agency's interpretation of a statute must begin with the statutory test: "{i}f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43 (citations omitted). If this Court finds that the statute is silent or ambiguous with respect to the specific question at issue, the question for the Court is whether Commerce's interpretation is based on a permissible interpretation of the statute. *Chevron*, 467 U.S. at 842. The agency's reasonable interpretations of its statutory responsibilities are entitled to judicial deference. *Id.* at 844; *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379-80 (Fed. Cir. 2001).

The Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it *de novo*. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (Court will not "weigh the adequate quality or quantity of the evidence for sufficiency").

Finally, given Commerce's special expertise, this court has traditionally granted

"substantial deference to the agency in the methods it employs in administering the antidumping and countervailing duty law." *North Star Steel Ohio, a Div. of N. Star Steel Co. v. United States*, 824 F. Supp. 1074, 1077 (Ct. Int'l Trade 1993).

## STATEMENT OF FACTS

Commerce published the AD order on wooden cabinets and vanities and components thereof ("WCV") on April 21, 2020. *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (Dep't Commerce Apr. 21, 2020). After the order was issued, Hualing made a single sale of WCV to the United States. *See* Hualing Vol. Resp. (Sept. 1, 2021): Attachment I: Hualing Section A Questionnaire Response (Jan. 4, 2021) (C.R. 67-71, P.R. 147), at 14-16. According to Hualing, the merchandise that it sold was not a typical ready-to-assemble ("RTA") cabinet but was instead a "specialty kitchen cabinet" that was custom-made with special features not present in the typical RTA cabinets sold to the United States. *Id.* In particular, the cabinet was made to be compliant with the Americans with Disabilities Act ("ADA"). *Id.;* Hualing Opening Brief at 6. The sales price charged by Hualing was higher than the prices that the U.S. importer had paid for other cabinets imported from China. *Id.* at 25. According to Hualing and the importer, this high sales price was justified by the fact that Hualing's cabinets were "specialty" cabinets that were ADA compliant. *See* Hualing Vol. Resp. (Sept. 1, 2021): Attachment I, pp. 14-16.

### A.    New Shipper Review

On December 1, 2020, based on Hualing's own request, Commerce initiated a NSR of WCV from China for the single sale of specialty merchandise made by Hualing. *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Initiation of Antidumping Duty New Shipper Review*, 85 Fed. Reg. 77,162 (Dep't Commerce Dec. 1, 2020).

During the NSR, Commerce wrestled with two issues related to Hualing. The first issue was whether Hualing had already made prior sales of subject merchandise during the period of investigation such that it was not a new shipper. *See Wooden Cabinets and Vanities and Components Thereof from China: Preliminary Recission of Antidumping Duty New Shipper Review; 2020*, 86 Fed. Reg. 46,178 (Dep't Commerce Aug. 18, 2021) ("NSR Preliminary Rescission") and accompanying Preliminary Decision Memo ("NSR Preliminary Rescission PDM") at 4-5. If Hualing was not a new shipper, then it was not entitled to request a NSR, and Commerce would have to rescind the review. *Id.* The second issue was whether Commerce's single sale of merchandise during the period of review for the NSR was a *bona fide* sale. *Id.* If Hualing's single sale was not a *bona fide* sale, this determination would also result in rescission of the NSR. *Id.*

Commerce devoted significant resources in the NSR to gathering evidence relevant to the question of whether Hualing's single sale was a *bona fide* sale. For example, after Hualing had submitted its initial questionnaire response, Commerce issued a supplemental questionnaire to Hualing asking for evidence related to: (1) potential differences in the production processes and production volumes for [    ] cabinets and other types cabinets; (2) potential differences in the purchase price and purchase volumes between the [    ] cabinets and other types of cabinets; and (3) the history and relationship between Hualing and its U.S. customer. Hualing Vol. Resp. (Dec. 30, 2021) at Attachment II, pp. 4-8 (P.R. 211, C.R. 118-122). After Hualing responded to this first supplemental questionnaire, Commerce issued a second supplemental questionnaire with additional questions related to: (1) why [    ] cabinets that are custom-made products are always "more expensive" than [    ] cabinets; (2) any differences in physical characteristics and production processes that would support the higher prices for [    ] cabinets; (3) how the

price for the sale was established and the role of the different individuals and entities involved in the sales negotiation; (4) evidence of prior sales of [      ] cabinets; and (5) the expenses incurred for the resale of the subject merchandise. *Id.* at Attachment IV, pp. 1-7.

On August 18, 2021, Commerce preliminarily determined in the NSR that Hualing did not qualify as a new shipper and stated that it intended to rescind the new shipper review with respect to Hualing. NSR Preliminary Rescission PDM. Significantly, Commerce stated in its preliminary rescission determination for the NSR that it would examine the *bona fides* nature of Hualing's sale in the context of the concurrent administrative review. *Id.* at 5. Commerce was very clear in expressing its intention:

> {B}ecause Hualing's entry is subject to the administrative review covering the POR October 9, 2019, through March 31, 2021, we do not intend to issue liquidation instructions after the completion of the final results of this NSR. Instead, we intend to examine the *bona fides* nature of Hualing's sale in the context of the administrative review.

*Id.* at 4. Thus, Hualing knew by mid-August that if it continued to be part of the instant administrative review, Commerce intended to examine the *bona fides* of its single sale during the POR.

In November 2021, Commerce issued a final determination rescinding the NSR because it determined that Hualing was not eligible as a new shipper as it had previously shipped subject merchandise to the United States during the period of investigation. Final IDM at 7 (P.R. 305). When it rescinded the NSR, Commerce again stated that it would examine the *bona fides* nature of Hualing's single sale in the context of the concurrent administrative review. *Id.* at 9.

### B.     Administrative Review

On April 30, 2021, Hualing requested an administrative review of itself for the POR of October 9, 2012 through March 31, 2021. Hualing Request for Review (Apr. 30, 2021) (P.R. 15).

The single sale at issue in the NSR is the same sale at issue in the annual administrative review. Commerce Prelim. Bona Fide Sales Memo (May 11, 2022) at 1 (P.R. 257).

On June 11, 2021, Commerce initiated the administrative review. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 31,282 (Dep't Commerce June 11, 2021) (P.R. 27). On September 1, 2021, Hualing voluntarily submitted its Section A response and provided information regarding its single sale of "specialty kitchen cabinets" in compliance with [                    ]. Hualing Section A Response (P.R. 147, C.R. 67) at 16.

The deadline for Hualing to withdraw a request for a review of itself was September 9, 2021 – *i.e.*, 90 days from the date of initiation of June 11, 2021. 19 C.F.R. § 351.213(d)(1). Because Hualing was the only party that had requested a review of itself, Hualing's withdrawal would have resulted in a rescission of the review with respect to Hauling. *See id.* However, knowing that if the review continued, Commerce would examine the *bona fides* nature of Hualing's sales, Hualing did not withdraw its request. Hualing had ample time to consider its options to do so as it knew by mid-August that if it continued to be part of the underlying administrative review at issue in this action, Commerce intended to examine the *bona fides* of its single sale during the POR.

On May 4, 2022, Commerce issued its preliminary results and found that Hualing did not make a *bona* fide sale during the period of review. Preliminary Decision Memorandum (May 6, 2022) (P.R. 255) at 9-12; Preliminary Bona Fides Sale Memo (May 2, 2022) (P.R. 257, C.R. 127) at 1.

