# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| _____x | |
| DALIAN HUALING WOOD CO., LTD., : | |
| : | |
| Plaintiff, : | |
| : | Court No. 22-00334 |
| v. : | |
| : | **PUBLIC VERSION** |
| UNITED STATES, : | |
| : | |
| Defendant, : | |
| : | |
| and : | |
| : | |
| AMERICAN KITCHEN CABINET ALLIANCE, : | |
| : | |
| Defendant-Intervenors. : | |
| _____x | |

## <u>PLAINTIFF'S REPLY BRIEF</u>

Michael S. Holton
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiff*
*Dalian Hualing Wood Co., Ltd.*

Dated: September 21, 2023

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

    A.  **The Government's Exhaustion Arguments Fail** ........................................ 1

    B.  **The Argument That CVD AR1 Was a Separate Proceeding Fails** ............... 8

    C.  **The Government's Explanations for Departing from Its Well-Established Practice Are Contradicted By the Record** ................................................... 11

    D.  **Commerce's Bona Fide Analysis Is Not Supported By Substantial Evidence** ............ 15

CONCLUSION ............................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F.Supp.2d 1367 (CIT 2013).............. 6

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F.Supp.2d 1366 (CIT 2012).............. 8

*Apex Frozen Foods Pvt. v. United States*, 862 F.3d 1322 (Fed. Cir. 2017)................................. 8

*Apex Frozen Foods Pvt. v. United States*, 2015 WL  4646543 (CIT July 27, 2016)..................... 8

*Consolidated Bearings Co. v. United States*, 166 F.Supp.2d 580 (2001)...................................... 7

*Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F.Supp.3d 1364 (CIT 2017) .......... 2

*Echjay Forgings Pvt. Ltd. v. United States*, 253 F.Supp.3d 1364 (CIT 2017) ................... 8, 9, 13

*FAG U.K. Ltd. v. United States*, 20 CIT 1277 (1996).................................................................... 4

*Fresh Garlic Producers Ass'n v. United States*, 121 F.Supp.3d 1313 (CIT 2015) ............... 12, 13

*Huzhou Muyun Wood Co. v. United States*, 324 F.Supp.3d 1364 (CIT 2018) .............................. 2

*Inner Mongolia Jianlong Biochem. Co. v. United States*, 337 F.Supp.3d 1329 (CIT 2018)......... 2

*Jinxiang Chengda Imp. & Exp. Co. v. United States*, 317 CIT 418 (CIT 2013) ................... 17, 18

*Ningbo Dafa Chemical Fiber Co. v. United States,* 580 F.3d 1247 (Fed. Cir. 2009).................... 8

*Novolipetsk Steel Pub. Joint Stock Co. v. United States*, 483 F.Supp.3d 1281 (CIT 2020) . 3, 4, 13

*Shanghai Sunbeauty Trading Co. v. United States*, 2018 WL 4489467 (CIT Sept. 6, 2018)  ....  17

*Tiancheng Pharm. Co v. United States*, 29 CIT 256 (2005) ........................................................ 2

**Statutes**

19 U.S.C. § 1675................................................................................................................ passim

19 U.S.C. § 1677m....................................................................................................15, 19, 21

28 U.S.C. § 2637..........................................................................................................................7

**Administrative Decisions & Publications**

*Carbon and Alloy Steel Cut-To-Length Plate from the People's Republic of China*,
  86 Fed. Reg. 6865 (Jan. 25, 2021) (final rescission) ................................................. 2

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 81 Fed. Reg. 17,435 (Mar.
  29, 2016) (final results) ........................................................................................... 12

*Passenger Vehicle and Light Truck Tires from the People's Republic of China*,
  86 Fed. Reg. 13,966 (Mar. 11, 2022) (final results) ......................................... 11, 12

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's
  Republic of China*, 86 Fed. Reg. 36,099 (July 8, 2021) (preliminary results) ............ 13, 14, 15

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's
  Republic of China*, 75 Fed. Reg. 41,148 (July 15, 2020) (preliminary results) ...................... 14

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
  87 Fed. Reg. 67,674 (Nov. 9, 2022) (final ADD results) ............................... 1, 22, 23

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
  87 Fed. Reg. 27,099 (May 6, 2022) (preliminary CVD results) ........................... 5, 6

*Wooden Cabinet and Vanities and Components Thereof from the People's Republic of China*,
  87 Fed. Reg. 27,090 (May 6, 2022) (preliminary ADD results) ........................ 6, 11

*Xanthan Gum from the People's Republic of China*, 82 Fed. Reg. 11,428 (Feb. 23, 2017)
  (final results) ........................................................................................................... 12

## INTRODUCTION

Plaintiff Dalian Hualing Wood Co., Ltd. ("Hualing") submits this Reply Brief responding to the Response Briefs of Defendant United States ("Government") and Defendant-Intervenor American Kitchen Cabinet Alliance ("Petitioner") (collectively, "Defendants") filed on August 24, 2023, ECF29-32 ("Gov. Br." and "Pet. Br.," respectively). For the reasons below, and in Hualing's Memorandum of Law in Support of its 56.2 Motion filed on June 22, 2023, ECF26-27 ("Hualing Br."), the Court should reject Defendants' arguments in full and invalidate Commerce's determinations as to Hualing in the first administrative review ("AR1") of the antidumping duty ("ADD") order on wooden cabinets and vanities and components thereof ("WCV") from the People's Republic of China ("China"). *WCV from China*, 87 Fed. Reg. 67,674 (Nov. 9, 2022) ("*Final Results*").

## ARGUMENT

### A.    The Government's Exhaustion Arguments Fail

The Government is wrong in claiming that Hualing did not administratively raise the arguments that: (1) 19 U.S.C. § 1675(a)(2)(B)(iv) requires that the sale would be used in "weighted average dumping margin"; and (2) Commerce used the same sale on which to base Hualing's individual countervailing duty ("CVD") rate in the parallel CVD AR1.[1] *Compare* Def. Br. at 17-19 *with* Hualing Administrative Case Brief (July 1, 2022), CR138, PR281 ("Case Brief"), at 7-8, 32 n.92. Regardless, both arguments fall under the "pure question of law" exception to the exhaustion doctrine in ADD proceedings.