Hualing submitted its case brief on July 1, 2022 arguing that Commerce should find its single sale was a *bona fide* sale. *See* Hualing Case Brief (July 1, 2022) (P.R. 281, C.R. 138). On

July 15, 2022, the AKCA submitted its rebuttal brief demonstrating that Commerce should

continue to find that Hualing's single sale was not a *bona fide* sale. AKCA Rebuttal Brief (July

15, 2022) (P.R. 290, C.R. 141). Commerce published the Final Results on November 9, 2022.

Final Results (P.R. 307). Commerce continued to find that Hualing did not have a *bona fide* sale

during the POR based on its traditional analysis of seven factors. Final IDM at Comment 2 (P.R.

305). This appeal followed.

## ARGUMENT

### I.     Commerce Lawfully Determined that Hualing's Single Sale of Merchandise During the POR Was Not a Bona Fide Sale

Commerce has a practice of excluding U.S. sales from consideration in dumping margins

when those sales are found to be non-*bona fide* sales. *See, e.g., Chlorinated Isocyanurates From

Spain*, 78 Fed. Reg. 72,633 (Dep't Commerce Dec. 3, 2013) and accompanying IDM at

Comment. 1. This practice was developed so that a respondent such as Hualing does not unfairly

benefit from an atypical sale and obtain a lower dumping margin than that producer's usual

commercial practice would dictate. *See Hebei New Donghua Amino Acid Co., Ltd.* V. *United

States,* 374 F. Supp. 2d 1333, 1344 (Ct. Int'l Trade 2005). Here, the record evidence

demonstrated that the one sale made by Hualing during the POR was not representative of

Hualing's potential future sales of subject merchandise. As a result, Commerce properly found

Hualing's one U.S. sale to be non-*bona fide* and rescinded the review with respect to Hualing.

In its opening brief, Hualing argues that Commerce's *bona fide* sales analysis was not in

accordance with law because: (1) Commerce lacks the statutory authority to conduct such an

analysis on separate rate applicants in administrative reviews; (2) Commerce arbitrarily singled

out Hualing for scrutiny while declining to analyze whether the sales of other separate rate

applicants were *bona fide* sales; (3) Commerce's *bona fide* sales analysis departed from the

agency's established practice of not analyzing separate rate applicant's sales; and (4) Commerce's *bona fide* sales determination was inconsistent with the proceedings in the concurrent CVD review of WCV from China. *See* Hualing Opening Brief (June 22, 2023) (ECF 28) at 12-23. As demonstrated below, each of these arguments is devoid of merit and should be rejected.

A. **Commerce Has the Statutory Authority to Analyze the *Bona Fides* of a Separate Rate Applicant's U.S. Sale in an Administrative Review**

There is a long line of cases stretching back for many decades recognizing that Commerce has the statutory authority to exclude sales from consideration in administrative reviews where the sales are "clearly atypical" and "would undermine the fairness of the comparison of foreign and U.S. sales." *See, e.g., Ipsco, Inc. v. United States*, 714 F. Supp. 1211, 1217, 13 C.I.T. 402, 408 (1989), *rev'd in part on other grounds*, 965 F.2d 1056 (Fed. Cir. 1992); *FAG U.K. Ltd. v. United States*, 20 C.I.T. 1277, 1281–82, 945 F. Supp. 260, 265 (1996) ("Commerce can ... exclude sales from {U.S. price} in an administrative review in exceptional circumstances when those sales are unrepresentative and extremely distortive."); *Windmill Int'l PTE., Ltd. v. United States*, 26 C.I.T. 221, 230 (2002) (recognizing "Commerce's discretion in employing a methodology to exclude sales from the United States price that are unrepresentative or distortive, that is, non-*bona fide* ones").

Commerce's authority to conduct a *bona fide* sales analysis in administrative reviews was recently upheld in *Novolipetsk Steel Pub. Joint Stock Co. v. United States*, 483 F. Supp. 3d 1281, 1283 (Ct. Int'l Trade 2020). In that case, the plaintiffs argued that Congress's amendment of 19 U.S.C. § 1675(a) to require a *bona fide* sales analysis of U.S. sales in a new shipper review under § 1675(a)(2)(B)(iv) demonstrates that Commerce does not have statutory authority under § 1675(a)(2)(A) to analyze the *bona fides* of a U.S. sale in an administrative review. *Id.* (citing

Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), Pub. L. No. 114-125 § 433, 130 Stat. 122 (2016)). The Court rejected this argument. It noted that § 1675(a)(2)(A) provides that when conducting an administrative review of an AD order, Commerce shall determine "the normal value and export price (or constructed export price) of each entry of the subject merchandise" and the "dumping margin of each such entry." *Id.* The Court found that the statute is "capacious enough to accommodate Commerce's authority to examine which sales it will consider for purposes of establishing a dumping margin in an administrative review in some circumstances." *Id.* The Court also explained that because the statute does not define "what constitutes a sale," Commerce "has discretion to provide a reasonable interpretation for what constitutes a sale for purposes of conducting an administrative review." *Id.* The Court also recognized that it was important for Commerce to ensure that the price of a respondent's single sale of merchandise is based on "commercial considerations" rather than an atypical sale engineered to reduce a respondent's dumping margin. *See id.* at 1291 ("{T}he pricing of NLMK's transaction reasonably suggests the price is artificially inflated to reduce NLMK's dumping margin").

### i. *Commerce Can Conduct a Bona Fide Analysis of Separate Rate Respondents*

Hualing argues that because it was a separate rate applicant instead of a mandatory respondent, Commerce should have limited its review of Hualing to a separate rate analysis and refrained from conducting a *bona fide* sales analysis. Hualing Opening Brief at 14-15. This argument is meritless and should be rejected. Commerce's statutory authority to determine whether a sale is a *bona fide* sale extends to separate rate applicants.

As Commerce has previously recognized, a respondent's U.S. sale must be a *bona fide* commercial transaction in order for Commerce to analyze the separate rate status of the

respondent. *Xanthan Gum from China*, 82 Fed. Reg. 11,428 (Dep't Commerce Feb. 23, 2017) ("*Xanthan Gum from China*") and accompanying IDM at Comment 4. When Commerce determines that all of a respondent's sales during the POR are non-*bona fide* sales, those sales do not provide a basis for determining whether the respondent qualifies for a separate rate. *Id.* Since non-*bona fide* sales do not qualify as reviewable sales, Commerce cannot conduct a separate rate analysis for that respondent. *Id.* Consistent with this principle, Commerce has rescinded reviews with respect to separate-rate applicants without any *bona fide* sales during the relevant POR. *See, e.g., id.* at Comment 4; *Fresh Garlic From China*, 79 Fed. Reg. 36,721 (Dep't Commerce June 30, 2014) (final results) ("*Fresh Garlic 18AR*") and accompanying IDM at Comment 18; *Certain Frozen Fish Fillets from Vietnam*, 81 Fed. Reg. 17,435 (Dep't Commerce Mar. 29, 2016) (final results) ("*FFF from Vietnam*") and accompanying IDM at Comment VII.