Hualing's Case Brief explained it is Commerce's well-established practice to not conduct a *bona fide* analysis on separate rate applicants "because as **a separate rate applicant** Hualing's

---

[1] Notably, Petitioner did raise an exhaustion argument for these arguments. *See* Pet. Br. at 1-38.

sale is not the basis of any 'weighted-average dumping margin determined in an administrative review.'" Case Brief at 7 & n.12 (emphasis in original) (quoting *Carbon and Alloy Steel Cut-To-Length Plate* ("*CTLP*") *from China*, 85 Fed. Reg. 18,915 (Apr. 3, 2020) (preliminary rescission), Preliminary *Bona Fides* Sale Analysis Memorandum ("PBFM") (Mar. 27, 2020), ACCESS Barcode 3962117, at 3 (citing 19 U.S.C. § 1675(a)(2)(B)(iv) (emphasis added)), *unchanged*, 86 Fed. Reg. 6865, 6866 (Jan. 25, 2021) (final rescission). The CTLP PBFM quote cites directly to 19 U.S.C. § 1675(a)(2)(B)(iv), which is the basis for Hualing's argument that Commerce's "*bona fide* analysis {was} unlawful." Case Brief at 7 & n.12.

Hualing further briefed that, because the separate rate applicant's sale is not included in the weighted average margin, a *bona fide* analysis was not relevant. Case Brief at 8 (citing *CTLP from China*, 85 Fed. Reg. 18,915, Issues and Decision Memorandum ("IDM") Comment 1 at 11 (quoting *Inner Mongolia Jianlong Biochem. Co. v. United States*, 337 F.Supp.3d 1329, 1338 (CIT 2018) (citing *Huzhou Muyun Wood Co. v. United States*, 324 F.Supp.3d 1364, 1376 (CIT 2018)); *see Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F.Supp.3d 1364, 1370 (CIT 2017) ("Commerce may exclude sales that would otherwise be included in the calculation of the export price if Commerce determines that the sales are not bona fide."); *Tianjin Tiancheng Pharm. Co. v. United States*, 29 CIT 256, 260 (2005) ("because the ultimate goal of the new shipper review is to ensure that the U.S. price side of the antidumping calculation is based on a realistic figure").

Hualing briefed Section 751(a)(2)(B)(iv) of the Tariff Act of 1930, as amended ("Act") (*i.e.*, § 1675(a)(2)(B)(iv)) serving as the authority and guidance for Commerce to conduct its *bona fide* analysis in AR1. *See* Case Brief at 3. Thus, the Government is wrong when it claims that "Hualing's case brief to Commerce never mentions 19 U.S.C. § 1675(a)(2)(B)(iv)." Def. Br.

at 18. Indeed, the Government quotes Hualing's briefed statement that its "sale is not the basis of

any weighted-average dumping margin"—conveniently omitting the citation to "Section

751(a)(2)(B)(iv) of the Act" (*i.e.*, § 1675(a)(2)(B)(iv)). Gov. Br. at 18 (quoting Case Brief at 7).

   The Government also incorrectly asserts that Hualing only argued that Commerce

departed from its practice. *Id*. at 18-19. Beyond arguing that Commerce unlawfully deviated

from agency practice, Hualing further argued that conducting a *bona fide* analysis was

"unlawful," or otherwise had "no relevance," because § 1675(a)(2)(B)(iv) only prescribes that

the analysis shall be conducted if the sale is to be used in the weighted-average dumping margin.

Case Brief at 7-8. This fact is established throughout Defendants' briefs where they argue the

same to this Court—Commerce's practice is to conduct a *bona fide* analysis only for sales used

in the dumping margin (*i.e.*, § 1675(a)(2)(B)(iv) prescribes that a *bona fide* analysis is required

for purposes of a margin calculation). *See* Gov. Br. 20, 38, 42-44; Def. Br. at 10, 12. Regardless,

Commerce's consistent practice supports this argument—noting that a *bona fide* analysis in

administrative reviews is applicable to mandatory respondents whose sales would be used in the

margin calculation. Hualing Br. at 20-21.

   Similarly, the Government misplaces reliance on *Novolipetsk Steel Pub. Joint Stock Co.

v. United* States, 483 F.Supp.3d 1281 (CIT 2020). The Government states: "Congress's

amendments to § 1675(a)(2)(B) are not worded restrictively, but rather, impose an affirmative

obligation on Commerce to ensure that U.S. sales used **to calculate an individual margin** for a

new shipper are *bona fide.*" Gov. Br. at 20 (emphasis added). The Government continued

quoting *Novolipetsk*, to support its position that § 1675(a)(2)(B)(iv) is equally applicable to

administrative reviews, stating "Congress 'did not make any changes to the provisions governing

administrative reviews' that would imply an intent to preclude Commerce's authority to conduct

a *bona fide* sales analysis in an administrative review." *Id.* at 20-21 (quoting *Novolipetsk*, 483 F.Supp.2d at 1286).

Petitioner similarly cites this Court's precedent in referencing "a long line of cases stretching back for many decades recognizing that Commerce has the statutory authority to exclude sales from consideration in administrative reviews where the sales are "clearly atypical" and "would undermine the fairness of the **comparison of foreign and U.S. sales**," *i.e.*, to calculate a dumping margin. Pet. Br. 10 (emphasis added). Like the Government, Petitioner cites *Novolipetsk*, to support the *bona fide* analysis: this Court "noted that § 1675(a)(2)(A) provides that when conducting an administrative review of an ADD order, Commerce shall determine 'the normal value and export price (or constructed export price) of each entry of the subject merchandise' and the 'dumping margin of each such entry.'" Pet. Br. 12 (quoting. *Novolipetsk*, 483 F. Supp. 2d at 1286). In other words, a *bona fide* analysis is only necessary when the sale is used in the dumping calculation. Petitioner also quoted this Court in *FAG U.K. Ltd. v. United States*, 20 CIT 1277, 1281-82 (1996): "Commerce can ... exclude sales from {U.S. price} in an administrative review in exceptional circumstances when those sales are unrepresentative and extremely distortive." Def. Br. 10. Petitioner's reference to "U.S. price" implies it is a price used in a margin calculation and should be only excluded in "exceptional circumstances" for administrative reviews.