In this regard, the facts of this case are remarkably similar to the facts of *Fresh Garlic 18AR*. In that case, the respondent Shijiazhuang Goodman Trading Co., Ltd. ("Goodman") had requested both an NSR and an administrative review. *Fresh Garlic 18AR* and accompanying IDM at Comment 18. Goodman's NSR was rescinded, however, because Commerce concluded that Goodman did not have any *bona fide* sales. *Id.* Thereafter, Commerce also rescinded the administrative review with respect to Goodman. *Id.* Commerce used the evidence collected during the NSR to determine that Goodman's sales were not *bona fide* because "the information on the record showed that the reported sales were not commercially reasonable and were not reflective of normal business practices." *Id.*

Goodman appealed Commerce's decision to this Court, arguing that it was entitled to a separate rate and "a lack of *bona fide* sales is an improper basis on which to rescind an administrative review." *Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313

(Ct. Int'l Trade 2015) (Restani, J). This Court rejected this argument and upheld Commerce's decision. First, this Court recognized that "{i}n evaluating the *bona fides* of entries, Commerce is permitted to exclude certain sales when they are unrepresentative or extremely distortive." *Id.* at 1335 (citing *Windmill*, 26 C.I.T. at 224; *FAG U.K.*, 20 C.I.T. at 1281-82). This Court then upheld Commerce's decision to rescind the review with respect to Goldman based on its finding that Goodman had no *bona fide* sales during the POR:

> Here, Commerce's actions were reasonable as it cannot evaluate a company for application of a separate rate to its sales when there are no sales that are not unrepresentative or distortive. As there were no reviewable entries, Commerce properly rescinded the review. Because all of the sales were not *bona fide,* there were no sales within the POR for which Commerce could grant Goodman a separate rate.

*Id.* This Court's holding in *Fresh Garlic Producers* thus directly addresses the central legal issued presented by Hualing's appeal — *i.e.*, whether Commerce has the legal authority to make a *bona fide* sales determination with respect to a separate rate applicant in an administrative review. Astoundingly, Hualing fails to reference this highly relevant precedent anywhere in its opening brief.

### ii.   *Hualing's Statutory Arguments Based on 19 U.S.C. § 1675(a)(2)(B)(iv) Are Devoid of Merit*

Hualing cites to 19 U.S.C. § 1675(a)(2)(B)(iv) to argue that the statute only allows Commerce to conduct a *bona fide sale* analysis if it is calculating a "weighted average dumping margin or individual {CVD} rate." Hualing Opening Brief at 14, 16-18. Hualing contends that since it is a separate rate applicant, and not a mandatory respondent, there is no "weighted-average" dumping margin for Commerce to calculate based on Hualing's sale, because Hualing's separate rate is based on the rate of the mandatory respondents. *See id*. This argument is baseless and should be rejected.

First, the statutory provision cited by Hualing applies to NSRs and not to administrative reviews. The relevant portion of the statute provides as follows:

> Any weighted average dumping margin or individual countervailing duty rate determined for an exporter or producer *in a review conducted under clause (i)* shall be based solely on the bona fide United States sales of an exporter or producer, as the case may be, made during the period covered by the review.

19 U.S.C. §1675(a)(2)(B)(iv) (emphasis added). The "clause (i)" referenced in the provision is referring to reviews for the "{d}etermination of antidumping or countervailing duties for new exporters and producers" – *i.e.*, new shipper reviews. *Id.* §1675(a)(2)(B). Thus, this provision does not apply to administrative reviews. Indeed, the legislative history for this provision shows that it was added to the statute as part of the TFTEA in 2015 to *require* that Commerce conduct a *bona fide* sales analysis in NSRs. *Novolipetsk*, 483 F. Supp. 3d at 1288 n.9 (citing TFTEA, Pub. L. No. 114-125, § 433, 130 Stat. 122 (2016)). As discussed above, the courts have held for decades, long before the passage of the TFTEA in 2015, that Commerce has separate authority to conduct a *bona fide* sale analysis of respondents' sales in administrative reviews.

In addition, even if 19 U.S.C. §1675(a)(2)(B)(iv) somehow did apply in administrative reviews, the reference to "weighted average dumping margin" would not preclude Commerce from analyzing the sales of separate rate applicants. In fact, the determination of the separate rate is based on a weighted average dumping margin. In particular, according to 19 U.S.C. § 1673d(b)(5), the provision that Commerce uses as guidance to determine the rate for separate rate respondents in administrative reviews, "the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated." Thus, the statutory provision reinforces the principle that in order for a separate rate applicant to be entitled to a separate rate, it must have a *bona fide* U.S. sale.

Finally, Hualing's contorted interpretation of the statute would lead to absurd results. According to Hualing, Commerce can only conduct a *bona fide* sales analysis if it is calculating a "weighted average" dumping margin. If this were true, Commerce could not conduct a *bona fide* sales analysis whenever a new shipper has only one sale. In that circumstance, the single margin calculated for that sale becomes the rate for the new shipper without any need to weight average the margins for multiple sales. Yet as the Court has recognized, single sales should be "carefully scrutinized to ensure that {respondents} do not unfairly benefit from unrepresentative sales." *Tianjin Tiancheng Pharm. Co. v. United States*, 29 C.I.T. 256, 260, 366 F. Supp. 2d 1246, 1250 (2005). In other words, under Hualing's interpretation of the statute, Commerce cannot conduct a *bona fide* sales analysis precisely when it is most important to conduct the analysis. This interpretation should, accordingly, be rejected. *See, e.g., Desert Glory, Ltd. v. United States*, 29 C.I.T. 462, 468 (2005) (rejecting an interpretation of the statute that "would yield patently absurd results").

**B.     Hualing Was Not Singled out By Commerce**

Hualing asserts that it was arbitrarily singled out in this review because there is no precedent that exists with similar facts to this case for conducting the *bona fides* sales analysis on sales made by separate rate applicants that are not mandatory respondents. Hualing Opening Brief at 22. As an initial matter, this is false. Commerce has previously found separate rate applicant's U.S. sales to be non-*bona fide*. *See, e.g., Xanthan Gum from China* and accompanying IDM at Comment 4; *Fresh Garlic 18AR* and accompanying IDM at Comment 18; *FFF from Vietnam* and accompanying IDM at Comment VII.

In addition, the Court has previously rejected this same argument from a similarly situated separate rate applicant. Specifically, in *Fresh Garlic Producers*, Goodman argued that

"it was arbitrary and capricious of Commerce to examine the *bona fides* of its sales when it did not examine the *bona fides* of any other separate rate respondents' sales." *Fresh Garlic Producers*, 121 F. Supp. 3d at 1335. The Court noted that Goodman ignored the fact that no other separate rate applicant had filed an NSR, and accordingly, Commerce had a reasonable explanation for why it treated Goodman differently. *Id.* The Court further explained that when Goodman filed the NSR, "it became subject to the potential negative impact of that review on the administrative review." *Id.* The Court concluded that "once Commerce had the information concerning the non-*bona fides* of Goodman's sales it could not ignore that relevant information." *Id.* (citing *Floral Trade Council of Davis v. United States*, 13 C.I.T. 242, 242, 709 F. Supp. 229, 230 (1989)). *See also Tianjin*, 29 C.I.T. at 260, 366 F. Supp. 2d at 1251 (finding that in determining whether a sale is *bona fide*, Commerce and the Court must review all evidence, and not "ignore other contradictory evidence.").

The facts in the underlying review in this case are almost identical to the facts in *Fresh Garlic Producers*. Here, like Goodman, Hualing requested a NSR of itself as well as an administrative review. Here, as with Goodman, Commerce collected evidence during the NSR demonstrating that Hualing's sale was not *bona fide*. Here, as for Goodman's sale, Commerce used that same information in the administrative review to conclude that Hualing's sale was not a *bona fide* sale and thus rescind the review with respect to Hualing. Commerce never singled Hualing out for different treatment. Hualing singled itself out for different treatment by requesting an NSR and subjecting itself to the potential negative impact of the NSR on the administrative review.