Hualing has not disputed that § 1675(a)(2)(B)(iv) serves as guidance for conducting a *bona fide* analysis in an administrative review. Rather, it disputes the application of § 1675(a)(2)(B)(iv), and whether the application of the *bona fide* analysis was lawful and relevant—because as a separate rate applicant, the sale is not used in the margin calculation, the applicant cannot benefit from the so-called unreasonable price. Hualing Br. 16-18; *see also* Case

Brief at 7-8. The Government even acknowledges that Commerce had no intent of "calculating a dumping margin" using Hualing's sale. Gov. Br. at 37-38.  Rather, the rate assigned to separate rate applicants is the rate calculated from the mandatory respondents, or in this case a single mandatory respondent, which is a dumping margin based on *bona fide* sales. Case Brief at 7-8. Therefore, Hualing as a separate rate applicant could not and would not unfairly benefit from an unrepresentative sale or an artificially low dumping margin based on the so-called non-*bona fide* sale.

The Government also incorrectly faults Hualing for failing to inform Commerce that CVD AR1 was based on the same sale. The Government argues that the "preliminary results in the {ADD/CVD} administrative reviews were issued on the same day, May 6, 2021{sic}," which implies that the government knew that Hualing's sale was under review in the concurrent proceeding. Gov. Br. at 19. Yet Hualing informed Commerce of the CVD AR1 *Preliminary Results* when briefing that:

> the Department reviewed Hualing's sale as the single mandatory respondent in the concurrent CVD proceeding and determined that its CVD rate was lower than the cash deposit paid by Hualing. *See {WCV} From . . . China: Preliminary Results of {CVD} Administrative Review, Rescission and Intent To Rescind Administrative Review, in Part; 2019-2020*, 87 Fed. Reg. 27,099 (May 6, 2022) . . . . There is nothing in the CVD Preliminary Results that indicates that Hualing will not continue to receive a lower CVD rate than it paid for its cash deposit on this sale.

Case Brief at 32 n.92; *see* Hualing Br. at 5, 13. With the CVD proceeding properly briefed, the Government is wrong to have faulted Hualing for having reminded Commerce at the Hearing that "the Department treated Hualing as a mandatory respondent based on the very same sale in the concurrent CVD proceeding." Hearing Transcript (Oct. 6, 2022), PR301, at 39-40; Def. Br. at 19 n.6. In short, Commerce was fully aware of the concurrent CVD review.

Commerce issued disparate ADD/CVD AR1 *Preliminary Results*, one in which the sale was found not *bona fide*, even where the sale was not to be included in any weighted average dumping margin, and the other in which the sale was found *bona fide* by calculating an individual CVD rate for that sale.[2] While the Government claims that Hualing should have indicated the inconsistency between the two determinations, Hualing nonetheless informed Commerce of the CVD review on two separate occasions. Case Brief at 32 n.92; Hearing Transcript at 39-40. It was not as if these cases were being conducted in vacuums; both were conducted by the same office: "AD/CVD Operations, Office I, Enforcement and Compliance." *WVC from China*, 87 Fed. Reg. 27,090, 27,091 ("*Preliminary ADD Results*") (May 6, 2022), PR231; *WVC from China*, 87 Fed. Reg. at 27,099. It is therefore unclear how Commerce could be unaware that it was conducting a review of the same company and same sale in the CVD proceeding, or more importantly, that its own statutory guidance prescribes that the sales used to calculate an individual CVD rate must also be *bona fide*.

Hualing informed Commerce that the statutory authority to conduct a *bona fide* analysis rested on the fact that the sale is one to be used in calculating a dumping margin. Case Brief at 7-8. Hualing also put Commerce on notice that the same sale was used in the concurrent review. *Id*. at 32 n.92; Hearing Transcript at 39-40. With respect to both issues, "Commerce was put on notice of Respondent's challenge to the agency's finding"—the legal standard for exhaustion recognized by this Court. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F.Supp.2d 1367, 1370 (CIT 2013).

---

[2] 19 U.S.C. § 1675(a)(2)(B)(iv) requires that a sale used to obtain an individual CVD rate shall be *bona fide. See* Hualing Br. at 12-13.

PUBLIC VERSION

Assuming *arguendo* that this Court were to find that these issues were not raised with enough specific clarity, both issues fall under the well-established "pure question of law" exception to the exhaustion requirement. *Consolidated Bearings Co. v. United States,* 166 F.Supp.2d 580, 587 (2001). Both issues arise from § 1675(a)(2)(B)(iv), which provides statutory guidance for conducting a *bona fide* sale analysis under specific circumstances. No party disputes this statutory guidance. It is disputed that Commerce's: statutory authority to conduct a *bona fide* analysis only extends to sales in the "weighted average dumping margin"; and individual CVD rate calculation constitutes a statutory finding of a *bona fide* sale. Here are all requirements for "pure question of law" are met because Hauling's issues/arguments:

a) are alleged to be "new";

b) are "of purely legal nature" (they are not factual);

c) do not require any "further agency involvement {}or additional fact finding or opening up of the record"; and

d) does not "create undue delay {}or cause expenditure of scarce party time and judicial resources."

*Id*. Both arguments are based on the pure statutory construction, *i.e*., a *bona fide* analysis only applies to a sale used in the "weighted average dumping margin;" and an individual CVD rate must be based on a *bona fide* sale. § 1675(a)(2)(B)(iv).