**C.      Commerce Properly Departed from Its Established Practice of Not
Reviewing Separate Rate Respondent's Sales Based on Resource Constraints**

Hualing next argues that Commerce acted arbitrarily when it departed from its

established practice of not conducting a *bona fide* sale analysis of separate rate applicants.

Hualing Opening Brief at 22. However, Commerce may depart from an established practice if it

provides a reasoned explanation for its departure and its actions are otherwise in accordance with

the authority granted by the statute. *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp.

3d 1343, 1365 (Ct. Int'l Trade 2019) (citing *Rust v. Sullivan*, 500 U.S. 173, 187 (1991); *Dorbest

Ltd. v. United States*, 35 C.I.T. 995, 999–1000 (2011) (citing *Pakfood Pub. Co. Ltd. v. United

States*, 753 F. Supp. 2d 1334, 1341-42 (Ct. Int'l Trade 2011)); *Bethlehem Steel Corp. v. United

States*, 25 C.I.T. 895 (2001) (citation omitted); *Allegheny Ludlum Corp. v. United States*, 24

C.I.T. 452, 459, 112 F. Supp. 2d 1141, 1148 (2000).

There is no statutory or regulatory provision that constrains Commerce from examining

the *bona fide* nature of separate rate applicant's sales of subject merchandise during an

administrative review. Rather, Commerce's general practice of not conducting such

examinations is driven purely by "resource constraints" that drive Commerce to limit individual

examination of exporters under review to the mandatory respondents. *Certain New Pneumatic

Off-the-Road Tires From China*, 80 Fed. Reg. 20,197 (Dep't Commerce Apr. 15, 2015) ("OTR

Final Results") and accompanying IDM at Comment 3.

As Commerce explained in the final results, the facts in this review were unique and

required a departure from its typical practice. Final IDM at 7-8 (P.R. 305). Normally, Commerce

may not have the ability to examine separate rate applicants' sales due to the enormous resource

expenditure involved. *Id.* at 8. However, in this case, Commerce had already expended these

resources because Hualing requested a NSR of itself and Commerce had gathered information and begun analyzing Hualing's single sale in the NSR. *Id.*

The cases cited by Hualing discussing Commerce's established practice are distinguishable because none of them involve a situation where a respondent's single sale served as the basis for its NSR and its separate rate application in a concurrent administrative review. Nor do any of the cases cited by Hualing involve a prior NSR where an allegation had been made that the respondent's single sale was not *bona fide*. *See PVLT 19/20 Final Results IDM* at Comment 6; *OTR 12/13 Final Results IDM* at Comment 3; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from China*, 80 Fed. Reg. 80,746 (Dep't Commerce Dec. 28, 2015) (prelim. results) and accompanying PDM at 12 n. 42, *unchanged in* 81 Fed. Reg. 39,905 (Dep't Commerce June 20, 2016) (final results).

Hualing also fails to account for cases where Commerce has made a determination that a separate rate applicant's sales were not *bona fide* based on evidence collected from a NSR of the applicant. *See, e.g., Xanthan Gum from China* and accompanying IDM at Comment 4; *Fresh Garlic 18AR* and accompanying IDM at Comment 18; *FFF from Vietnam* and accompanying IDM at Comment VII ("NTACO's and Nam Phuong's entries were covered by both a NSR and this administrative review. We rescinded {the NSR} based on a finding that the sales at issue were not *bona fide* {and} there are no other *bona fide* sales on which to conduct a review with respect to NTACO and Nam Phuong. Therefore, we are rescinding this review with respect to these companies."). The only distinction between this case, on the one hand, and *Xanthan Gum from China*, *Fresh Garlic 18AR,* and *FFF from Vietnam*, on the other hand, is that in the latter cases Commerce both collected the evidence necessary for a *bona fide* sale analysis and reached a *bona fide* sale determination in the NSR, whereas in this case, Commerce collected the

evidence necessary for a *bona fide* sale analysis in the NSR and did not make the *bona fide* sale determination until the administrative review. However, the only reason for this distinction is that Commerce determined that Hualing was not, in fact, a new shipper and rescinded the NSR on that basis without reaching the *bona fide* sale determination. This is a distinction without a difference. In all three cases, Commerce had already expended significant resources collecting evidence relevant to the *bona fide* sale determination in the NSR, and it would make no sense to ignore that evidence in the concurrent administrative review.

In sum, the unique circumstances present in the underlying review warranted a departure from Commerce's general practice of not examining the *bona fide* nature of Hualing's sale of cabinets, and Commerce properly departed from its established practice in this matter.

### D. Commerce's Determination in the First CVD Review Does Not Detract from Its Determination in the Underlying AD Review

The Court should reject Hualing's argument that "Commerce violated its statutory mandate by arbitrarily conducting its *bona fide* analysis" in the AD review while simultaneously declining to conduct such an analysis in the concurrent CVD review. *See* Hualing Brief at 12-13. Commerce could have conducted a *bona fide* sales analysis in the CVD review. However, its decision not to do so did not preclude a *bona fide* sales analysis in the AD review. In fact, it was reasonable for Commerce to conduct a *bona fide* sales analysis only in the AD proceeding and not the CVD proceeding because Hualing only requested a NSR in the AD proceeding and not the CVD proceeding. Moreover, Commerce notified Hualing in the NSR that it would examine the *bona fides* nature of Hualing's sale in the AD review. Commerce Preliminary Decision Memo for NSR (Aug. 12, 2021) at 4-5. At no point did Commerce state that it would conduct a *bona fide* sales analysis in the CVD review.

The Court has upheld Commerce's ability to treat each segment of a proceeding as having its own administrative record, which may result in different decisions in different segments. *See Weishan Hongda Aquatic Food Co. v. United States,* 273 F. Supp. 3d 1279, 1289 (Ct. Int'l Trade 2017), *aff'd,* 917 F.3d 1353 (Fed. Cir. 2019) (explaining that "…the administrative and new shipper reviews represent different segments of the proceeding, and although Commerce aligned the schedules of the two reviews, it maintained separate administrative records"); *see also Hyundai Steel Co. v. United States,* 279 F. Supp. 3d 1349, 1372 (Ct. Int'l Trade 2017) (finding that "…Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings"); *Pakfood Co. v. United States*, 724 F. Supp. 2d 1327, 1345 (Ct. Int'l Trade 2010) (finding that "Commerce makes determinations based upon the record of the relevant segment of the proceeding, not previous segments, and {that} the record of this review supports Commerce's determination" in the third review despite coming to the opposite conclusion in the two prior reviews). The administrative record of the CVD review is separate and distinct from the administrative record of the AD review. Moreover, the evidence relevant to whether Hualing's sale was a *bona fide* sale was only on the record of the AD review, because Hualing itself voluntarily submitted it onto the record. *See* Hualing Vol. Resp. (Sept. 1, 2021) (CR 67-71, PR 147). There is no indication that this same evidence was on the record of the CVD review. It was thus perfectly reasonable for Commerce to conduct a *bona fide* sale analysis in the AD review but not the CVD review.

### E. Conclusion

For all the foregoing reasons, Commerce's *bona fide* sales analysis was in accordance with law. Commerce had the statutory authority to conduct the analysis in an administrative

review, and that authority extends to separate rate applicants. It did not arbitrarily single out Hualing in conducting the analysis. Its analysis was consistent with agency practice and, to the extent the decision to conduct a *bona fide* sale analysis of a separate rate applicant departed from agency practice, that departure was supported by a reasonable explanation. Finally, Commerce's proceedings in the concurrent CVD review do not detract from its analysis in the AD review because these are separate proceedings with separate administrative records. Commerce's final results should thus be upheld as being in accordance with law.