Finally, this Court by statute "shall, where appropriate, require exhaustion of administrative remedies." 28 U.S.C. § 2637(d). To the extent necessary, this Court should exercise its "judicial discretion in not requiring litigants to exhaust administrative remedies" because "the Court is authorized to determine proper exceptions to the doctrine of exhaustion." *Consolidated Bearings*, 166 F.Supp.2d at 586 (internal quotations omitted). Moreover, the U.S. Court of Appeals for the Federal Circuit ("CAFC") "will not reverse this Court's affirmative exhaustion determination if the record contains 'at least a suggestion' of the argument in

question." *Apex Frozen Foods Pvt. v. United States*, 862 F.3d 1322, 1323 (Fed. Cir. 2017) (quoting *Ningbo Dafa Chemical Fiber Co. v. United States,* 580 F.3d 1247, 1259 (Fed. Cir. 2009)). This Court in *Apex* explained the "initial decision is left to the judgment of {this} court, which may find that an argument was exhausted if Commerce had notice of it." *Apex Frozen Foods Pvt. v. United States*, 2015 WL  4646543, *5 (CIT July 27, 2016) (citing *Ad Hoc Shrimp Trade Action Comm. v. United States,* 882 F.Supp.2d 1366, 1373 (CIT 2012)).

The related statutory and CVD arguments "satisf{y} the administrative exhaustion requirement" because, through briefing and hearing testimony, Hualing "alert{ed} the agency to the argument with reasonable clarity and avail{ed} the agency with an opportunity to address" them. *Ad Hoc Shrimp Trade Action Comm.*, 882 F.Supp.2d at 1373. At very minimum, the record evidences "at least a suggestion" of these arguments such that this Court should exercise its statutory discretion to consider them in this appeal. *Apex*, 862 F.3d at 1323.

## B.    The Argument That CVD AR1 Was a Separate Proceeding Fails

Defendants argue that Hualing's argument alleging inconsistent treatment with the parallel CVD AR1 does not extend to this proceeding. Gov. Br. 21-22, Def. Br. at 21. Specifically, they argue that each proceeding is distinct and separate. *Id.* The problem with their argument is that Hualing is not requesting judicial review of the parallel CVD proceeding. As discussed above, Commerce's statutory guidance when calculating an individual CVD rate is to base the rate on a *bona fide* sale. Defendants do not dispute that the 2020 CVD rate in the parallel CVD AR1 was based on the same sale as the one determined to be non-*bona fide* in the AD proceeding. Moreover, the Government misplaces reliance on *Echjay Forgings Pvt. Ltd. v. United States*, 475 F.Supp.3d 1350, 1375-1378 (CIT 2020). The Government cites *Echjay* for the proposition of allowing inconsistent determinations in ADD/CVD proceedings. Gov Br. 21.

While inconsistent determinations may be possible, this Court clearly explained the inconsistent determinations were the result of different regulations, yielding different results. *Echjay*, 475 F.Supp.3d at 1377. There is no such issue here; both the "weighted average margin calculations" and individual calculated CVD rates are guided by § 1675(a)(2)(B)(iv). In other words, there is no difference in Commerce's statutory guidance in the present circumstances.

Here, and as this Court explained in *Echjay*: "consistency has long been a core interest of administrative law, and inconsistent treatment is inherently significant." *Echjay,* 475 F.Supp.3d at 1375 (citations omitted). Consequently, Commerce's disparate ADD/CVD determinations "compel the agency to explain whether (1) good reasons prompt that departure; or (2) the prior determinations are inapposite such that it is not in fact a departure at all." *Id*. at 1375 (quotation omitted).

The Government attempts to distinguish the two AR1s by arguing that (1) Hualing requested an ADD new shipper review ("NSR") and not a CVD NSR; (2) Hualing requested to be voluntary respondent and submitted questionnaire responses; and (3) a *bona fide* analysis is only required in NSRs, not administrative reviews. Gov. Br. at 21-22. None of these claimed distinctions are persuasive.

First, Commerce's "bedrock principle that each proceeding is evaluated separately and based upon its own record," makes the rescinded ADD NSR inapplicable to the case. *Id*. at 22. Defendants want this Court to believe that the ADD NSR is somehow relevant to this case. It is not. That NSR was rescinded not because of a *bona fides* determination, but because Commerce found that Hualing had sales of subject merchandise during the period of investigation—which made it ineligible for the NSR. Hualing Br at 7. The NSR made no other determination. Consequently, Commerce has no statutory obligation to conduct a *bona fide* analysis because of

the NSR.

Second, Hualing did request to be a voluntary respondent and submitted questionnaire responses in the ADD AR1. Unlike CVD AR1, where Hualing was a mandatory respondent and submitted questionnaire responses—in ADD AR1 Commerce never selected Hualing as a mandatory or voluntary respondent, Hualing was merely a separate rate applicant. Hualing Br. at 4-5. In other words, if Commerce had any statutory obligation to conduct a *bona fide* analysis in an administrative review, it was to conduct a *bona fide* analysis in CVD AR1 where Hualing was a mandatory respondent and the single sale served as the basis for its individual CVD rate. *Id*.

Finally, Commerce next attempts to have it both ways by arguing that "Section 1675(a)(2)(B)(iv) applies to {NSRs} and does not mandate *bona fide*s analysis in administrative reviews." Gov. Br. at 22. The Government also notes that "Congress's silence regarding *bona fide* sales in administrative reviews . . . means that Commerce is not required to conduct a *bona fide*s analysis in every administrative review, like it is in {NSRs}." Gov. Br at 22 n.7 (quotation omitted). Yet even if Commerce is not required to conduct a *bona fide* analysis in administrative reviews, this Court should require that Government provide a reasonable explanation for treating the same sale in one review different than the other review. Commerce cites Section 1675(a)(2)(B)(iv) at least ten times to support its basis for conducting a *bona fide* analysis on a single separate rate applicant. Gov. Br. at 3, 6-7, 12, 16, 18, 20-23, 43. Moreover, as noted above, the rescinded NSR and conducted AR1 are separate proceedings. If Section 1675(a)(2)(B)(iv) also does not require *bona fides* analyses in administrative reviews as argued by the Government, then there was no requirement that Commerce conduct the *bona fide* analysis in AR1—regardless of its intention "to examine the bona fides nature of Hualing's sale in the context of the administrative review." *Id*. at 4 (quotation omitted). This is especially so

PUBLIC VERSION

because the reason for rescinding the NSR was Commerce's finding Hualing ineligible for a

NSR *ab initio*.