## II. Commerce's *Bona Fide* Sales Determination Is Supported by Substantial Evidence

The Court should also reject Hualing's claims that Commerce's *bona fide* sale determination was not supported by substantial evidence. As demonstrated below, each factor that Commerce examined supported its determination that, based on the totality of the circumstances, Hualing's single sale of WCV was not a *bona fide* sale. Rather than pointing to any error that would require a remand of Commerce's *bona fide* sale determination, Hualing instead is asking the Court to reweigh the evidence and arrive at a different determination than the one reached by Commerce. This is not a basis for reversal under the Court's standard of review. Thus, Commerce's determination should be upheld as supported by substantial evidence.

### A. Commerce's *Bona Fide* Sales Determination

In evaluating whether sales are *bona fide*, Commerce considers the totality of the circumstances to determine whether the sales under consideration are atypical, distortive, or otherwise unrepresentative of normal business practices. In determining whether the sale is commercially reasonable or typical of normal business practices, Commerce considers, *inter alia*, factors such as (a) the price of the sale, (b) whether the sale was made in commercial quantities; (c) the timing of the sale; (d) the expenses arising from the transaction; (e) whether

the goods were resold at a profit; (f) whether the transaction was made on an arm's-length basis; and (g) any other circumstances associated with the sale. *Silicomanganese from India*, 80 Fed. Reg. 75,660 (Dep't Commerce Dec. 3, 2015) (final results) ("*Silicomanganese from India*") and accompanying IDM at Issue 1. The factors are meant to examine the commercial realities surrounding an alleged sale of subject merchandise. *Hebei New Donghua Amino Acid Co., Ltd. v. United States*, 374 F. Supp. 2d 1333, 1342 (Ct. Int'l Trade 2005). The Court has recognized that any factor indicating that a sale is not likely to be typical of sales which the exporter will make in the future is relevant to the *bona fide* sales analysis. *Tianjin*, 29 CIT at 260, 366 F. Supp. 2d at 1250. In addition, when only one sale is used to calculate a new margin and cash deposit rate, Commerce will heavily scrutinize the single transaction. *Id.*

In the underlying review, Hualing made only one sale during the POR, and as a result, Commerce heavily scrutinized that one sale. Final IDM at 7-8 (P.R. 305). This scrutiny led Commerce to conclude that the sale was not *bona fide*:

- **Price**: Based on a comparison of Hualing's sales price to other prices on the record, Commerce found that Hualing's sales price and the U.S. importer's resale price were atypical and not representative of their business practices or indicative of their future selling practices. *Id.* at 11-14. In reaching this finding, Commerce found that there were only minor physical differences between Hualing's so-called "specialty" cabinets and other standard cabinets, and Hualing had failed to substantiate the higher price that was charged for the ADA compliant cabinets. *Id.* at 13.

- **Commercial Quantities**: Commerce found that Hualing's single sale is not indicative of a *bona fide* sale and indicates that the single sale was made for the purpose of establishing a new AD deposit rate, without regard for commercial reasonableness. *Id.* at 14-15. Furthermore, Hualing's sales of similar merchandise to its domestic and third country markets indicated that its single "specialty" cabinets sale to the United States was atypical of the company's own business practices. *Id.*

- **Timing**: Commerce found that the fact that Hualing's single sale for higher priced "specialty kitchen cabinets" was negotiated during the original investigation indicated that the sale was intended for the purposes of obtaining an artificially low dumping margin and, therefore, not *bona fide*. *Id.* at 16-17.

- ***Expenses***: Commerce found that the sales expenses incurred by the U.S. importer significantly exceeded Hualing sales price to the U.S. importer and the U.S. importer's resale to the downstream customer, raising serious questions regarding the *bona fide* nature of the transaction. *Id.* at 17-18. In reaching this finding, Commerce included the AD/CVD cash deposits paid to Customs and Border Protection ("CBP") because there were considerable questions regarding the importer's decision to incur significant AD/CVD expenses for the entry of Hualing's cabinets as part of a *bona fide* sale. *Id.*

- ***Whether Goods Were Resold at a Profit***: While Commerce noted that the reseller resold the WCV at a gross profit, Commerce found that the U.S. importer's markup and resale price was atypical and not indicative of future commercial practices, and thus the resale was not an appropriate benchmark to determine whether the sale is indicative of future commercial selling practices. *Id.* at 18-20. Commerce also found that the U.S. importer's resale price was artificial, based on the purported "customized" and "specialty" nature (*i.e.*, ADA compliant) of the product, and not indicative of a *bona fide* sale. *Id.*

- ***Arm's-Length Transaction***: Commerce found that the concurrent sales negotiations between the three relevant parties was not indicative of future commercial selling practices. *Id.* at 21. First, Hualing had never produced cabinets or "specialty" cabinets for the U.S. market, and the U.S. importer had never before purchased any "specialty" cabinets." *Id.* Second, the artificially high price paid by the U.S. importer indicated that the sale was not reflective of normal business considerations. And third, Hualing and the U.S. importer planned in advance to ship "specialty" cabinets that purportedly cost "two or three" times the price of other cabinets to the United States. *Id.* Thus, the negotiations for Hualing's single sale were not based on the independent interests of the parties involved and were only made for the purpose of establishing an artificial antidumping deposit rate. *Id.*

- ***Other Relevant Factors***: Commerce found it relevant that Hualing had made a single sale of "specialty" cabinets, because this was Hualing's explanation for why its sales price was so much more expensive than standard cabinets. *Id.* at 22-23. When Commerce interrogated this explanation, it found no substantial differences for the dimensions or cost of production between ADA compliant cabinets and standard cabinets. Commerce thus found that because Hualing's ADA compliant cabinets are more expensive than standard cabinets, without any reasonable explanation or basis for this price discrepancy, they are not representative of Hualing's future selling practices. *Id.*

The bottom line is that Commerce properly applied its seven-factor analysis to Hualing's single sale and ultimately determined based on substantial evidence on the record that the sale was not *bona fide*.

**B.      Hualing Impermissibly Asks This Court to Reweigh the Evidence to Reach a Different Conclusion than Commerce Regarding the *Bona Fides* of its Single Sale**

A party challenging Commerce's determination must show how it is "unsupported by substantial evidence on the record" or otherwise not "in accordance with law." Applying this standard, the plaintiff may not ask the Court to reweigh the evidence and decide the case for Commerce. *See Matsushita*, 750 F.2d at 933. The Court has thus consistently refrained from reweighing the evidence and reaching a conclusion different from the agency's conclusion, because "{i}t is within Commerce's discretion to weigh the relevant factors." *Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1391 (Ct. Int'l Trade 2021) (Restani, J.) (citing *Nippon Steel Corp. v. United States*, 27 C.I.T. 1856, 1859, 301 F. Supp. 2d 1355, 1360 (2003) ("In conducting its review, the court's function is not to reweigh the evidence but rather to ascertain whether the {agency's} determinations are supported by substantial evidence on the record."). In this regard, as explained in greater detail below, Hualing's challenge to the evidence supporting Commerce's *bona fide* sale determination is no different than the "garden variety request to reweigh evidence" that the Court has routinely rejected. *Catfish Farmers of Am. v. United States*, 33 C.I.T. 1258, 1269-70, 641 F. Supp. 2d 1362, 1375 (2009).

### i.      *The Price of the Sale*

Commerce conducted multiple comparisons of Hualing's sales price to other benchmarks on the record. As discussed below, each of those comparisons demonstrated that – as Hualing's own importer conceded – the sale price was atypically high.