### C.  The Government's Explanations for Departing from Its Well-Established Practice Are Contradicted By the Record

Commerce's "well-established" practice indisputably does not conduct *bona fide*

analyses on separate rate applicants – as Commerce stated less than two-months before issuing

the *Preliminary ADD Results* and the Government now recognizes. *Passenger Vehicle and Light*

*Truck Tires from China*, 87 Fed. Reg. 13,966 (Mar. 11, 2022) (final results), IDM ("*PVLT 19/20*

IDM") Comment 6; *see* Gov. Br. 7, 10-11. At issue is whether Commerce provided a reasoned

explanation to depart and whether record evidence supports this departure from its "well-

established practice." *Id*. The Govnerment's primary basis for Commerce departing from its

well-established practice to not conduct a *bona fide* analysis was the finding that Hualing was

not a "typical" separate rate applicant. Gov. Br. 11-12. Specifically, it alleges that (1) Hualing

requested a NSR and Commerce was required to conduct a *bona fide* analysis; (2) Commerce

indicated its intent to "to examine the bona fide nature of Hualing's sale in the context of

{AR1},"; (3) Hualing requested to be a voluntary respondent and submitted questionnaire

responses; and (4) Commerce had the resources to conduct the *bona fide* analysis. *Id*. at 12-13.

Hualing has already demonstrated that none of these bases justify Commerce's departure

from its "well-established practice" in administrative reviews to not require a *bona fide sale*,

where it limits examination of respondents, and only requires a suspended entry during the

period. Hualing Br. 14-16. Simply, none of Commerce's reasons explain why it departed from its

practice of only requiring a suspended entry for separate rate applicants. Moreover, Commerce's

conclusory statements that it did not lack the resources in this case are contradicted by extensive

record evidence. Hualing Br. at 18-21.

11

Defendants misplace reliance on *Fresh Garlic Producers Ass'n v. United States*, 121 F.Supp.3d 1313 (CIT 2015), which is distinguishable from AR1.[3] First, as the Government admits, the "{NSR} in *Fresh Garlic Producers* was rescinded due to the absence of *bona fide* sales, whereas Hualing's {NSR} was rescinded due to failure to qualify as a new shipper." Gov. Br. 13 n.4; *see* Pet. Br. at 13. The Government mischaracterizes this distinction as immaterial; in administrative reviews, Commerce's "well-established practice" "*does not perform a bona fide analysis on sales made by separate rate applicants that are not mandatory respondents*." Hualing Brief at 20-21 (emphasis in original) (citing *PVLT 19/20* IDM Comment 6). In contrast, "Commerce is required to assess *bona fide* sales in {NSRs}, 19 U.S.C. § 1675(a)(2)(B)(iv)" Gov. Br. at 7, 21. Therefore, in *Fresh Garlic*, Commerce was required to conduct a *bona fide* analysis pursuant § 1675(a)(2)(B)(iv). This was not the case with Hualing because its NSR was rescinded due to failure to qualify as a new shipper—obviating any requirement for a *bona fide* analysis pursuant § 1675(a)(2)(B)(iv).

Once Hualing's NSR was rescinded, Commerce was no longer obligated in the NSR to conduct a *bona fide* analysis pursuant § 1675(a)(2)(B)(iv). Consequently, Commerce's "well-established practice" to not "*perform a bona fide analysis on sales made by separate rate applicants that are not mandatory respondents*" then became the standard on which to determine whether a *bona fide* analysis was applicable in the "context of the administrative review." Hualing Br. at 20; Gov. Br. at 15. Moreover, as Defendants now concede, "Commerce is not

---

[3] Petitioner further misplaces reliance on the distinguishable *Xanthan Gum from China*, 82 Fed. Reg. 11,428 (Feb. 23, 2017) (final results), and *Fish Fillets from Vietnam*, 81 Fed. Reg. 17,435 (Mar. 29, 2016) (final results). *Id.* Pet. Br. at 13. In *Xanthan Gum*, Commerce considered the mandatory respondent's sales and did not address the *bona fides* analysis, but rather considered applying adverse facts available. *Xanthan Gum from China* IDM Comment 1. *Fish Fillets* features the same fact pattern as *Fresh Garlic*, where Commerce first determined that the sale was not *bona fide* in the NSR. *Fish Fillets from Vietnam* IDM Comment VII.

required to conduct a *bona fide*s analysis in every administrative review, like it is in {NSRs}." Gov. Br at 22 n.7. In other words, Commerce's stated intent to "to examine the bona fide nature of Hualing's sale in the context of the administrative review" did not impose a requirement to do so. Such mere stated intent does not give Commerce authority to deviate from its practice.

In *Fresh Garlic*, Commerce did not conduct a *bona fide* analysis in the administrative review, unlike AR1. Rather, Commerce by contrast applied the *bona fide* result from the NSR— it was required to conduct—to the administrative review. The *Fresh Garlic* reasoning (*i.e.*, finding the NSR determination applicable to the administrative review) is more akin to Hualing's point that the individually calculated CVD rate treating the same sale as *bona fide* in the CVD proceeding should be applicable to the ADD proceeding. Simply, the distinction of when and how a *bona fide* analysis is conducted is material. *See Echjay*, 475 F.Supp.3d at 1375 (differences in practice can have different results). *Bona fides* analyses are required in NSRs but in administrative reviews are only required for mandatory respondents, not separate rate applicants. Hualing Br. at 20-21. Therefore, in AR1, the "context" of the *bona fide* analysis should have been determined by its "well-established practice"— not the § 1675(a)(2)(B)(iv) requirement or Commerce's intent in the NSR.