#### a.   *CBP Data AUV versus Ranged CBP Data*

Commerce determined that Hualing's single sale was atypical based on a comparison of Hualing's sales price to the average unit value ("AUV") of the sales of the other separate rate

applicants during the POR. Final IDM at 11 (P.R. 305). In fact, the AUV of Hualing's sale was

[          ], whereas the AUV of all imports of cabinets during the POR was [          ], meaning

Hualing's AUV was [      ] percent more than the AUV of other imports of cabinets from China

during the POR. *See* Commerce Preliminary Bona Fide Sales Memo (May 11, 2022) at 4-5 (P.R.

257, C.R. 127). Hualing argues that this AUV is not a suitable benchmark for measuring whether

its sale price was atypical because it reflects imports for different types and sizes of cabinets.

Hualing Opening Brief at 26. However, as Commerce explained in the *Final Results*, it is

Commerce's practice to use broad-based averages for the entire POR, rather than ranged

individual sales prices for comparison, because using AUVs, rather than a range of prices

contained in the CBP data, establishes a fair market price for all U.S. imports and a baseline for

comparison. Final IDM at 11-12 (P.R. 305). Commerce noted that the AUV derived from the

CBP data was based on a large sample that is representative of the average per-unit price of

subject merchandise from China during the POR, whereas single prices from ranged data points

do not ensure the same level of representativeness. *Id.* Moreover, the Court has sustained

Commerce's use of AUVs derived from CBP data as a "useful tool for comparison because it

provides a fair representation of prices set by the market." *Id.* (citing *Jinxiang Chengda Import &*

*Export Co., Ltd. v. United States*, 37 C.I.T. 418 (Ct. Int'l Trade 2013)).

Hualing argues that instead of comparing its sales price to broad-based AUVs,

Commerce should have compared Hualing's sales price to "ranged individual sales prices."

Hualing Opening Brief at 32. However, Commerce did conduct such a comparison. When

Commerce ranged the CBP data by individual AUVs, Hualing's single entry was ranked [    ] out

of [      ] for all per-piece entries during the POR. Commerce Final Bona Fides Sales Memo

(Nov. 4, 2022) (P.R. 306, C.R. 141) at 2. The fact that [                    ] entries, or [

] of all entries, have a [          ] AUV than Hualing's single sale demonstrates that

Hualing's price is atypical. *Id.* It demonstrates that Hualing's price is [                    ] in the

POR. Acknowledging this fact, Hualing complains that this case is still "unlike other cases where

pricing was clearly outside the range." Hualing Opening Brief at 32. In other words, Hualing is

simply asking this Court to reweigh the evidence and find that a sales price [

] of all prices is not atypical. While arguably no reasonable mind would differ with

Commerce's weighing of the evidence, the agency's finding is certainly supported by substantial

evidence and should be upheld.

### b. Separate Rate Applicant and Mandatory Respondent Comparisons

Hualing also noted that it argued in its case brief that [      ] other separate rate applicants,

[                                      ], had sales prices during the POR that were

[      ] than Hualing. Hualing Opening Brief at 28. However, Commerce found that the average

sales price of these separate rate applicants was [                 ] than Hualing's AUV of

[      ]): [                                      ]. Commerce Final Bona Fides Sales Memo (Nov.

4, 2022) (P.R. 306, C.R. 141) at 3. Thus, Commerce continued to find that Hualing's sales price,

when compared to the other respondents, was [                 ] and atypical. *Id.*

It is Commerce's practice in the course of a *bona fides* analysis, either as an alternative or

in addition to the CBP data examination, to compare a respondent's selling price of the reported

U.S. transaction to the POR sales made by the other producers/exporters under review, or the

respondent's own sales. *See Mattresses from China*, 86 Fed. Reg. 31,275 (Dep't Commerce June

11, 2021) (rescission of new shipper review) ("*Mattresses from China*") and accompanying IDM

at 9-10; *see also Tianjin*, 29 C.I.T. at 268-69, F. Supp. 2d at 1257-58. In the preliminary results,

consistent with that practice, Commerce compared Hualing's price to the mandatory

respondent's reported quantity and value and the sample invoices submitted in the separate rate applications subject to the review. Commerce Preliminary Bona Fides Sales Memo (May 11, 2022) (P.R. 257, C.R. 127) at 5. Hualing's AUV per piece ranges from [     ] percent to [     ] percent more than the other separate rate applicants and the mandatory respondent who reported sales on a per piece basis. *Id.* Hualing's AUV per KG (*i.e.*, $[       ]) ranges from [     ] percent to [     ] percent more than the other separate rate applicants who reported sales on a per KG basis. *Id.* Hualing argues that Commerce unreasonably conducted a self-selected price comparison analysis with certain separate rate applicants and mandatory respondent prices and offers its own comparison based on the CBP data for [                           ]. Hualing Opening Brief at 32-33. However, Hualing's comparison using [       ] is based on CBP data, whereas Commerce's comparison was based on quantity and value data and sample invoices from the separate rate applications. Thus, Hualing's alternative comparison using [       ] does nothing to undermine Commerce's analysis.

Hualing also complains that Commerce used the wrong Harmonized Tariff Schedule and price for [     ] and conducted a cost comparison that failed to account for how much [     ] wood was used to produce the cabinets. *Id.* at 33. However, Commerce pointed out that in making this argument in its case brief, Hualing failed to properly account for all wood inputs consumed by the mandatory respondent when it compared the cost of production data. Commerce Final Bona Fides Sales Memo (Nov. 4, 2022) (P.R. 306, C.R. 141) at 3-4. Specifically, Hualing's wood input consumption calculations were flawed and while the consumption difference between the mandatory respondent's [     ] and Hualing's [     ] is accurate, Hualing's analysis fails to account for all of the wood inputs consumed and the overall cost of the wood inputs. *Id.*

PUBLIC VERSION

Hualing also argues that the costs of certain materials such as [    ] do not change the "intrinsic element" that cabinets made from [         ] are not comparable. Hualing Opening Brief at 33. In regards to [    ], Commerce noted that Hualing overstated the cost differences between [         ] and that Hualing's cost of [            ] its material cost more than the mandatory respondent's [         ]. Commerce Final Bona Fides Sales Memo (Nov. 4, 2022) (P.R. 306, C.R. 141) at 3-4. The mandatory respondent's consumption of paint was [    ], whereas Hualing's was [    ], but the mandatory respondent consumed [         ] the amount of [    ] than Hualing. *Id.* If the raw materials' consumption shows such as stark difference, it should not be disregarded in favor of only considering the cabinets' material.

For the mandatory respondent's [    ] cabinets, Commerce accounted for the average consumption amount of all wood inputs plus the [    ] to calculate the average cost of these inputs. *Id.* The percent difference between Hualing's and the mandatory's respondent's average cost of wood material inputs and [         ] for their cabinets is [    ] percent. *Id.* Commerce determined that this cost difference did not account for the [    ] price difference between Hualing's cabinets and the mandatory respondent's cabinets. *Id.* at 4-5. Ultimately, Commerce conducted a comprehensive analysis and adjusted Hualing's costs and found that overall, while [    ] cabinet are more costly to produce, the cost and sales data on the record of this review does not substantiate the [    ] pricing difference between the mandatory respondent's cabinets and Hualing's cabinets. *Id.* at 4-5.

### c. *Hualing Domestic Sales*

Commerce also found that the price of Hualing's U.S. sale of cabinets, [

].