Finally, Defendants misplace reliance on *Novolipetsk*, which does not support a *bona fide* analysis in AR1. There, the only respondent's sale would be the basis of the weighted average dumping margin, and thus appropriate for a *bona fide* analysis. By contrast in AR1, Hualing was a separate rate applicant whose dumping margin was to be based on the mandatory respondent's *bona fide* calculated rate.

The Government attempts to defend its singling out Hualing by arguing that Commerce conducted a *bona fide* analysis of two separate rate applicants in the 19-20 administrative review of the ADD order on *Tapered Roller Bearings from China* ("*TRBs 19-20*"). Gov. Br. at 14. It

provides the distinguishing factor: "Commerce 'issued supplemental questionnaires to the separate rate applicants.' and determined that the sales for two of them—Jingli and BRTEC— were not *bona fide*." *Id*. at 14 (citing *TRBs 19-20*), 86 Fed. Reg. 36,099 (July 8, 2021) (preliminary results), Preliminary Decision Memorandum ("PDM") at 10).[4] This quote confirms that *TRBs 19-20* is very different than AR1 in that, (1) Commerce issued *all* four separate rate applicants supplemental questionnaires, in some cases multiple supplemental questionnaires; (2) Commerce reviewed the *bona fide* nature of *all* separate rate applicants sales, and the mandatory respondent. *Id.* By contrast, in AR1 Commerce did not review any other separate rate applicant. Moreover, Commerce in AR1 did not issue supplemental questionnaires to any separate rate applicant, including Hualing. Accordingly, the unique *TRBs 19-20* does not rebut Commerce's "well-established practice" of not performing *a bona fide* analysis on sales made by separate rate applicants that are not mandatory respondents. Hualing Br. at 20-21. Moreover, it proves that Commerce arbitrarily treated Hualing's sales differently than all other separate rate applicants in AR1.[5]

The Government devotes extensive briefing concerning Commerce's resources to conduct to a *bona fides* analysis. Gov. Br. at 15-17. Yet it never addresses Hualing's demonstration that Commerce on three separate occasions found that it lacked resources to

---

[4] Further unlike AR1, Commerce in *TRBs 19-20* stated: "we are rescinding this administrative review with respect to BRTEC and Jingli because we cannot rely on *their sales to calculate dumping margins* in this administrative review." *TRBs 19-20*, 87 Fed. Reg. 1120 (Jan. 10, 2022), IDM at 1 (emphasis added). Commerce did not make any such point in AR1, and Hualing's sale was not the basis of calculating a dumping margin.

[5] The Government also cites an earlier review of *TRBs from China*, 75 Fed. Reg. 41,148 (July 15, 2010) (preliminary results), for conducting a *bona fides* analysis of a "voluntary respondent." Gov. Br. at 14 n.5. Yet as Hualing briefed: "As *TRBs 08-09 Prelim Results* indicates, the Department issued the questionnaire to New Torch, and the other mandatory respondents on the same day. Moreover, in this particular review there were only three respondents, and no separate rate applicants." Case Brief 13-14.

review all respondents in AR1. Hualing Br. at 18-20; *Cf. TRBs 19-20* PDM at 10 (Commerce considered whether all respondents' sales were *bona fide* and issued additional questionnaires). Nonetheless, Commerce concluded that it had the resources because it: dedicated resources in the NSR; and Hualing requested to be voluntary respondent. Gov. Br. at 15-17. Neither justifies Commerce having resources to depart from its practice of not conducting a *bona fide* analysis in administrative reviews. As Hualing explained, "the fact that Commerce expended resources in the context of the NSR does not provide a reasoned basis from departing from its practice to not conduct a *bona fides* analysis." Hualing Br. at 20. Moreover, the Government's conclusory implication that Hualing requesting to be a voluntary respondent somehow provided it with resources to conduct the analysis also does not justify departing from its practice—when Commerce thrice found that it lacked resources to review all respondents. *Id*. at 19-20.

Critically, Commerce never selected Hualing as a voluntary respondent. If it had the resources for the *bona fide* analysis, then it should have had resources treat it has voluntary respondent. There is also no indication that the NSR record was complete with respect to questions concerning *bona fides*. In fact, Commerce relied on voluminous information from AR1 to conduct its *bona fide* analysis. In other words, if Commerce had the resources, then—at minimum—it should have issued additional questionnaires to Hualing in AR1 as required by statute to address deficient information. 19 U.S.C. § 1677m(d). Ultimately, however, the Government's argument is the same conclusory position that Commerce had the resources because it said so. IDM, PR305, at 11. In short, not only did Commerce unreasonably deviate from its practice, but further failed to provide a valid basis for treating Hualing different than other separate rate applicants.

### D.  Commerce's *Bona Fide* Analysis Is Not Supported By Substantial Evidence

The Government's conclusion again concedes that the "analyzed" *bona fide* statutory

factors did not make Hualing's sale "commercially unreasonable":

> Although these factors {price, commercial quantity, timing, expenses, profit, arm's-length nature, and other factors} did not necessarily make the sale commercially unreasonable for Hualing and its U.S. importer—in that, for example, Hualing and the U.S. importer "incurred a profit on the sale," Commerce explained that the sale was "only made for the purpose of establishing an artificial antidumping deposit rate, without regard for commercial reasonableness."

Gov. Br. at 44 (citations omitted).

This conclusion that the *bona fide* factors did not make Hualing's sale "commercially unreasonable for it and its U.S. importer" should end the *bona fide* analysis. *Id*.; *see* PBFM (May 2, 2022), CR127/ PR257), at 3. Second, besides Commerce's dislike of the sale being for Americans with Disabilities Act ("ADA") cabinets, there is **no** evidence that the sale was "only made for the purpose of establishing an artificial antidumping deposit rate, without regard for commercial reasonableness." IDM at 16. There is likewise **no** evidence that the "sale is{not} indicative of future commercial selling practices." Gov. Br. at 44. These claims, beyond being unsupported, contradict Commerce's finding that the statutory factors did not indicate Hualing's sale "commercially unreasonable for it and its U.S. importer." *Id*. In other words, if the statutory factors do not show that Hualing's sale was "commercially unreasonable," then there is no evidence that Hualing's future sales also would not be "commercially unreasonable"—regardless of whether it sells ADA cabinets. There was accordingly no basis for the analysis to proceed.