Commerce Final Bona Fides Sales Memo (Nov. 4, 2022) (P.R. 306, C.R. 141) at 3. Based on this

data, Hualing's U.S. sale price is atypical when compared to its domestic sales of [

]. *Id.* In its brief, Hualing argues that "it is unclear how Commerce determined that

Hualing's domestic cabinets were "identical" given that Commerce declined to "examine"

Hualing's responses in AR1." Hualing Opening Brief at 34. However, Commerce found that the

merchandise was identical based on the evidence that was available on the record, which showed

that the merchandise sold in the United States and domestically was [

] produced by Hualing. Hualing offers no evidence to the contrary.

Hualing also argues that Commerce could have requested that it explain any differences

between these products. *Id.* However, Hualing was fully aware of Commerce's analysis in both

the NSR and the administrative review and had the responsibility to provide the information

Commerce needs to make the most accurate decision. *See Fusong Jinlong Wooden Grp. Co. v.*

*United States*, 617 F. Supp. 3d 1221, 1241 (Ct. Int'l Trade 2022) ("The burden of production

[      ] to the party in possession of the necessary information."); *Bebitz Flanges Works Priv.*

*Ltd. v. United States,* 433 F. Supp. 3d 1297, 1306 (Ct. Int'l Trade 2020) ("As the party in

possession of the necessary information, the burden is on Bebitz to develop the record, not

Commerce."); *see also Venus Wire Indus. Pvt. Ltd. v. United States,* 471 F. Supp. 3d 1289, 1306

(Ct. Int'l Trade 2020) ("{I}t is well established that … the burden falls on the interested party to

place relevant information within its possession on the record") (quoting *Yama Ribbons and*

*Bows Co. v. United States*, 36 C.I.T. 1250, 1254, 865 F. Supp. 2d 1294, 1299 (2012)).

#### d. Other Objective Record Information

Hualing submitted a price quote provided by its importer from a U.S. domestic producer showing that the price of U.S. produced cabinets was higher than Hualing's sales price. Hualing Case Brief at 24 (P.R. 281); Hualing Opening Brief at 35. Commerce found in the final results that the price quote from the U.S. producer did not substantiate the high price of Hualing's cabinets. Final IDM at 13 (P.R. 305). Commerce noted that the U.S. producer's single price quote is not a sales invoice and, therefore, not probative in determining the U.S. market price for ADA compliant cabinets. *Id.* More importantly, Commerce found that there is no rationale for Commerce to compare a price quote from a U.S. producer to a Chinese producer, because this pricing information only demonstrates the pricing difference between U.S.-produced cabinets and Chinese-produced cabinets. *Id.* In its opening brief, Hualing complains that Commerce cites no precedent or reasoning for this rationale. Hualing Opening Brief at 34-35. But the logic of Commerce's rationale is self-evident. To determine the typical price for imports of Chinese cabinets, Commerce looked to the prices of Chinese producers instead of U.S. producers. Hualing is, at rock bottom, simply asking this Court to reweigh the significance of this evidence in a manner favorable to Hualing.

#### ii. Commercial Quantities

With respect to the factor of commercial quantities, Commerce determined that Hualing's single sale was not indicative of a *bona fide* sale and indicated that the single sale was made for the purpose of establishing a new AD deposit rate, without regard for commercial reasonableness. Final IDM at 14 (P.R. 305). As noted by Commerce, the Court in *Tianjin* found that "{i}n one-sale reviews, there is, as a result of the seller's choice to make only one shipment, little data from which to infer what the shipper's future selling practices would look like. This

leaves the door wide open to the possibility that the sale may not, in fact, be typical, and that any resulting antidumping duty calculation would be based on unreliable data." *Id.* at 14 (citing *Tianjin*, 366 F. Supp. 2d at 1250).

In this matter, Commerce determined that Hualing's own business practices undermined the *bona fides* nature of the sale, especially, given the fact that Hualing's sales of similar merchandise to its domestic and third country markets indicate that its "specialty" cabinets are an atypical sale. *Id.* at 15. Commerce reached this conclusion because: (1) Hualing did not make subsequent sales to the same customer or other customers in the U.S. market; (2) the record demonstrates that Hualing is [              ] producer of cabinets; (3) Hualing made [     ] cabinet sales in its domestic market, with the domestic sales quantity and value of cabinets totaling [                 ] of its sales of other products' (4) Hualing [         ] sales of cabinets to its reported third country markets [                              ]. Commerce Prelim. Bona Fide Sales Memo (May 11, 2022) (P.R. 257, C.R. 127) at 6. Further, as illustrated in the table below, the quantity of Hualing's kitchen cabinet sale in the U.S. market [

           ], is a [        ] of its sales of other merchandise in both the domestic and export markets:

| Comparison of Quantity (Comparison of Quantity (Hualing Vol. Resp. (Dec. 30, 2021) (P.R. 211, C.R. 102-122) at Attachment II, p. 6) | |
| --- | --- |
| **Merchandise** | **Quantity (m³)** |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

In its opening brief, Hualing takes issue with the fact that a single sale is not sufficient for determining whether the sale is *bona fide*, that Commerce failed to explain how the sales of similar merchandises show the sale is not in commercial quantities, and that Hualing's importer sold unique custom specialty products for years. Hualing Opening Brief at 37-38. However, these arguments are an oversimplification of the issue. *Id.* at 37. As discussed above, Commerce reviewed the sale in a greater context of Hualing's regular course of business transactions and found that the lack of repeat customer, the quantity of those types of sales, the value of the sale, and the [     ] of sales to the third country markets are more compelling and raise considerable and objective questions regarding the *bona fide* nature of the sale. Preliminary IDM at 6 (P.R. 253); Final IDM at 16-17 (P.R. 305).

### iii.   Timing of the Sale

In the final determination, Commerce determined that the timing of the sale was aberrant. Final IDM at 16 (P.R. 305). The record is clear that the U.S. importer and Hualing were in discussions regarding shipping the specialty cabinets to the U.S. during the investigation only after the AD/CVD petitions were filed. *Id.* Commerce found that when viewed in conjunction with the fact that there was only one sale during the POR and it was made at an atypical price (an artificially high price), the timing indicates that the sale was intended for purposes of obtaining an artificially low dumping margin and, therefore, was not *bona fide*. *Id.* at 16-17. Further, as noted in the final results, the timing and sequence of this single U.S. sale was highly suspect:

> The petition on cabinets from China was filed in March 2019. According to Hualing, one of the owners visited the United States in June 2019 and discussed with the U.S. importer about shipping "specialty kitchen cabinets." In August 2019, the U.S. importer visited Hualing and they further discussed "how to ship unique kitchen cabinets" to the United States. The preliminary AD duties were

imposed in October 2019 and the AD orders were issued in April 2020. In June 2020, the U.S. importer inquired with Hualing to purchase [                                        ] cabinets.

Commerce Prelim. Bona Fide Sales Memo (May 11, 2022) (P.R. 257, C.R. 127) at 7.

Hualing argues that there is nothing atypical regarding the timing of the sale as it was a sale with a "long-time customer" and that Commerce failed to objectively analyze the timing of Hualing's shipments. Hualing Opening Brief at 39-40. First of all, the fact that the U.S. importer resold the cabinets to a long-time customer does not alter the fact that Hualing had no prior existing relationship with the U.S. importer and had never before produced and sold any cabinets. Moreover, the timing of the sale and the start of the cabinet production, when viewed in conjunction with the other circumstances and factors, cast significant doubt on the *bona fide* nature of Hualing's single sale. Thus, Commerce's findings with respect to the timing of the sale are supported by substantial evidence.