Commerce's analysis further admits that the statutory factors—*i.e.*, quantity, timing, expenses, profit, and arm's length—neither indicated the sale was atypical, commercially unreasonable nor favored finding that the sale was not *bona fide*. Commerce nevertheless, based on the "totality of the circumstances," deemed the sale to be non-*bona fide.* IDM at 18. Yet these circumstances addressed below do not support this finding.

**Hualing's Sale Prices**

There is indisputably a wide-range of *bona fide* prices, and wide-ranging pricing methods on which to make price comparisons. There are vast variations of WCV, not only from a stand-point of complete cabinets versus parts (*i.e.*, toe-kicks, drawer sides, etc.), but also due to the extreme variations of the types of wood used in the production of the merchandise. Hualing Br. at 26. Thus, AR1 prices are easily manipulated to support desired outcomes. *See id.* 33 (similar comparison as employed by Commerce for Hualing showing that the prices of other separate rate applicants and the mandatory respondent would likewise not be found *bona fide*).

Consequently, consistent with a myriad of Commerce's *bona fide* results, the most reasonable method to evaluate commercial reasonableness is through an objective, unmanipulated range of prices reported in the U.S. Customs and Border Protection ("CBP") data. Hualing Br. at 31. Further, the unrebutted unmanipulated objective evidence from the importers' prior sales and the price quote for ADA cabinets provided by its importer from a domestic producer substantiates the commercial reasonableness of Hualing's prices. *Id.* at 34-35.

Hualing detailed the impropriety of using the broad-based average unit value ("AUV") sustained in *Jinxiang Chengda Imp. & Exp. Co. v. United States*, 317 CIT 418 (CIT 2013), and *Shanghai Sunbeauty Trading Co. v. United States*, 2018 WL 4489467 (CIT Sept. 6, 2018). Hualing Br. at 30-32. This Court in both recognized Commerce not being limited to using a single AUV, but also has a practice of comparing prices to ranges. *Id.* at 31-32. Defendants do not directly address Hauling's demonstrated inapplicability of this precedent. The Government claims that, as in *Jinxiang Chengda*, Hualing's sale was both atypical compared to the broad average and, although within the range, was nonetheless atypical because it was "[

], " or "[    ] out [        ]." Gov. Br. at 27. However, in *Jinxiang Chengda* the respondent's sale was outside the range of the CBP data, and "was still *by far* the highest in the

{CBP} data." *Jinxiang Chengda*, 317 CIT at 425 (emphasis in original). Defendants fail to

address *Jinxiang Chengda* having explained that "Commerce's practice does not use broad-based

averages when the subject merchandise is unique or has unique pricing." Hualing Br. 31-32. This

is not a mere theoretical concern, but manifested in AR1 where wide-ranging prices between a

complete cabinet and single parts (*e.g.*, drawer sides) prevents AUVs from being representative;

with averaged data being unduly distorted by low-priced parts.

Furthermore, Hualing's price is not commercially unreasonable for being in the top [

]. Its AUV was nonetheless between other WCV that Commerce considered typical or

commercially reasonable. Other separate rate applicants having [

] Hualing's confirms that Hualing's pricing was not out of line with what is commercially

reasonable in the CBP data or in AR1. *Id*. at 32. In other words, using an objective standard

Hualing's entry was not aberrational.

Commerce's problem with Hualing's entry is that it was for ADA cabinets, concluding

that "nothing on the record indicat{ed} that ADA cabinets are priced so differently from

standard cabinets that it is incorrect to compare Hualing's price to the price of other cabinets."

Gov. Br. at 29-30. The basis for this finding was Hualing's statement that "all cabinet production

uses the same processes and equipment." *Id.* at 28-29.

As initial matter, now for the third time Commerce ignores "the importer's statement that

custom ADA cabinets are more expensive because a manufacturer generally produces standard

sizes, and custom by nature means that the producer must adjust its machines to account for the

different sizes—driving cabinets costs higher." Hualing Br. at 43. Commerce also disregarded

evidence not fitting its story. Here, Commerce arbitrarily disregarded a price quote the U.S.

importer obtained from a U.S. producer for the ADA project. *see* Gov. Br. at 32-33; Hualing Br.

at 6, 28, 35-36, 39, 43. To substantiate the quote was for the same merchandise, the importer "provided a one-to-one comparison of the items from the domestic producer with Hualing." Hualing Br. 35.

Commerce cannot have it both ways, claiming that Hualing did not provide evidence indicating that ADA cabinets are priced differently than standard cabinets, while asserting that the U.S. producer's price quote is inapplicable because Commerce is only concerned with "the typical price of cabinets produced in China and sold on the U.S. market," (*i.e.*, not probative). Gov. Br. at 33 (citing IDM at 13). Assuming *arguendo* the quote is not probative and Hualing therefore did not provide evidence, then Commerce should have issued Hualing a supplemental questionnaire pursuant to § 1677m(d). Section C, *supra.* Here, Commerce requested information in the NSR on pricing of ADA cabinets, which Hualing provided. The information was specific to the same ADA cabinets for the same project. Consequently, Hualing and its U.S. importer lacked any basis to suspect that this quote was not indicative of ADA pricing.

The commercial reasonableness of Hualing's price is confirmed by the totality-of-the-circumstances, CBP data, the U.S. importers selling prices for similar custom cabinets, and a quote for the very same merchandise from U.S. producer. While finding that for the same ADA cabinets not probative because Commerce is only concerned with "the typical price of cabinets produced in China and sold on the U.S. market," IDM at 13, in contrast Commerce considered Hualing's sale of different WCV in the domestic market and other markets was prohibitive—because it fit Commerce's predetermined outcome.