### iv.  *Expenses Arising from the Transaction*

Unusual expenses arising from a transaction can suggest that the sale is not a *bona fide* sale. In *CTL Plate from Romania*, for example, Commerce found that "{t}he extraordinarily high transportation costs incurred by the importer, combined with other expenses borne by the importer in connection with this sale and the fact that the merchandise was subsequently resold at a significant loss (excluding transportation and other costs) lead us to conclude that there is no basis upon which it could be found that the sale is commercially reasonable." *Certain Cut-to-Length Carbon Steel Plate From Romania*, 63 Fed. Reg. 47,232, 47,234 (Dep't Commerce Sept. 4, 1998) (notice or rescission) ("*CTL Plate from Romania*"). Here, Commerce noted that the sales expenses incurred by the U.S. importer are significant. Commerce Prelim. Bona Fide Sales Memo (May 11, 2022) (P.R. 257, C.R. 127) at 7. The total expenses, including customs fees,

brokerage and handling, and international and U.S. freight, equals $[          ], whereas

Hualing's price to the U.S. importer was $[          ] and the U.S. importer's price to the

downstream customer was [          ]. *Id.* at 8. The fact that the total expenses [

                              ] raises considerable questions regarding the *bona fide* nature of the

sale.

      Hualing argues that Commerce does not generally consider "AD and CVD cash deposits"

in its expense analysis as it can create a margin where it does not exist. Hualing Opening Brief at

40-41. However, *bona fides* determinations are made on a case-by-case basis after considering

the totality of the circumstances. In this case, the totality of the circumstances warranted

consideration of the significant AD and CVD cash deposits. Indeed, it was highly unusual for a

U.S. importer to enter into negotiations in the middle of AD/CVD investigations to purchase

cabinets that the importer had never before purchased from a Chinese company that had never

before produced or sold to the United States at prices that were two to three times higher than

other Chinese cabinets. Under these circumstances, the fact that the importer was willing to bear

the AD/CVD duties as an expense [                                                                      ]

was a relevant factor in Commerce's analysis.

      ***v.    Resold at Profit***

      Commerce determined that upon excluding the AD and CVD cash deposits paid by the

U.S. importer, the U.S. importer made a gross profit from the resale of Hualing's cabinets. Final

IDM at 18-19 (P.R. 305). However, Commerce also found that the resale is not an appropriate

benchmark to determine whether the sale under review is indicative of future commercial selling

practices. *Id.* Commerce disagreed that simply because the U.S. importer resold the merchandise

at a profit indicates that the sale was *bona fide*, especially because the determination should be

based on a totality of the circumstances and the mark-up on the product was aberrant. *Id.* The resale price of Hualing's cabinets was on average [      ] percent more than the prices reported by the importer between 2018 and 2020. Commerce Final Bona Fides Sales Memo (Nov. 4, 2022) (P.R. 306, C.R. 141) at 5. Moreover, the U.S. importer resold that merchandise at a [

]. Remarkably, out of [      ] sales reported by the importer for the two-year period the resale of Hualing's cabinets was the [                        ]. *Id.*

Hualing quibbles with various aspects of Commerce's analysis and then boldly asserts that once Commerce determined that the importer made a gross profit, that "should end the analysis." Hualing Opening Brief at 42-44. In other words, Hualing once again attempts to have the Court reweigh the evidence while simultaneously arguing that Commerce should have ignored relevant facts on the record that called into question the profit made on cabinets that were imported at an already high price and then resold with an aberrant markup.

### vi.      *Arm's Length Basis*

This Court has recognized that, even when a respondent and its U.S. customer are not strictly affiliated, Commerce's *bona fides* analysis may consider whether a sale was an arm's-length transaction by examining whether the parties to that sale had negotiated based on independent interests. *See Am. Silicon Techs. v. United States*, 110 F. Supp. 2d 992, 995 (Ct. Int'l Trade 2000). Here, in the underlying review, Commerce found that even though the sales between Hualing and its customer may not have been unusual, the concurrent sales negotiations were not indicative of future sales for the following reasons: (1) Hualing has never produced cabinets or "specialty" cabinets for the U.S. market and the U.S. importer has never purchased the purported "specialty" cabinets; (2) the artificially high price paid by the U.S. importer indicates that the nature of the sale was not reflective of normal business considerations; and (3)

Hualing and the U.S. importer planned in advance of the sale, in the middle of the AD/CVD investigations, to ship "specialty" cabinets that purportedly cost "two or three" times the price of other cabinets to the United States. Commerce Prelim. *Bona Fide* Sales Memo at 9-10 (P.R. 257). These factors, when considered in concert with the totality of the circumstances, indicate that the sale is not indicative of future commercial selling practices and is not *bona fide*. *Id.*

Hualing argues that Commerce's arm's length analysis is conflicted. Hualing Opening Brief at 44. However, while the terms of an agreement could appear normal in isolation, that does not mean that Commerce must end its analysis there. In this case, the other factors such as the high prices and the lack of prior production are more indicative of whether this was an arm's-length transaction based on considerations independent of the desire to make a high-priced sale that would lead to an aberrantly low dumping margin. Again, rather than pointing to any evidence that Commerce ignored that is fatal to its conclusion, Hualing is asking the Court to reweigh the evidence and reach a different conclusion. That is not the role of the Court.

### vii. *Other Relevant Factors*

Commerce stated that the specialty nature of the cabinets at issue in Hualing's single U.S. sale was relevant to Commerce's *bona fides* analysis. Final IDM at 22 (P.R. 305). Hualing and the U.S. importer state on numerous occasions that ADA compliant cabinets are more expensive than standard cabinets. *Id.* Of course, specialty products, made as a single sale, are thus not *bona fide* because they would establish a distorted cash deposit rate. *Id.* at 22-23; *See, e.g., Jinxiang Chengda*, 37 C.I.T. at 425-27; *see also Tianjin*, 366 F. Supp. 2d at 1257-58; *Freshwater Crawfish Tail Meat from China*, 68 Fed. Reg. 1,439 (Dep't Commerce Jan. 10, 2003) (final results), and accompanying IDM at 8; *Freshwater Crawfish Tail Meat From China*, 73 Fed. Reg. 20,249 (Dep't Commerce Apr. 15, 2008) (final results) and accompanying IDM at 6; *Mattresses*

*from China* and accompanying IDM at 12. The specialty nature of the cabinets that were sold demonstrates that the sale is not representative of Hualing's future sales of subject merchandise.

Hualing states that Commerce conceded that no one factor made Hualing's sale of specialty cabinets "commercially unreasonable," yet failed to explain how the same sale exhibited atypical prices, future selling practices, or an inappropriate basis for a dumping margin. Hualing Opening Brief at 45. However, the reason that Commerce found it relevant that Hualing had made a single sale of "specialty" cabinets is that this was Hualing's explanation for why its sales price was so much more expensive than standard cabinets. *See* Final IDM at 22-23 (P.R. 305). When Commerce interrogated this explanation, it found no substantial differences for the dimensions or cost of production between ADA compliant cabinets and standard cabinets. *Id.* Thus, Commerce's findings that the sale was "not representative of Hualing's future selling practices" should also be upheld as supported by substantial evidence.

### III.    Conclusion

For the foregoing reasons, AKCA respectfully requests that the Court uphold Commerce's determination as supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/ *Luke A. Meisner*
Roger B. Schagrin
Luke A. Meisner
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 7th St. NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for American Kitchen Cabinet Alliance*

Date: August 24, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing reply brief contains 12,001 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated: August 24, 2023

/s/ *Luke A. Meisner*