### Whether Hualing's Sale Was In Commercial Quantities

The Government acknowledges that Hualing's single sale of "[     ] sets of kitchen cabinets is **not atypical** when compared to other sale quantities on the record of this review," *i.e.*, other "cabinets produced in China and sold on the U.S. market." Gov. Br. at 34 (emphasis

added) (citations omitted); Hualing Br. at 36; PBFM at 6; IDM at 13. Although this fact should have ended the analysis of this factor, the Government argues that "Commerce . . . considered other circumstances in its totality-of-the-circumstances analysis." Gov. Br. at 33. Yet no such factor addresses whether the sale was made in commercial quantities, and Hualing fully rebutted these "other circumstances." Hualing Br. at 36-38.

### Timing of the Sale

The Government again acknowledges the AR1 facts do not indicate "the timing of the sale by itself does not indicate that a sale **is not** *bona fide*." Gov. Br. at 36 (emphasis added ) (quoting Hualing Br. at 39; IDM at 16). Consequently, substantial evidence does not support Commerce's finding of atypical timing. Once more, this fact should have ended the analysis of this factor. Again, instead of providing evidence that the sale's timing was unusual, the Government claims that Commerce "considered details . . . as part of the totality of the circumstances." *Id.*  Hualing fully rebutted the "details" that Commerce relied upon. *Id.*; Hualing Br. at 39-40.

### Expenses Arising from the Transaction

The Government does not support ADD/CVD cash deposits being included in the expense analysis under § 1675(a)(2)(B)(iv), instead arguing that Commerce considered the totality-of-the-circumstances. Gov. Br. at 37-38. Yet again none of the cited circumstances address whether Hualing's expenses were unusual. In contrast, Hualing emphasized precedent evidencing Commerce's practice to **<u>not</u>** consider ADD/CVD cash deposits in its *bona fide* analysis. Hualing Br. 41. It would not be unusual for a U.S. importer to believe that its Government is reasonable, and that the final margin would be lower than the PRC-wide rate if its exporter fully cooperated with Commerce. *Id.* at 42.

**Goods Were Resold at a Profit**

The Government agrees that the "U.S. importer's sale was profitable if antidumping and countervailing duty cash deposits were excluded" consistent with its practice. Gov. Br. at 39. This should have ended the analysis of this factor, which is not rebutted by the Government's argument that the importer's sale price for the ADA cabinets was on average higher than its other resale prices for other cabinets—*i.e.*, the importer resold the merchandise at profit. Gov. Br. at 39. Similarly, the importer's resale price of the ADA cabinets being its [                    ] cabinet also does not rebut the fact the importer resold the merchandise at profit. *Id*. Rather, this fact evidences ADA cabinets being sold at commercially reasonable prices, as they were lower in price than other sales made by the importer. Moreover, neither fact implies that importer's resale price was commercially unreasonable or unrepresentative of future selling practices. Beyond these conclusory statements, there is no reasoned explanation why these facts are relevant to this factor.

The Government echoes Commerce's finding that "the record lacked any "*substantiating* cost or pricing data" for ADA cabinets, Gov. Br. at 39 (quoting IDM at 20). Yet the importer explained that the ADA cabinets being "custom by nature means that the producer must adjust its machines to account for the different sizes—driving cabinets costs higher." Hualing Br. at 43. The importer provided a price for the same cabinet project, that Commerce disregarded. Commerce cannot simultaneously claim that Hualing did not provide evidence and the U.S. producer's price quote is not probative. If this quote was not probative, then Commerce should have issued a supplemental questionnaire per § 1677m(d). Commerce requested pricing of ADA cabinet pricing information, which Hualing provided. Hualing lacked any basis to suspect that this quote for the same cabinets was not indicative of ADA pricing.

**Whether the Transaction was Made on an Arm's-Length Basis**

Commerce preliminarily found that its concerns to whether the transaction is representative of future commercial practices, did not "weigh{} against finding the sale not an arm's length transaction or non-*bona fide*." Gov. Br. 41 (quoting PBFM at 9). In other words, Commerce acknowledged that the future commercial practices issue is unrelated to this factor. In the *Final Results*, on the same record, Commerce without any support stated: (1) "the negotiations for Hualing's single sale were not based on the independent interests of the parties involved"; and (2) "the sale was 'only made for the purpose of establishing an artificial antidumping deposit rate, without regard for commercial reasonableness.'" *Id.* at 42-43 (quoting IDM at 21). Commerce cites no evidence supporting these conclusory claims, and Hualing fully rebutted "the facts of the record" that Commerce relied on. *Id*. at 43; Hualing Br. at 44-45.

**Other Relevant Factors**

Rather than address Hualing's reliance on "other factors," the Government restates Commerce's conclusory determinations that the sale was not *bona fide* due to price, quantity, timing of sale, expenses, profit, arm's length, and "other . . . factors" (*i.e.*, because it was a single sale and the cabinets were ADA). Gov. Br. 43. At the same time, Commerce admits that the "statutory factors"—quantity, timing, expenses, profit, and arm's length—did not indicate that Hualing's sale was atypical, commercially unreasonable, or weigh in favor of a finding that the sale was not *bona fide*. PBFM at 6. The Government provides no other analysis concerning "other . . . factors" besides restating the statutory factors. Based on Commerce's acknowledgement and Hualing's demonstration, there is no reasonable basis to find this sale unrepresentative of future selling practices.

PUBLIC VERSION

## **CONCLUSION**

For the foregoing reasons, Hualing respectfully requests that this Court remand for

Commerce to reconsider its *Final Results* and assign the separate ADD rate for Hualing.

Respectfully submitted,

*/s/ Michael S. Holton*
Michael S. Holton
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiff*
*Dalian Hualing Wood Co., Ltd.*

Dated: September 21, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiffs' Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 6,995 words, less than the 7,000 word limit.

 */s/ Jordan C. Kahn*_____
*Counsel for Plaintiff*
*Dalian Hualing Wood Co., Ltd.*

Dated: September 21, 2023

45797_1